1

2                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF MISSOURI
3                            WESTERN DIVISION

4  UNITED STATES OF AMERICA,      ) Case No. 11-00109-01-CR-W-DGK
                                  )
5             Plaintiff,          ) Kansas City, Missouri
                                  ) April 13, 2011
6  v.                             )
                                  )
7  COREY M. McKINNEY,             )
                                  )
8             Defendant.          )
   _____)
9
            TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
10           BEFORE THE HONORABLE ROBERT E. LARSEN
                CHIEF UNITED STATES MAGISTRATE JUDGE
11
   APPEARANCES:
12
   For the Plaintiff:          Patrick D. Daly, Esq.
13                             AUSA
                               400 E. Ninth St., Ste. 5510
14                             Kansas City, MO  64106
                               (816) 426-3122
15
   For the Defendant:          Daniel J. Ross, Esq.
16                             600 E. 8th St., Ste. A
                               Kansas City, MO  64106
17                             (816) 931-5000

18 Court Audio Operator:       Ms. Joella Baldwin

19 Transcribed by:             Rapid Transcript
                               Lissa C. Whittaker
20                             1001 West 65th Street
                               Kansas City, MO  64113
21                             (816) 914-3613

22

23

24 Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.
25

1    (Court in Session at 1:32 p.m.)

2    THE COURT:  Be seated everyone.  Good afternoon.

3    MR. DALY:  Good afternoon.

4    MR. ROSS:  Good afternoon, Your Honor.

5    THE COURT:  I'm calling the case of the *United States of*

6  *America vs. Corey M. McKinney*.  The number of the case is 11-44-

7  REL-01.  Let me get the Assistant U.S. Attorney's appearance,

8  please.

9    MR. DALY:  Yes, Your Honor.  Patrick Daly appearing on

10 behalf of the United States with my case agent, Greg Harmon.

11    THE COURT:  Thank you.  And counsel for Mr. McKinney.

12    MR. ROSS:  Dan Ross for defendant.  He's appearing in

13 custody and person.

14    THE COURT:  Thank you.  We're here to do the preliminary

15 examination in the hearing on the question of bond or detention.

16 I have a waiver of the preliminary which has been executed by

17 both Mr. Ross and by his client.  I'll just ask a couple of

18 questions of Mr. McKinney about this.  Sir, have you had an

19 adequate opportunity to review the waiver and talk about it with

20 your counsel here?

21    MR. MCKINNEY:  Yes, sir, I have.

22    THE COURT:  Is there anything about the preliminary

23 hearing that you don't understand?

24    MR. MCKINNEY:  No, sir, I understand it.

25    THE COURT:  Is there anyone that's made any threats or

1 promises to get you to waive your right to the hearing?

2        MR. MCKINNEY: No, sir.

3        THE COURT: Do you want to ask me any questions about it

4 before I accept your waiver?

5        MR. MCKINNEY: Not at this time, sir.

6        THE COURT: I do find this is both knowledgeable and

7 intentional on the part of Mr. McKinney. I do sign the document

8 reflecting my approval of the waiver, and I'm directing the

9 United States to proceed to the grand jury within the next 30

10 days as required by law. The next issue is the question of bond

11 or detention. I'm going to judicially notice the affidavit in

12 support of the criminal complaint here. The detective is present

13 in court. If anybody wants to call him, I'll allow that. I'm

14 also going to judicially notice the fact that this is the type of

15 a violation that Congress has told us that there should be a

16 presumption against release. And so, that's one of several

17 things that I have to consider. Also, I have been provided with

18 a copy of the Pretrial Services Report on Mr. McKinney. I've

19 read that. I assume everyone has seen it. Any corrections by

20 the United States to that report?

21        MR. DALY: None for the United States, Your Honor.

22        THE COURT: Any corrections, Mr. Ross, that you or your

23 client want to bring to my attention?

24        MR. ROSS: Yes, Your Honor. If the Court please, at

25 page -- the last page, which would be page 3, the very last

1 sentence is a paragraph attributing information from the AUSA Pat

2 Daly to Mr. Hair for Pretrial Services, the last sentence, he

3 added, and I'm quoting, he added "The defendant is considered a

4 legal guardian of the 16-year-old." We strongly disagree with

5 that assertion. My independent research has determined he has no

6 legal status and connection with this individual. There is

7 simply a -- he was residing -- or she was, C was residing with my

8 client on the occasion. I'm referring to C.H., who is referenced

9 as a suspect/victim in this case. She is the 16 year old female.

10          THE COURT: Okay.

11          MR. ROSS: But there is not a formal legal guardianship

12 relationship.

13          THE COURT: Okay. I'll accept that proffer from

14 counsel. Mr. Daly, do you have any additional information on

15 that issue?

16          MR. DALY: Well, we can elicit evidence from our

17 detective on --

18          THE COURT: Okay.

19          MR. DALY: -- direct examination.

20          THE COURT: Okay. All right. So, but with regard to

21 the report though, I am going to, at this point, not rely on that

22 information in the report until we hear what the detective has to

23 say. So, I'll grant Mr. Ross's objection to that portion of the

24 report at this time. But other than that, there's no problem

25 with stipulating that our Pretrial Service officer would testify

1  in accordance with the information in the report?

2          MR. ROSS:  So stipulated.

3          THE COURT:  Is that the case with you too?

4          MR. DALY:  Yes, Your Honor.

5          THE COURT:  Right.  Okay.  All right.  Now, so, is there

6  additional evidence by the United States?

7          MR. DALY:  We do, Your Honor.

8          THE COURT:  All right.  If you'd go ahead and call your

9  witness up here.

10         MR. DALY:  The United States calls Detective Greg Harmon

11 to the stand.

12         THE COURT:  Would you raise your right hand, sir?

13             GREG HARMON, GOVERNMENT'S WITNESS, SWORN

14         THE COURT:  Go ahead and take the stand.  When you get

15 up there, it may make a noise to adjust.  It's just adjusting for

16 weight.  That's all.

17         THE WITNESS:  Okay.

18                     DIRECT EXAMINATION

19 BY MR. DALY:

20 Q.  Good afternoon, Detective Harmon.

21 A.  Afternoon.

22 Q.  Can you please state and spell your full name for the benefit

23 of the Court?

24 A.  Yes.  My name is Greg Harmon, G-R-E-G  H-A-R-M-O-N.

25 Q.  And what is your current title and responsibilities?

1  A.  I'm a detective with the Kansas City, Missouri Police

2  Department, assigned to the Vice Section of the Narcotics and

3  Vice Division.

4  Q.  And in that section, what are you responsibilities?  What

5  sort of crimes do you investigate?

6  A.  I mainly investigate crimes involving human trafficking.

7  Q.  Okay.  We just heard some statements as to the issue that the

8  characterization of the victim in this case or -- excuse me --

9  the defendant as being the guardian or the legal guardian for the

10 16-year-old.

11 A.  Yes.

12 Q.  There were some representations, obviously, in the Pretrial

13 Service Report as well as in the -- your investigation.  What did

14 you learn as it relates to whether or not Mr. McKinney is the

15 guardian of the victim in this case?

16 A.  We were told by the minor victim that he was her brother, and

17 we were also told by a school resource officer for the school in

18 which she attends that he's listed on the contact information as

19 a guardian.

20 Q.  Okay.  And that she is residing at his location and goes to a

21 school in that area?

22 A.  Correct.

23 Q.  And that's the residence at -- where's he?

24 A.  Oak Street.

25 Q.  Okay.  Now go -- let's step back for a moment.  How did you

1  first learn of this case?  How did your office first learn of

2  this case?

3  A.  We had a male victim that showed up at one of our patrol

4  stations claiming that money was being extorted from him from the

5  defendant -- or by the defendant.

6  Q.  Okay.  And when you learned that, what did he tell about this

7  attempt to extortion?  What did this extortion scheme entail?

8  A.  He was contacted, our mail victim was contacted, via

9  Facebook, by a female who stated that she was 17 years old.

10 During the course of the Facebook contact, she -- they chatted

11 and then exchanged phone numbers.  Then they text messaged back

12 and forth, and they made arrangements for that evening to -- for

13 the male victim to show up at the female victim's house off Oak

14 Street.

15 Q.  Okay.  And a lot of this information is in your affidavit

16 that you filed in this case, correct?

17 A.  Correct.

18 Q.  So, upon his arrival at Oak Street on -- do you recall what

19 date that was?

20 A.  The text messaging started or the initial contact started the

21 23rd, but he did not arrive until midnight, which would have been

22 the 24th.

23 Q.  Okay.  And when he arrived there, did they have sex?

24 A.  Correct.  They had sex.

25 Q.  Did they make arrangements to meet the next time, the next

1  day?

2  A.   I believe they talked the next day and then made arrangements

3  to meet again.

4  Q.   Okay.  And did he eventually return to the residence?

5  A.   Yes, he did.

6  Q.   What happened then?

7  A.   When he returned to the residence, they were in the course of

8  beginning to have sex.  They were both naked when the defendant

9  entered the room and confronted our male victim.

10 Q.   And what happened at that point?

11 A.   The defendant explained to the male victim that the female

12 victim was, in fact, 16 years of age, and that basically, he

13 wanted money from the male victim so that he would not pursue any

14 kind of criminal charges with this.

15 Q.   And did he have any kind of weapon in his hand or mallet or

16 any?

17 A.   The male victim explained that he had some sort of a mallet

18 in his hand or in his coat pocket.

19 Q.   Okay.  And did the female victim say anything about who this

20 person was and his name?

21 A.   She explained that it was her brother, and the male victim

22 knew the defendant as Monroe.

23 Q.   Okay.  And what's the male defendant's full name?

24 A.   Corey Monroe McKinney.

25 Q.   Okay.  Now, he demanded money.  Did he eventually get money?

1  A.  That night?

2  Q.  Yes.

3  A.  The male victim explained that he only had $160 in his

4  checking account.  So, the arrangement was to walk to a nearby

5  ATM, withdraw a portion, which ended up being $100, and that was

6  going to be the initial payment.

7  Q.  Have you had any chance to look at any surveillance of the

8  ATM where this occurred?

9  A.  We were able to get surveillance video from the ATM, actually

10  surveillance stills from the ATM, and it did show our victim,

11  male victim, getting money out with the defendant kind of around

12  the corner a little bit away from the front of the ATM.

13  Q.  And so, he's not in front of the ATM, but he's off to the

14  side of it?

15  A.  Correct.  This was not the camera that's located on the ATM

16  but rather a camera above that gets a wider angle.

17  Q.  Okay.  And after this initial payment of money, was there a

18  demand for more money?

19  A.  There was an arrangement set for a later date to get

20  additional money, yes.

21  Q.  Okay.  And did the informant advise you that the defendant

22  said anything in relation to what he would do if he wasn't paid?

23  A.  If he didn't pay, he was going to alert the police as to what

24  happened with the sexual encounter.  He was going to send the

25  video.  There was a video taken of the sexual contact.  He was

1  going to send that to the news agency.  And he also explained

2  that later he had sent that with an encrypted code that had not

3  been attached, and he was going to go through our male victim's

4  friends on Facebook and send them the video also.

5  Q.  Did he communicate these things via text message?

6  A.  Yes.

7  Q.  And are you aware of the phone number that he used to

8  communicate those text messages?

9  A.  Yes, I do.  It was the phone number associated with -- on Mr.

10  McKinney's Facebook page.

11  Q.  And how do you know it was Mr. McKinney's phone?

12  A.  We just called it moments ago, and the voicemail says this is

13  Mr. Corey McKinney.

14  Q.  So, after that occurs, you're working, you spoke with the

15  informant.  Was there any sort of arrangement for the payment to

16  be made to Mr. McKinney?

17  A.  Correct.  The male victim was receiving messages, kind of

18  increasing the demand for money.  So, we arranged to set up a

19  controlled delivery, I guess you could call it, to where our

20  informant, male victim, would drop off the money, and then if the

21  defendant were to show up, they would arrest him.

22  Q.  And did that happen?

23  A.  Yes, it did.

24  Q.  All right.  Could you describe what happened and what date

25  that occurred on?

1  A.  It was April the 7th, and the defendant had texted specific

2  instructions to our male victim as to how the money was going to

3  be given to him.  And in the instructions, he explained to put

4  the money into an envelope and then to put that envelope into a

5  manilla envelope, and that envelope was to be dropped off to the

6  security guard at DeVry University.

7  Q.  And was there anything written on the envelope?

8  A.  There was a letter -- the letter D and a series of numbers

9  written on the outside of the envelope.

10 Q.  And is there any significance to that series of numbers?

11 A.  I contacted DeVry, and that is Mr. McKinney's Student ID

12 number.

13 Q.  Okay.  And did your male victim eventually drop that money

14 off at that security desk?

15 A.  Yes, he did.

16 Q.  And were you surveilling this at the time?

17 A.  Yes.  We actually supplied the money with recorded currency

18 that we had and gave it to our male victim.  Prior to him

19 arriving at DeVry, myself and another detective located ourselves

20 directly across from the security office, and we watched the

21 transaction between the male victim with the security officer.

22 Actually, our male victim handed him the package, and the male --

23 or the security officer then handed him another package, and our

24 victim then left.  Shortly thereafter, Mr. McKinney then showed

25 up to the security desk and retrieved the package with the money.

1  Q.  And what happened at that point?

2  A.  He was placed under arrest.  And then shortly, feet away

3  basically, was -- the female victim was located also.

4  Q.  And did you speak to her at that time?

5  A.  We, at that -- Mr. McKinney was transported to police

6  headquarters' jail, and the female victim was transported to the

7  Sex Crimes Unit, so that an interview could be conducted.

8  Q.  And upon your making contact with her, did -- well, did you

9  recover anything from the informant or the security desk?

10 A.  The informant was given a package, and inside the package was

11 a USB flash drive.  He believed he was giving the money to the

12 security guard and were going to receive the video from the

13 sexual encounter with the minor -- that he had with the minor,

14 the minor female victim.  We did retrieve that, yes.

15 Q.  And did you have a chance to look at that USB?

16 A.  Yes, I did.

17 Q.  And what's on the USB?

18 A.  On that one, it was a -- it was the recorded sexual encounter

19 between the male victim and the female minor victim.

20 Q.  Okay.  Was there another USB drive recovered in this?

21 A.  Yes, there was.  When we made contact with the minor female

22 victim, she had in her possession a cell phone that belonged to

23 her and another USB flash drive.

24 Q.  And did you have a chance to look at those items?

25 A.  Correct.  On her version of the flash drive, that was a

1  longer version, which included the setting up of the camera and

2  the taking down of the camera.  The beginning and the end were

3  not on the male victim's version.

4  Q.  Besides that distinction between the version that the

5  informant got and the version that the female victim had, was

6  there anything notable in what you were able to see in the video

7  that the female victim had?

8  A.  Yes, the version she had, it showed a male setting up the

9  video, and at the end of the video, it also showed a male and a

10 brief, a brief flash of the defendant's face.

11 Q.  Okay.  Did you have a chance to look at the phone that she

12 had in her possession?

13 A.  Yes, I did.

14 Q.  And she provided consent to do this?

15 A.  Yes, yes.

16 Q.  Okay.  I'm going to approach you with what we've marked as

17 Government's Exhibit #1.  I've already provided it to the

18 defense.

19         MR. DALY:  May I approach, Your Honor?

20         THE COURT:  Yeah.

21 BY MR. DALY:

22 Q.  And, Detective Harmon, we certainly don't need to go through

23 each picture here.  But can you briefly describe for the Court

24 what these -- this series of pictures contains?

25 A.  These are photos of Mr. McKinney, the defendant, and photos

1  of the female victim.

2  Q.  Okay.  And these were photos taken -- received from her

3  image --

4  A.  This is directly from her phone.

5  Q.  And do you know the approximate dates and times these photos

6  would have been taken?

7  A.  From the time stamp on the phone, whenever we retrieved all

8  this, all the images off, it appeared as if it was March 21st

9  between the hours of 10:27 to 11:52 p.m.

10 Q.  But it's -- the date stamp, is that in Greenwich Mean Time,

11 and it says like March 22nd and --

12 A.  It --

13 Q.  Yeah.

14 A.  It was initially time stamped in Greenwich Meridian.

15 Q.  Right.

16 A.  And then through a conversion, we were able to pinpoint these

17 dates and times.

18 Q.  Okay.  I'm going to show you what we've previously marked as

19 Government's Exhibit #2.  The defense has been provided a copy.

20         MR. DALY:  May I approach, Your Honor?

21         THE COURT:  Yeah.

22         MR. DALY:  Thank you.

23 BY MR. DALY:

24 Q.  And can you describe what we see there in those images, on

25 Government's Exhibit #2?

A.   These are still photos taken of the video with the sexual

encounter between the male victim and the female victim.

Q.   And these photos were recovered from where?

A.   These were recovered from her phone also.

Q.   Okay.  And you say still images.  Is it as if she's holding a

phone to the screen that the video's playing on?

A.   Yes.

Q.   Okay.  And you've had a chance to look at that video

eventually.  Are these images consistent --

A.   These are consistent with the images or the video that were

on the USB flash drives.

Q.   Okay.  Did you also have a chance to look at the phone of the

male victim in this case?

A.   Yes.

         MR. DALY:  Your Honor, at this time I'd like to approach

the Government witness with Government's Exhibit #3, which has

also been previously provided to the defendant.

         THE COURT:  Okay.

BY MR. DALY:

Q.   And could you describe for the Court what you see there in

Government's Exhibit #3?

A.   These are the same photos of the video that were on her phone

also.  They were received in a text message form.

Q.   And as you look at that, if you look at the picture in the

top right corner as we're looking at it, what is the phone number

1  it says it's received from?

2  A.  816-423-1027.

3  Q.  And how is that number significant?

4  A.  It's the number belonging to Mr. McKinney.

5  Q.  And is there a message at the bottom of that picture in the

6  top right corner?

7  A.  It says "Someone sent this to me to remind you of staying on

8  track."

9  Q.  In addition to text messages, prior to the male victim's

10  contacting your office, you made some reference that the

11  defendant was going to send these or threaten to have sent them

12  to somebody in the media.  Did he threaten to send them to any

13  other people associated with the male victim in this case?

14  A.  He made reference to sending it to individuals that are

15  friends with our victim that have -- or have friends status on

16  Facebook, including his wife.

17  Q.  And is it your understanding, do you know if the defendant

18  ever did post anything about the male victim in this case on

19  Facebook?

20  A.  The defendant did make a post on his own Facebook account

21  asking for information regarding our male victim, giving specific

22  name of our male victim, the address of our male victim, the

23  victim's wife's name and his place of employment.

24  Q.  And have you had a chance to look at his Facebook page since

25  that time?

1  A.  Yes.

2  Q.  Is that post still on his page?

3  A.  It is not.

4  Q.  Okay.

5       MR. DALY:  At this time, the Government has no further

6  questions for this witness, Your Honor.

7       THE COURT:  Are you offering #1, #2 and #3?

8       MR. DALY:  Yes, Your Honor.  We offer those --

9       THE COURT:  Any objection to #1, #2 and #3?

10      MR. ROSS:  No.

11      THE COURT:  For purposes of these proceedings, they're

12 in.  I am going to keep them under seal though, to protect the

13 interests of the juvenile in this case.  Any cross-examination?

14      MR. ROSS:  Briefly, Your Honor.

15      THE COURT:  Go ahead.

16                    CROSS-EXAMINATION

17 BY MR. ROSS:

18 Q.  Good afternoon, detective.

19 A.  How do you do, sir?

20 Q.  I want to ask you first about the guardian status.  Your

21 testimony is that you believe my -- or testified that my client

22 was the female's legal guardian.  Is that correct?

23 A.  Uh-huh.

24 Q.  Is that yes?

25 A.  Yes, sir.

1  Q.  And that was based on you being told at Center School that

2  there was a document listing him as guardian?

3  A.  He's listed --

4  Q.  Did you see the document?

5  A.  No, I did not, sir.

6  Q.  Is it a document that exists?

7  A.  I'm not sure if it's a paper document, an electronic document

8  or how that's kept, sir.

9  Q.  Do you know who provided the information?  Well, let me make

10 this a leading question.  You do not know how the information got

11 in to the Center School District document, do you?

12 A.  No, sir.

13 Q.  If it were provided by the female, the minor perhaps?

14 A.  Yeah, I couldn't testify as to how the document --

15 Q.  Or if they made it up, if they guessed, possibly?

16 A.  Possibly, yes.

17 Q.  Do you know that there is a legal status of guardianship in

18 the state of Missouri?  Do you know this?

19          MR. DALY:  Objection, foundation.

20          MR. ROSS:  He testified to it, Your Honor.

21          THE COURT:  I'm going to let you ask the question.  Go

22 ahead.  It's overruled.  Go ahead.

23          THE WITNESS:  Can you repeat the question?  I'm sorry.

24 BY MR. ROSS:

25 Q.  Yes.  Guardianship is a legal status bestowed by a court,

1  usually a probate court, correct?  Or do you know this?

2  A.  I do not know, sir, no.

3  Q.  So, you don't even know what guardianship is.  Is that fair

4  to say?

5  A.  I do know what a guardian is, but I don't know what the state

6  law is, if that's --

7  Q.  Did you make any effort to look on Casenet, to call the

8  probate division, to call DFS to see --

9  A.  I did.

10 Q.  And, in fact, you found out there was no record of him being

11 the quote, "legal guardian" pursuant to a legal court of

12 jurisdiction, correct?

13 A.  I don't know what you're asking, but I'll tell you what I did

14 find from Family Services.  They did state that the mother of the

15 female had signed power of attorney over to Mr. McKinney.

16 Q.  Had signed power of attorney for purposes of attending Center

17 School District, correct?

18 A.  I don't know what her intentions for signing power of

19 attorney were.

20 Q.  Did you attempt to get a copy of the power of attorney when

21 you were --

22 A.  No.

23 Q.  -- when you were talking to the Center School District

24 individuals?

25 A.  No, I did not.

1  Q.  When you contacted someone who said there was a power of

2  attorney signed by the real parent, allowing defendant some

3  involvement, did you ask for a copy of that document?

4  A.  No, we haven't had a chance to follow up with that, and we

5  haven't had a chance -- we haven't been able to get in contact

6  with the mother.  Every phone number we've got either comes back

7  to Mr. McKinney or may or may not be working.  We cannot get in

8  touch with the mother to get further clarification on the status.

9  Q.  Your confidential informant is Mr. Russell.  Is that right?

10 A.  Correct.

11 Q.  Have you viewed the entirety of the flash drive content with

12 respect to Mr. Russell's images on that flash drive, at least the

13 one that was recovered from the female?

14 A.  Are you asking me if I've sat through the whole hour and 30

15 minutes and watched it?

16 Q.  Yes.

17 A.  No.

18 Q.  Why not?

19 A.  Honestly, sir, because it's child porn, and I don't feel the

20 need to sit through the whole child porn.  I've reviewed pieces

21 and kind of sped up and tried to do my due diligence with the

22 images that were shown at the time and I have not sat and watched

23 the whole hour and some odd minutes of the whole interaction.

24 Q.  Based on your review of the flash drive, based on your --

25 well, have you yourself had direct contact with Mr. Russell?

1 A.  Yes.

2 Q.  Do you believe that Mr. Russell believed the minor female

3 that he was having sexual intercourse with on at least one

4 occasion and intended to have on another occasion, do you believe

5 that always suspected that she was a minor?

6         MR. DALY:  Objection, foundation, speculation -- calls

7 for speculation and relevance.

8         THE COURT:  Do you know?  Has he ever said anything to

9 you about that?

10         THE WITNESS:  He's never said anything to me about it.

11         THE COURT:  Okay.  Sustained.

12 BY MR. DALY:

13 Q.  On the flash drive, was there a depiction of him stating I'm

14 waiting for the "To Catch a Predator" camera crew to come in?

15 A.  Yes, there was a question about that, yes, but he never

16 stated that to me.  And I thought that was your question.  I'm

17 sorry.

18 Q.  Oh, I'm sorry.  So, you do have information that was stated

19 in some other form where he seemed to recognize this was a minor?

20 A.  Yeah, it was rather a strange setup, for lack of better

21 words.  I mean, to be contacted out of the blue on Facebook and

22 then that night be invited over to have sex -- or to meet with

23 someone and possibly have sexual intercourse.  It does sound like

24 a setup to me.

25 Q.  And, of course, he went for the setup bait and met this girl,

1  who he expected the "To Catch a Predator" cameras, as he

2  announced on the flash drive, to come through the door at any

3  time.  He accepted that bait.  In fact, had sex with her that

4  night within hours.

5  A.  Yes, he did.

6  Q.  Was a deal struck with Mr. Russell?

7         MR. DALY:  Objection, relevance.

8         THE COURT:  Overruled.

9  BY MR. ROSS:

10  Q.  Was a deal --

11  A.  Which kind of deal, sir?

12  Q.  -- struck.  Was an agreement to defer prosecution of Mr.

13  Russell for having knowing sex, sexual intercourse or contact

14  with a minor, to your knowledge?

15  A.  No deal was struck because that was never brought up.  We

16  never perceived him as a suspect because we didn't believe that

17  he knowingly had sex with a minor.

18  Q.  Had you concluded that he knowingly had sex with a minor,

19  would you have considered him a suspect?

20         MR. DALY:  Objection, calls for speculation.

21         THE COURT:  Sustained.

22  BY MR. ROSS:

23  Q.  Did he appear with an attorney at any time, Mr. Russell?

24  A.  No.

25  Q.  Your testimony is, also with respect to a mallet, I believe

it was referenced as a rubber mallet in your paperwork.  I

believe you testified it was just a mallet.  It was a rubber

mallet.  Is that right?

A.  That's what he explained it was, is a rubber mallet, yes,

sir.

Q.  And then I understand from your testimony that it was either

in his hand or in his, the suspect's pocket, one or the other?

A.  Correct.  Correct.  We were told by the minor victim that it

was in a pocket.  We were told by Mr. Russell that it was in his

hand.

Q.  A search warrant was served on the defendant's residence?

A.  No.

Q.  Was it searched?  Was there a computer seized?

A.  Yes, there was.

Q.  How was the computer seized?

A.  We were advised by the Child Abuse Hotline that the minor

victim was able to go back to her residence.  So, we transported

her back there.  Prior to going there, she signed a consent to

search the computer, which we did not search.  But in the process

of taking her back to her residence, in the process of the

officers taking her back there, they were able to observe a

computer, which was consistent with the statement that she gave

us to where the video was filmed from.  So, it was seized.

Q.  Was there plain view to a rubber mallet that was seized?

A.  I don't believe a rubber mallet was observed in plain view.

1  So, no, a rubber mallet was not seized.

2  Q.  Now, you have testified under oath that in connection, at

3  least with the flash drive retrieved from the minor in this, the

4  female, that there was, at the beginning prior to the recording

5  of the sex acts, there was a male --

6  A.  Correct.

7  Q.  -- that was -- how do you know, what did you see in terms of

8  setting up the camera by a male?  How did you conclude it was a

9  male?

10  A.  You could see just the clothing that was worn.  You could see

11  hands.  It was a man's hand.  You couldn't see any facial

12  features at that point in time.  Basically, mid-chest to above

13  the knee maybe.

14  Q.  Okay.  And then there's a span of, as you put it, child porn

15  through the end of that flash drive.  And at the end, there's a

16  take down of the camera, correct?

17  A.  Correct.

18  Q.  And you don't watch everything in between because it's child

19  porn, correct?

20  A.  Correct. I did not watch everything.

21  Q.  And then, but and it's a take down, and presumably again,

22  it's a man based on his clothing and his hands, correct?

23  A.  No, you see his face.

24  Q.  Oh, you do?  And you saw my client's face --

25  A.  Correct.

1  Q.  -- and that's your testimony under oath?

2  A.  Yes, sir.

3  Q.  And it's in connection with the take down of the camera?

4  A.  Correct.  It was a continuous running one event from

5  beginning to end.

6  Q.  Now, I believe in the Government's Exhibits #2 and #3, you

7  have still photos from the flash drive that have been brought to

8  court to help establish the Government's claims today?

9  A.  Were those entered?  I'm sorry.  What your --

10  Q.  They are entered, yes.

11          THE COURT:  You're talking about the pictures, right?

12          MR. ROSS:  Yes.

13          THE COURT:  He's talking about Exhibits #1, #2, and #3.

14          THE WITNESS:  No, sir, these are from our child victim's

15  phone.

16  BY MR. ROSS:

17  Q.  Let me ask you this.  Could you have made still photos from

18  the flash drive, including the photo of my client's face, that

19  you claim appears on the flash drive?

20  A.  One more time, sir.  I apologize.  I didn't understand what

21  you were asking.

22  Q.  Could you have made a still photo?

23  A.  Could I have?

24  Q.  Someone at your direction?

25  A.  Yes, we very well could have.

1 Q. It wasn't done?

2 A. We may have. I'm not for sure.

3 Q. You brought what you thought was necessary. And I guess, I

4 just want to make crystal clear on the record, you have

5 personally observed this picture of my client on the flash drive

6 associated with the take down or at least in the sequence --

7 A. Yes, sir.

8 Q. -- prior to the take down? Is it fair to say, just based on

9 hands and clothing, you could not identify my client as being the

10 male who put together or put up and took down the webcam?

11 A. Correct. I couldn't identify anybody on that.

12 MR. ROSS: One moment, please. That is all, Your Honor.

13 Thank you.

14 THE COURT: Any additional examination?

15 MR. DALY: No, Your Honor.

16 THE COURT: You may step down. Any additional evidence

17 by the United States?

18 MR. DALY: No further evidence, Your Honor.

19 THE COURT: Any evidence the defense wants to present?

20 MR. ROSS: No.

21 THE COURT: Okay. I'm ready to rule this. I'm going to

22 make the finding that the defendant should be detained without

23 bond based on the dangerousness prong of the statute. I'll get

24 out a written order to that effect. And, Mr. McKinney, you can

25 see it, and if you want to, you can appeal me. You have a right

to appeal me here within our court and ask another judge to look
at it.  And if don't get relief here, you can go up to the Eighth
Circuit Court of Appeals and ask for relief from those judges.  I
think that's everything that we can cover today.  Anything else
on behalf of the United States?

                  MR. DALY:  No, Your Honor.

                  THE COURT:  Mr. Ross, anything else?

                  MR. ROSS:  No, Your Honor.  Thank you.

                  THE COURT:  Thank you.

                  THE COURT:  Thank you.

                        (Court Adjourned at 2:02 p.m.)

## INDEX

| WITNESSES FOR THE PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Greg Harmon | 5 | 17 | | |

| EXHIBITS: | MARKED | ADMITTED |
|---|---|---|
| G#1 | 13 | 17 |
| G#2 | 14 | 17 |
| G#3 | 15 | 17 |

1

2

3

4

5

6

7    I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
above-entitled matter.

8

9

10    /s/ Lissa C. Whittaker              August 26, 2011
Signature of transcriber                    Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25