1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF MISSOURI
2                         WESTERN DIVISION


3

     UNITED STATES OF AMERICA,     ) Case No. 4:11-CR-00109-DGK-1
4                                  )
             Plaintiff,            )
5                                  )
     VS.                           )
6                                  )
     COREY MONROE MCKINNEY,        )
7                                  )   January 15, 2013
             Defendant.            )   Kansas City, Missouri
8

9            *****************************************
                           VOLUME I
10    TRANSCRIPT OF JURY TRIAL COMMENCING WITH DEFENDANT'S OPENING
                           STATEMENT
11                      BEFORE GREG KAYS
                   UNITED STATES DISTRICT JUDGE
12           *****************************************

13   APPEARANCES:
     For United States:       Patrick Daly
14                            Brian P. Casey
                              U.S. Attorney's Office
15                            400 E. 9th Street, Suite 5510
                              Kansas City, Missouri  64106
16
     For Defendant:           K. Louis Caskey
17   [Defendant present.]     14 Dockside Drive
                              Lake Tapawingo, Missouri  64015
18                               and
                              Stephanie Burton
19                            Law Office of Stephanie Burton, LLC
                              4743 Troost Avenue
20                            Kansas City, Missouri  64110

21
                        Regina A. McBride, RDR, CRR
22                        Official Court Reporter
                        400 East 9th Street, Room 8652
23                        Kansas City, MO  64106
                              816.512.5623
24

     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

1                     I N D E X

2   Opening statement by Ms. Burton - Page 3
    Reporter Certificate - Page 131
3
    WITNESSES:
4
    ANDY JAMAAL RUSSELL
5        Direct Examination by Mr. Casey - Page 6
    COURTNEY PAIGE HILL
6        Direct Examination by Mr. Daly - Page 84

7

    EXHIBITS ADMITTED:
8
    Government Exhibit 59 - Printout of FB messages between child
9     victim and John Doe - Page 11
    Government Exhibit 9 - Surname of John Doe.wmv file - Page 26
10  Government Exhibit 67 - Overhead US Bank ATM video - Page 41
    Government Exhibit 68 - US Bank ATM video Image 1 - Page 41
11  Government Exhibit 69 - US Bank ATM video Image 2 - Page 41
    Government Exhibit 70 - US Bank ATM video Image 3 - Page 41
12  Government Exhibit 71 - US Bank ATM video Image 4 - Page 41
    Government Exhibit 61 - Summary of text messages between
13    defendant and John Doe - Page 48
    Government Exhibit 152 - Message to teresa.bmp - Page 65
14  Government Exhibit 62 - Child victim birth certificate - P 94
    Government Exhibits 77-95 - Photos of defendant's
15    apartment - Page 97
    Government Exhibit 5 - 3 the hard way.wmv file - Page 109
16  Government Exhibit 175 - Screen capture from 3 the hard
      way.wmv - Page 112
17  Government Exhibit 7 - 3 way.mpg file - Page 113
    Government Exhibit 176 - Screen capture from 3 the hard
18    way.wmv - Page 115
    Government Exhibits 26-48 - Photos of activity taken in
19    defendant's apartment - Page 118

20

21

22

23

24

25

1          (Opening statement of Ms. Burton commenced at 2:13

2     p.m.)

3          MS. BURTON:  May it please the Court?

4          THE COURT:  Yes, ma'am.

5          MS. BURTON:  Good afternoon, ladies and gentlemen.

6    My name is Stephanie Burton.  I'm one of the attorneys, along

7    with Mr. Louis Caskey, for the defendant, Corey McKinney.  I

8    want to thank you for your time and for your service here

9    today.

10          A trial in this essence is a reenactment of the

11   alleged crime of which the defendant is accused and the

12   investigation that followed.  Keep in mind, that although the

13   counts are charged collectively, the events are covered over

14   three different time lines.  Counts 1 and 2 are alleged to

15   have occurred in or around September of 2010.  Counts 3, 4, 5

16   and 7 are alleged to have occurred in or around March of 2011.

17   And Count 6 is alleged to have occurred between April and

18   August of 2011.

19          Today you are making the most important decision in

20   Mr. McKinney's life.  We're not picking a tie.  We're not

21   deciding on dessert.  We're not deciding what to wear.  It is

22   as important as deciding to undergo a major surgery, which has

23   a 50 percent mortality rate.

24          Mr. McKinney sits at that table an innocent man.

25   That's the presumption of innocence, where in this country

1    being charged with a crime is not evidence and not enough to

2    send a person away for the rest of their life.

3           The burden of proof in this case is always on the

4    government.  The United States Constitution requires that.

5           Do not take your eye off the ball, no matter how it

6    bounces.  Critically evaluate the evidence.  Hold the

7    government to their burden of proving Mr. McKinney guilty

8    beyond all reasonable doubt.  And if the government fails to

9    do so, then it is your role and your duty under the United

10   States Constitution to find Mr. McKinney not guilty.

11          If after you consider the testimony you feel that

12   you need a little bit more before you can believe that

13   Mr. McKinney has done what the government has accused him of,

14   then the law requires that you render a not guilty verdict.

15          THE COURT:  All right.  Will the attorneys please

16   come forward?

17       (Bench conference on the record outside the hearing of

18       the jury.)

19          THE COURT:  So far you haven't gave any opening

20   statement.  The opening statement should be what you believe

21   the evidence will be.  You can't talk about the Constitution

22   or anything like that.  You have to tell me what you believe

23   the evidence will be.  I was going to give you a little leeway

24   but --

25          MS. BURTON:  I was --

```
 1              THE COURT:  So if you'll move what you believe what
 2       the evidence will show, that --
 3              MR. CASKEY:  I think she's finished.
 4              MS. BURTON:  I was just about done.
 5              THE COURT:  Oh, I'm sorry.  Okay.  But you
 6       understand what I'm saying?
 7              MS. BURTON:  I understand what you're saying.
 8              THE COURT:  Okay.  Thank you.
 9              MR. CASKEY:  Thank you.
10          (End of bench conference.)
11              MS. BURTON:  And I was just at the close.  But
12       please keep an open mind.  Don't be put off by the charges.
13       And after you hear all of the evidence, we are asking that you
14       return a verdict of not guilty on all counts.  Thank you.
15              THE COURT:  Thank you, Ms. Burton.
16              All right.  Will the government please call their
17       first witness?
18              MR. CASEY:  Your Honor, the United States calls A.J.
19       Russell.
20              THE COURT:  All right.  Sir, would you please face
21       our clerk and raise your right hand?  This lady right here.
22          ANDY JAMAAL RUSSELL, GOVERNMENT WITNESS, SWORN
23              THE COURT:  Sir, please have a seat.  Sorry about
24       that.  I went on a little walk over there.  Good afternoon.
25              THE WITNESS:  Good afternoon.
```

1        THE COURT:  Would you please begin, sir, by speaking

2    your full name and spelling your last name for us?

3        THE WITNESS:  Andy Jamaal, R-U-S-S-E-L-L.

4        THE COURT:  Thank you, Mr. Russell.

5        Mr. Casey, sir.

6                    DIRECT EXAMINATION

7    BY MR. CASEY:

8    Q.  Mr. Russell, what is your current occupation?

9    A.  I'm a code enforcement officer for the City of Kansas

10   City.

11   Q.  How long have you been a code enforcement officer for the

12   City of Kansas City?

13   A.  For five years.

14   Q.  And that's the City of Kansas City, Missouri; correct?

15   A.  Yes.

16   Q.  Is that position sometimes referred to as a housing

17   inspector?

18   A.  Yes.

19   Q.  Very generally, what are your duties as a code enforcement

20   officer?

21   A.  I have a caseload that I'm responsible for as far as

22   housing code violations.  I conduct field inspections, send

23   the appropriate letters to the owner or occupant, and if

24   compliance isn't done then there's a summons issued for -- for

25   housing quarters.

1   Q.  Okay.  And Mr. Russell, can I ask you just to move to the

2   microphone, to you a little closer.  You speak very, very

3   quietly.  I'd like to now draw your attention to March and

4   April of 2011.  What shift did you work in your position as

5   code enforcement officer at that time?

6   A.  7:30 to 4:00.

7   Q.  And how old were you in March and April of 2011?

8   A.  Thirty-one.

9   Q.  Were you married at the time?

10  A.  Yes.

11  Q.  Are you still married?

12  A.  Yes.

13  Q.  Did you have any children?

14  A.  Yes.

15  Q.  How many?

16  A.  Two boys.

17  Q.  I'd like to draw your attention specifically to the

18  morning of March 23rd, 2011.  What were you doing that

19  morning?

20  A.  I was working at the time.

21  Q.  At some point that morning did you receive what's called a

22  friend request from someone on Facebook?

23  A.  Yes.

24  Q.  Could you briefly explain what Facebook is?

25  A.  Sure.  Facebook is a social website where you have a -- a

1    certain amount of friends.  You're able to make comments,

2    they're able to post.  They're able to make comments on the of

3    posts that you make.  You're able to, you know, pretty much

4    reach out to whoever is your friend.  You're able to look at

5    their photos, pictures, things like that.

6    Q.  And could you briefly explain what a friend request is?

7    A.  Sure.  Just by a simple search, if you put in someone's

8    first or last name, that's a search engine that -- that

9    populates a certain number of names.  And to be someone's

10   friend on Facebook, they have to accept your friend request.

11   It's simply an accept or deny.

12   Q.  And if they accept it they become your friend?

13   A.  Yes.

14   Q.  And does becoming someone's friend on Facebook make it

15   easier to communicate with them?

16   A.  Yes.

17   Q.  And that's over something that you can -- Facebook is

18   something that's on the Internet; is that correct?

19   A.  Yes.

20   Q.  And you can actually -- could you access that with a

21   computer?

22   A.  Yes.  And also a mobile device.

23   Q.  And also a mobile device.  On that morning of March 23rd,

24   2011, who was the friend request from?

25   A.  It was from a Courtney Notakiddanymore Hill.

1    Q.   And was that middle name was that Notakiddanymore all one

2    word?

3    A.   Yes.

4    Q.   And prior to that morning did you know anyone named

5    Courtney Hill?

6    A.   No.

7    Q.   What did you do in response to the friend request from

8    Courtney Notakiddanymore Hill?

9    A.   I accepted the friend request.

10   Q.   Did Courtney Hill respond?

11   A.   I actually sent the first -- I sent the initial message.

12   It was a private -- private message that I sent.

13   Q.   And could you explain what a private message on Facebook

14   is?

15   A.   Sure.  It's pretty much like a -- a chat, a chat type of

16   ordeal in an email form to where not everyone is able to see

17   the conversation.  It's more or less a private conversation.

18   Q.   Okay.  And what was your first message about?

19   A.   My first message was just me trying to figure out how she

20   knew me.

21   Q.   And was -- did Ms. Hill have what's called a profile on

22   Facebook?

23   A.   Yes.

24   Q.   What is that?

25   A.   A profile is basically a picture.  Typically it shows the

1   person whose page it is.

2   Q.  And did Ms. Hill's profile come with a picture?

3   A.  Yes.

4   Q.  Could you please describe?

5   A.  Sure.  She had on a purple, looked like an athletic bra

6   type of ordeal, and then some white Spandex biking shorts.

7   Q.  And generally -- well, after you sent the first message

8   did a conversation start between you and Ms. Hill that day?

9   A.  Yes.

10   Q.  Generally what was that conversation about?

11   A.  Just developing a rapport, you know, me asking what her --

12   you know, what her hobbies are, what she does for fun, you

13   know, things like that.

14   Q.  Were some of the parts of the message, could you describe

15   it as flirting?

16   A.  Yes.

17   Q.  Was there a written record of that conversation?

18   A.  Yes.

19   Q.  How did you get that record?

20   A.  Printed them off.

21   Q.  So ultimately at some point you printed off the -- all

22   the rec -- all the messages you had with Courtney Hill on

23   March 23rd?

24   A.  Yes.

25   Q.  Okay.

1          MR. CASEY:  I'd now like to show the witness what's

2    been marked for identification as Government's Exhibit 59.

3    Q.  Mr. Russell, do you recognize Government's Exhibit 59?

4    A.  Yes.

5    Q.  What is it?

6    A.  It's a printout of a Facebook message is that of me and

7    Courtney.

8    Q.  Is Government's Exhibit 59 a multipage document?

9    A.  Yes.

10   Q.  And prior to court have you -- have you looked at it?

11   A.  Yes.

12   Q.  And is it a true and accurate copy of the Facebook

13   messages you exchanged with Courtney Notakiddanymore Hill on

14   March 23rd?

15   A.  Yes.

16          MR. CASEY:  Your Honor, I offer Government's Exhibit

17   59 into evidence.

18          THE COURT:  Any objection to 59?

19          MR. CASKEY:  No objection, Your Honor.

20          MS. BURTON:  No objection.

21          THE COURT:  59 is admitted.

22      (Government Exhibit 59 admitted in evidence.)

23          MR. CASEY:  Can we just blow up the top message

24   there?

25   Q.  Mr. Russell, is the first message from you?

1   A.  Yes.

2   Q.  And so if you see the -- the picture, that indicates who

3   the message is from?

4   A.  Yes.

5   Q.  What did you say?

6   A.  Good mornin Ms. Courtney.  I'm trying to figure out how I

7   know you.

8   Q.  How did she respond?

9   A.  Good morning Mr. Russell, we don't know each other but I'm

10  trying to expand to more of a -- to a more group of people,

11  and by your message you seem polite and mannerable.  Thanks

12  for the add.

13  Q.  Does she add something?

14  A.  Yes.  I forgot the word positive in my explanation.

15  Q.  And your next message is at 11:22 a.m.  What were you

16  doing at that point?

17  A.  I was still at work at the time.

18  Q.  Okay.  And so you're communicating on your cellular phone?

19  A.  Yes.

20  Q.  What did you say?

21  A.  Yeah I try to be mannerable at all times...and to let you

22  know, I'm a straight up clown on here though.

23  Q.  How did she respond?

24  A.  LOL.  That's cool.  LOL basically means just an

25  abbreviation for laughing out loud.

1   Q.  Indicating that she found it funny?

2   A.  Yes.

3   Q.  And on the next page, what do you say?

4   A.  You live here in KC?

5   Q.  And how did she respond?

6   A.  Yes I do.  Do you?

7   Q.  How do you respond?

8   A.  Yes, ma'am, I'm reppin that 816.

9   Q.  How does she respond?

10  A.  LOL.  How old are you?

11  Q.  Your response is?

12  A.  31...how bout you?

13  Q.  Was 31 your true age at that time?

14  A.  Yes.

15  Q.  What's her response to that?

16  A.  I am 17.

17  Q.  At this point did the middle name Notakiddanymore mean

18  anything to you at this point?

19  A.  There was no real significance.  I -- you know, there are

20  different profile names that people call me -- people come up

21  with, so just thought it was -- just a name she created.

22  Q.  But did it matter that she said she was 17?

23  A.  Yes.

24  Q.  Why?

25  A.  Because 17 is of legal age.

1   Q.  So she was old enough for you as an adult to have sex with

2   her?

3   A.  Yes.

4   Q.  Legally in Missouri?

5   A.  Yes.

6   Q.  Okay.  Let's flip to page 3.  What's your response?

7   A.  Damn...I'm old..LMAO.

8   Q.  And what is LMAO?

9   A.  LMAO is an abbreviation for laughing my ass off.

10  Q.  Also indicating that something's funny?

11  A.  Yes.

12  Q.  How did she respond?

13  A.  LOL no you're not, 60 is old, you seem cool about it.  I

14  am.

15  Q.  I'm just going to move to -- do you see, you exchange a

16  number of other messages here?

17  A.  Yes.

18  Q.  And I'm going to move to the next page, page 4.  And

19  starting kind of in the middle of the page, do you see a

20  message where you say, I'm glad you are funny, I love to

21  laugh...do you run track?

22  A.  Yes.

23  Q.  And how does she respond to that?

24  A.  Well, if you choose to keep me as a friend then you will

25  be laughing and yes I run track but now -- but no athletic or

1  in touch with your body?

2  Q.  How do you respond?

3  A.  Yep...you def have -- def have a track body...no running

4  this season?  Why not..I'm athletic...I'm in shape, always

5  room for improvement though.

6  Q.  How does she respond?

7  A.  Me too.  And I'm not running this season because 1 I've --

8  I've busy with homework and 2 I'm getting a mouth

9  procedure...in the process of getting braces.  LOL.

10  Q.  What's your response to that?

11  A.  LOL, mouth procedure...so you're a junior in high school?

12  Q.  How did she respond?

13  A.  LOL a tooth extraction silly and yes I'm a junior in high

14  school.

15  Q.  Is being a junior in high school consistent with being 17

16  years old?

17  A.  Yes.

18  Q.  Did you question her age when she said she was a junior in

19  high school?

20  A.  No.

21  Q.  And that last message is at 5:06 p.m.  Where were you at

22  at that time?

23  A.  I was actually at home at the time.

24  Q.  Okay.  And at 5:08 what's your response?

25  A.  Where you attend?

1   Q.  How does she respond?

2   A.  Center senior high.  I don't particularly like it but I'm

3   dealing with it.

4   Q.  And are the next number of messages a couple messages

5   about Center High School?

6   A.  Yes.

7   Q.  Going to the next page, page 6, is there a message in the

8   middle of the page where she's asked if you smoke or drink?

9   A.  Yes.

10  Q.  How do you respond?

11  A.  Only smoke on occasion.  I love drinkin that clear though!

12  You?

13  Q.  How does she respond?

14  A.  Naw, I don't smoke nor drink, I have before but not like

15  that.

16  Q.  How do you respond?  Going over to the next page.

17  A.  Very good very good...say no to drugs, LOL...do you work?

18  Q.  What's her response?

19  A.  No but I've been looking and its difficult.  Would you

20  like to meet?

21  Q.  And you respond?

22  A.  Yeah it is pretty tough out here.  Yeah that's cool we can

23  meet.  Is this some type of -- it's cutting off there.  Is

24  this some type of -- some kind of dateline NBC setup?

25  Q.  Why do you ask that question?

1   A.   I'm just -- I've never been advanced by -- you know, by a

2   woman before as far as, you know, initially, getting to know

3   someone.  And that, you know, her asking me do I want to

4   meet -- do we want to meet?

5   Q.   It just was very fast for your experience; is that right?

6   A.   Yes.

7   Q.   What is your reference -- what do you mean by Dateline NBC

8   setup?

9   A.   Dateline NBC, there is a show, comes on every week or it

10  did come on every week.  And this -- you know, basically, you

11  know, a series of episodes where there's computer chatting,

12  and there's a -- it's a man that's an adult, and the

13  recipient, the person they're chatting with is claiming to be

14  a minor, someone that's underage.  They ask to -- you know,

15  they ask to meet up at a particular place whether it's a mall

16  or whether it's their home.  And then once the -- once the

17  adult gets there, the host and the cameraman just, you know,

18  basically come out.  You know, what's going on?  You knew this

19  was a minor.  So that's -- that's what the...

20  Q.   And are those episodes of Dateline NBC sometimes called To

21  Catch a Predator?

22  A.   Yes.

23  Q.   And on To Catch a Predator what are the claimed ages of

24  the girls, typically?

25  A.   They'll be 13 or 14.

1    Q.  But not 17?

2    A.  No.

3              THE COURT:  Excuse me.  Where is that sound coming

4    from?

5              MR. DALY:  It might be a chair.

6              A JUROR:  It's my chair.  Yeah.  Sorry.

7              THE COURT:  Oh, I'm sorry.  We need to oil our

8    chairs.  I was just curious.  Thank you.

9              Sorry about that, Mr. Casey.  Please proceed.

10             MR. CASEY:  No problem, Your Honor.

11   Q.  In response to your question about Dateline NBC, what does

12   Ms. Hill say?  And I think you've been given a hard copy if

13   it's easier to follow along.  Page 7.

14   A.  LOL no silly.  You just seem like a cool person to talk

15   to, I mean we're just friends, but if you don't feel

16   comfortable meeting then I understand.

17   Q.  How do you respond?

18   A.  Naw, that's cool, just makin sure you feel comfortable.

19   Q.  How does she respond?

20   A.  Yeah, I'm comfortable with almost anything.  Do you have

21   an idea where you want to meet?

22   Q.  How do you respond?

23   A.  Wherever you're comfortable.

24   Q.  How does she respond?

25   A.  Aw okay cool.  Wednesdays and Sundays are my free days.

1   You would come to meet me alone right?

2   Q.  Your response?

3   A.  Umm yeah who would I bring?  Where would we meet?

4   Q.  Her response?

5   A.  LOL just making sure, and it depends if you care if we're

6   in public or private.

7   Q.  Your response?

8   A.  Okay...where would a public spot and where would be a

9   private spot?

10  Q.  Her response.

11  A.  Public spot, Starbucks and Private spot, my apartment.

12  Q.  Your response.  And start on the next page.

13  A.  You live by yourself?  When will you be 18?

14  Q.  What does she say?

15  A.  No, I live with my big brother but he's never here so it's

16  like always empty over here and May 18th -- and my 18th

17  birthday May 21.

18  Q.  What do you ask her?

19  A.  Where do you live?

20  Q.  What does she say?

21  A.  112th and Oak, I could pick you up if you want, I have a

22  valid driver's license LOL.

23  Q.  Are you familiar with that address, 112th and Oak?

24  A.  Yes.  The vicinity.

25  Q.  What -- what is there?

1  A.  Coach House Apartments.

2  Q.  And how are you familiar with Coach House Apartments?

3  A.  At one time I was a house inspector for South Kansas City.

4  I've conducted inspections there before.

5  Q.  Okay.  So your response is?

6  A.  Coach house...valid huh?  LOL.

7  Q.  Her response is?

8  A.  Yes, sir, how'd you know?  And yes, valid LOL because

9  since I got it -- since I got it everyone's been telling me

10  how late I am in getting it.

11  Q.  And that's referring to her driver's license?

12  A.  Yes.

13  Q.  Skip to the top of the next page.  What is the message

14  from Ms. Hill at the top of the next page?

15  A.  LMAO oh wow and that's cool.  So when do you want to meet?

16  Q.  And what's your response?

17  A.  I'm actually bowling tonight with my partners, or else I

18  would say tonight.  You said Wednesdays and Sundays only

19  right?

20  Q.  Her response?

21  A.  Yeah, but tomorrow my bro is going to hook up with his

22  friend so I'll be here alone after school for a couple of

23  hours.

24  Q.  Your response?

25  A.  What time is that?

1    Q.  And drawing your attention to the time on these messages,

2    8:39.  What were you doing at 8:39?

3    A.  I was still at home.

4    Q.  Okay.  Her response?

5    A.  What time is that?

6    Q.  And she said in response to your question?

7    A.  4 'til 7.

8    Q.  You said?

9    A.  I can swing through for a little bit...be round there bout

10   4:15...I get off at 4...cool?

11   Q.  And at this point does she ask you for your phone number

12   on the next page?

13   A.  Yes.

14   Q.  And after a couple of attempts do you give it to her?

15   A.  Yes.

16   Q.  And that's after nine o'clock.  Where were you at that

17   point?

18   A.  I was actually getting ready to head to the bowling alley.

19   Q.  Okay.  So you do go out to the bowling alley with friends

20   that night?

21   A.  Yes.

22   Q.  And at this point does your conversation switch from

23   Facebook to text messaging?

24   A.  Yes.

25   Q.  What is text messaging?

1   A. Text messaging is basically mobile to mobile conversation

2   without -- without it being verbal. You just input -- input

3   words, send to the recipient's phone number, and then they're

4   able to read just what you're trying to, you know, get across.

5   Q. So you send it directly to the person's phone number?

6   A. Yes.

7   Q. And how did you get Ms. Hill's phone number?

8   A. She -- after I gave her my phone number she actually

9   texted me on her number, then that's when I was able to --

10   that's when I was able to see the number that she texted me

11   from.

12   Q. And did you reply to that number?

13   A. Yes.

14   Q. And what was the nature of those text messages you

15   exchanged that night?

16   A. It was getting -- it was getting pretty flirty. At that

17   point we were -- we were at the -- at the point where we were

18   going to meet up.

19   Q. And did you save those messages on your phone?

20   A. Yes.

21   Q. At this point the messages with Ms. Hill on the March

22   23rd, did you save those?

23   A. I believe I did.

24   Q. Okay.

25   A. There were a number of text messages that I did delete,

1    though.

2    Q.  There were messages you did -- did delete.  Could these

3    have been among the ones you deleted?

4    A.  Yes.

5    Q.  Okay.  But through the text messages, did you agree to see

6    Ms. Hill that night?

7    A.  Yes.

8    Q.  And where was that going to be at?

9    A.  It was at her apartment.

10   Q.  And why were you going to her apartment that night?

11   A.  It was under -- it was under -- or to the point where we

12   were going to engage in sex.

13   Q.  Okay.  And so very generally, where is the Coach House

14   Apartment complex located?

15   A.  Right off of -- right off of Red Bridge and Holmes.

16   Q.  And is that sort of south -- southern part of Kansas City?

17   A.  Yes.

18   Q.  Okay.  At some point, did you, in fact, go to Ms. Hill's

19   apartment?

20   A.  Yes.

21   Q.  What time was that?

22   A.  I actually ended up at her apartment, it was around 12:02.

23   Technically March the 24th.

24   Q.  So the early morning?

25   A.  That morning.

1   Q.  Early morning of March the 24th?

2   A.  Yes.

3   Q.  What happens when you get there?

4   A.  I -- when I get out of the car, she's meeting -- she met

5   me at the front door, because there's a security entrance.  So

6   she just -- you know, she lets me in.

7   Q.  And did you go with her up to the apartment?

8   A.  Yes.

9   Q.  Could you briefly describe the interior of that apartment?

10  A.  Sure.  As soon as you enter the -- the apartment, to your

11  immediate left is the kitchen.  If you looked straight ahead

12  there's a living room.  You have to go through the living room

13  to get to the bedroom, and then in the bedroom there's a -- a

14  full bathroom.

15  Q.  And where did Ms. Hill take you when she entered the

16  apartment?

17  A.  She took me to the bedroom.

18  Q.  How was she dressed?

19  A.  She had on a robe and some slippers, house slippers.

20  Q.  What happened after you entered the bedroom?

21  A.  After I entered the bedroom we were just asking a series

22  of questions, still just developing a rapport.

23  Q.  Was there anything playing on the computer?

24  A.  Yes.  When I -- when I first entered the bedroom there was

25  a -- there was a pornographic movie that was playing.

1    Q.  And where did you sit in the bedroom?

2    A.  I sat on the bed.

3    Q.  Okay.  And were you facing the computer?

4    A.  There -- the side of me was for the most part.

5    Q.  What did you guys talk about?

6    A.  Talked about the number of, you know, tattoos that I have,

7    the number of, you know, different piercings that I have.  You

8    know, I told her I was able -- and I had the ability to sing.

9    Just, you know, just still breaking the ice.

10   Q.  And where was the computer located in the room?

11   A.  The computer was on the -- the immediate wall.

12   Q.  Was it at the foot of the bed?

13   A.  Yes.

14   Q.  Facing towards the bed?

15   A.  Yes.

16   Q.  Did you notice a camera attached to the computer?

17   A.  No, I didn't.

18   Q.  And did you notice that the camera was recording?

19   A.  No.

20   Q.  Okay.  At some point did Ms. Hill remove her robe?

21   A.  Yes.

22   Q.  What happened next?

23   A.  We engaged in sex.

24   Q.  Did that sexual contact include genital to genital

25   contact?

1    A.  Yes.

2    Q.  Did it include oral to genital contact?

3    A.  Yes.

4    Q.  At the time were you aware of any recording taking place?

5    A.  No.

6    Q.  Have you since become aware of that?

7    A.  Yes.

8    Q.  Have you been shown a recording of your sexual activity

9    with Ms. Hill on the early morning of March 24th?

10   A.  Yes.

11   Q.  And does the video that you were shown, did it truly and

12   accurately record the conversations and activity that took

13   place that night?

14   A.  Yes.

15           MR. CASEY:  Your Honor, I'd like to offer into

16   evidence what's been marked as Government's Exhibit 9.  That's

17   the video that we're referring to at this point.

18           THE COURT:  Any objection to Exhibit 9?

19           MR. CASKEY:  No objection.

20           THE COURT:  Nine is admitted.

21      (Government Exhibit 9 admitted in evidence.)

22           MR. CASEY:  Can we move to the -- about the 8 minute

23   and 20 second mark and play for about 30 seconds?

24           We're having difficulty.  We can just start it at

25   the seven minute mark and let it play.

1          (Government Exhibit 9 played from 6:53:15 to 7:30.)

2               MR. CASEY:  Is it possible to stop it?

3     Q.  Mr. Russell, who are the voices we're hearing?

4     A.  That's me and Courtney.

5               MR. CASEY:  Okay.  May we play some more?

6          (Government Exhibit 9 played.)

7               MR. CASEY:  Pause it.

8     Q.  Mr. Russell, is that you talking about your tattoos?

9     A.  Yes.

10    Q.  And does the conversation continue for a while?

11    A.  Yes.

12    Q.  Does part of that conversation include the number of

13    piercings you have?

14    A.  Yes.

15    Q.  And they're from -- in some sensitive -- or talk about

16    piercing in sensitive places; is that correct?

17    A.  Yes.

18              MR. CASEY:  Okay.  If we could skip to around the 12

19    minute, 45 second mark.

20         (Government Exhibit 9 played commencing at 12:35.)

21    Q.  And you're referring to piercings there?

22    A.  Yes.

23              MR. CASEY:  Could you pause for a second?

24    Q.  Mr. Russell, what's in front of the camera there?

25              THE COURT:  I'm sorry.  I didn't hear that question.

1    Q.  I'm sorry.  What is in front of the camera there?

2    A.  A beer that I was drinking.

3    Q.  Okay.  And then you -- you had placed it there?

4    A.  Yes.

5    Q.  Did you place it -- but you didn't know there was a camera

6    recording?

7    A.  No.

8    Q.  Just a coincidence?

9    A.  Yes.

10           MR. CASEY:  Okay.  Can we play some more, please?

11       (Government Exhibit 9 played from 13:10 until 16:57.)

12    Q.  Mr. Russell, that part of the conversation did you bring

13    up Dateline NBC again?

14    A.  Yes.

15    Q.  And did you ask Ms. Hill about what year she was in high

16    school?

17    A.  Yes.

18    Q.  And during that are you still thinking about how old she

19    is?

20    A.  No.  I mean, I -- you know, she told me she was 17.  I

21    believed her.  It was just, you know, I was just nervous

22    because I just met her, and, you know, we were, you know, over

23    at the -- you know, over at her house, so...

24    Q.  So you were kind of joking, is that what -- what was the

25    purpose?

1   A.  Yeah.  You know, it was just the -- you know, bad timing

2   for, you know, for a sense of humor.

3               THE REPORTER:  I'm sorry.  For a what?

4               THE WITNESS:  A sense of humor.

5               MR. CASEY:  Could we press play again?

6           (Government Exhibit 9 played until 19:09.)

7               MR. CASEY:  Now can we pause?

8   Q.  At that point did Ms. Hill take off her robe?

9   A.  Yes.

10  Q.  Is that when the sexual activity began?

11  A.  Yes.

12  Q.  I'd like to just show some very short clips.  Could we

13  play at about the 25-minute mark, just maybe five seconds?

14          (Government Exhibit 9 played and stopped 25:05.)

15              MR. CASEY:  Pause, please.

16  Q.  And what does that depict?

17  A.  I was performing a sexual act on her.

18  Q.  And that's oral sex?

19  A.  Yes.

20              MR. CASEY:  And can we please go about to about the

21  56-minute mark?

22          (Government Exhibit 9 played.)

23              MR. CASEY:  And please pause.

24  Q.  And what does that depict?

25  A.  We're having sex.

1    Q.  Genital to genital sex?

2    A.  Yes.

3              MR. CASEY:  I think we can stop the video.  Yeah,

4    take it off.

5    Q.  Is there -- does that video also record after the sexual

6    activity?

7    A.  Yes.

8    Q.  And does it show you, you know, leaving the bedroom at the

9    end of your evening?

10   A.  Yes.

11   Q.  And in general, is the video, the length of the video

12   consistent with how long the sexual activity lasted?

13   A.  Yes.

14   Q.  Roughly how long was that?

15   A.  About an hour or so.

16   Q.  When did you leave Ms. Hill's apartment?

17   A.  It was around -- I'd say it was around two -- two o'clock.

18   Q.  Did you discuss anything with her while you were leaving?

19   A.  We were just -- just pretty much I mentioned something

20   about, you know, my bowling and -- and then, you know, when

21   was the next time I was going to come over.

22   Q.  And at any point during your stay in the apartment, were

23   you aware of anyone in that apartment besides you and

24   Ms. Hill?

25   A.  No.

1   Q.  The next morning did you continue to send and receive text

2   messages with Ms. Hill?

3   A.  Yes.

4   Q.  Generally what was the content of those messages?

5   A.  It was basically how much I enjoyed the sex last night,

6   and just follow-up of -- of when I was going to, you know, be

7   able to come back over there.

8   Q.  Did you agree to go back to the apartment at some point?

9   A.  Yes.

10  Q.  When was that?

11  A.  Friday, the 25th.

12  Q.  What happened when you went back to the apartment?

13  A.  When I got there, me and Courtney, we're going to the --

14  into the bedroom, and we're getting ready to perform, you

15  know, sex, sexual activity, and that's when the defendant

16  comes to the -- comes to the bedroom door.

17  Q.  Were you dressed at the time?

18  A.  No, I wasn't.

19  Q.  You were completely undressed?

20  A.  Yes.

21  Q.  What did you do as soon as he entered the room?

22  A.  I started apologizing, you know, for -- for being in his

23  house, and, you know, I hurried up and put my clothes back on

24  in a hurry.

25  Q.  Did you get all your clothes back on?

1   A. No. I think I left -- I think a left a sock.

2   Q. So you were really hurrying at that point?

3   A. Yeah. Yes.

4   Q. Who did the defendant say he was?

5   A. He said his name was Monroe.

6   Q. What did Monroe do at that point?

7   A. At that point, as I'm trying to leave the apartment, and

8   I'm still apologizing, he's not letting me get past him. You

9   know, I'm actually trying to, you know, get out of the -- the

10   apartment door, and he actually barricades himself in front of

11   the door. He has a mallet, and he starts banging it against

12   the refrigerator.

13   Q. Do you see the person that called himself Monroe in the

14   courtroom today?

15   A. Yes.

16   Q. Could you please identify him by an article of clothing

17   and where he is sitting?

18   A. It's the gentleman in the dark suit, burgundy tie, wearing

19   glasses.

20         MR. CASEY: Your Honor, may the record reflect the

21   identification of the defendant, Corey McKinney?

22         THE COURT: The record will so reflect.

23   Q. Now, while he's standing in front of the door banging the

24   mallet against the fridge -- well, let me back up one

25   question. Could you please describe the mallet?

1   A.  It was a -- it was a rubber mallet.  As far as what a

2   mallet is?

3   Q.  Well, just roughly how large?

4   A.  It was probably about seven or eight inches long,

5   something like that.

6   Q.  Okay.  And that's sort of similar to a hammer?

7   A.  Yes.

8   Q.  What did he say?  What did the defendant say at this

9   point?

10   A.  At this point he told me to stop, just stop moving,

11   because I was pacing back and forth.

12   Q.  What was his tone?

13   A.  It was -- it was authoritative.

14   Q.  Was he shouting?

15   A.  There were instances where he was shouting.  But typically

16   it was -- you know, it was a monotone.  It was a monotone

17   voice.

18   Q.  And did you feel threatened?

19   A.  Yes.

20   Q.  Were you able to leave the apartment without a physical

21   confrontation?

22   A.  No.

23   Q.  Why not?

24   A.  You know, the times that I attempted to leave the

25   apartment, we didn't get too physical.  But, you know, at that

1   point I felt if I would have tried to maneuver around him, you

2   know, there definitely would have been some type of brawl.

3   Q.  And what did -- what would he tell you at this point?

4   A.  What he was telling me was, you know, basically do I --

5   does he realize -- or do I realize how much trouble that I can

6   get into?

7   Q.  And why would you get into trouble?

8   A.  Because he said his sister was 16 years old.

9   Q.  Rather than what?

10  A.  Seventeen.

11  Q.  And why would that get you into trouble?

12  A.  Because 16 is considered a minor.

13  Q.  Okay.  And what type of trouble would you get into?

14  A.  Most likely statutory -- statutory rape, I believe.

15  Q.  Did he mention the number of years in prison you might go

16  to?

17  A.  He mentioned something around, at least, I believe he said

18  at least 10 years.

19  Q.  And did he mention anything about, you know, what would

20  happen to your family?

21  A.  He did -- he did mention something, you know, about my

22  family, about me not being able to take care of them, you

23  know, if I'm -- if I'm behind bars.

24  Q.  Did the defendant ask you if you had had sex with his

25  sister?

1   A.  Yes.

2   Q.  What did you say?

3   A.  I said no.

4   Q.  And what did the defendant do after you said no?

5   A.  Courtney went into the bedroom, and she played the -- the

6   audio of what I knew was me and her having sex.

7   Q.  So by the audio you could recognize that it was you two

8   nights before?

9   A.  Yes.

10  Q.  Did you actually see the video at that point?

11  A.  No.

12  Q.  Why not?

13  A.  I was just -- you know, I had my head down, and I didn't

14  want to go in there to see it.

15  Q.  Okay.  And did the defendant actually direct her to go

16  play it for you?

17  A.  Yes.

18  Q.  Okay.  Did the defendant tell you that he knew you were

19  married?

20  A.  Yes.

21  Q.  What did you say?

22  A.  Actually I denied it at first, until he told me that my

23  wife's name was Reagan, and I had two -- I had two children.

24  Q.  Did -- besides playing the audio for you did the defendant

25  show you anything else?

1    A.  Yes.

2    Q.  What?

3    A.  I was -- I was sitting on -- sitting on a bar stool, I

4    believe.  Monroe was in front of me.  Courtney was behind me,

5    and she had a roll of -- of paper, a roll of papers, and --

6    and documents that were in a rubber band, then she -- she

7    tossed them to him.

8    Q.  What were those papers?

9    A.  They were our dialogue, our conversation.  We were doing

10   the Facebook messages, and then also there was a manuscript of

11   the text messages that -- that were back and forth.

12   Q.  Of a handwritten copy of your text messages with Ms. Hill?

13   A.  Yes.

14   Q.  Did the defendant ask you any questions about what you

15   were going to do about the situation?

16   A.  Yes.

17   Q.  What did he -- what did you say?

18   A.  At this point I was -- I was silent.  I was shaking my

19   head.  You know, just basically, I don't know.  I don't know

20   what to do.

21   Q.  And just to be clear, what is the situation?

22   A.  The situation was sleeping with his -- sleeping with his

23   sister.

24   Q.  And he had a recording of it?

25   A.  Yes.

1   Q.   Okay.  And it was clear to you that he had a recording of

2   it?

3   A.   Yes.

4   Q.   What did he ask you for?

5   A.   He asked me for money.

6   Q.   Did he ask you how much that video would be worth to you?

7   A.   Yes.

8   Q.   And did he ask you how you're going to remedy the

9   situation?

10  A.   Yes.

11  Q.   So what -- what did you understand he was referring to?

12  A.   What I understood is basically it was going to be hush

13  money.  You know, if I would have paid him whatever agreed

14  amount, then he would have kept the -- kept the video, and

15  things like that just private.

16  Q.   Did you -- did you respond to him, though?

17  A.   At -- at first I -- I kept saying, "I don't know," and

18  then Courtney, she says, "You need to speak up."

19  Q.   Okay.  And ultimately did the defendant demand money for

20  the video?

21  A.   Yes.

22  Q.   How much?

23  A.   $400 initially.

24  Q.   Was it possible it was 500?

25  A.   I believe it was 500.  500 later.

1    Q.  Okay.

2    A.  Through the text messages.

3    Q.  Okay.  And what did you say when he asked you for -- what

4    he asked you for that night?

5    A.  I told him -- I told him all I had was roughly around 160

6    in my account, in my checking account.

7    Q.  What did he say?

8    A.  At this point he told me to make a payment of $100, and

9    then at a later date, assigned date is when I paid the

10   remainder.

11   Q.  And was the remainder to be 400?

12   A.  Yes.

13   Q.  For a total of 500?

14   A.  For a total -- I'm sorry.  It was a total of 500.

15   Q.  Okay.  And was that -- when was that remainder to be paid?

16   A.  It was to be paid on March the 31st.

17   Q.  What did you agree to do to get the $100?

18   A.  I knew that there was an ATM that was -- that was close.

19   So I knew I had to go there to pull out the money.

20   Q.  About how far was it?

21   A.  Roughly no more than two blocks.

22   Q.  And what bank was that with?

23   A.  It was at U.S. Bank.

24   Q.  Did you have an account with that bank?

25   A.  No.

1  Q.  Did you have your wallet with you to go get the money?

2  A.  No.

3  Q.  Why not?

4  A.  My wallet was in the car.

5  Q.  So what happened next?

6  A.  At that point I was -- I gave my keys to Courtney, and

7  Courtney went down to my car to retrieve my wallet.

8  Q.  Did the defendant demand anything else from you besides

9  your keys?

10  A.  He demanded my -- my phone.

11  Q.  What happened when Courtney or Ms. Hill returns to the

12  apartment?

13  A.  When she returned to the apartment she gave me my wallet,

14  and then I gave her -- that's when I gave her my keys and my

15  cell phone.  And before we -- me and the defendant left the

16  apartment, she went to a -- another location.

17  Q.  Did the defendant get a phone call at some point?

18  A.  Yes.

19  Q.  And could you please explain what happens?

20  A.  From what I believe, it -- it -- it seems as if she was --

21  Courtney was at the place where she needed to be.  And then

22  that was the go ahead for -- for us to walk to the ATM.

23  Q.  And did the defendant tell you why he had Courtney leave

24  the apartment?

25  A.  Yes.

1    Q.  Why?

2    A.  He told me it was just in case I had any funny ideas, you

3    know, if I tried to get into an altercation with him, you

4    know, I wouldn't be able to leave.

5    Q.  What else did he tell you on your walk to the bank?

6    A.  When I walked to the bank he told me that he was in the

7    armed forces, the Navy, I -- the Navy, I believe, for several

8    years.  He has an extensive record of doing research about --

9    about people, finding out about people.  And, you know, that

10   he's showing Courtney how to do the same thing.

11   Q.  Research into people's background?

12   A.  Yes.

13   Q.  After the defendant's arrest in this case, were you shown

14   a bank surveillance video?

15   A.  Yes.

16   Q.  What did that video show?

17   A.  It showed me pulling out -- pulling money out of the ATM,

18   and then the defendant was to the side of the ATM.

19   Q.  Did it truly and accurately depict your $100 withdrawal

20   from U.S. Bank on the night of March of 25th, 2011?

21   A.  Yes.

22         MR. CASEY:  Your Honor, that video has been marked

23   for identification as Government's Exhibit 67.  I now offer

24   that into evidence.

25         MR. CASKEY:  No objection.

1          THE COURT:  Exhibit 67 is admitted.

2      (Government Exhibit 67 admitted in evidence.)

3   Q.  And were you also shown, before testifying today, a number

4   of still photographs that were made from that video?

5   A.  Yes.

6   Q.  And were those Government's Exhibits 68 to 71?

7   A.  Yes.

8   Q.  And do those exhibits truly and accurately reflect their

9   subject matter?

10  A.  Yes.

11          MR. CASEY:  Your Honor, I offer Government's

12  Exhibits 68 to 71.

13          MR. CASKEY:  No objection.

14          THE COURT:  68 through 71 are admitted.

15      (Government Exhibits 68-71 admitted in evidence.)

16          MR. CASEY:  Can we play Government's Exhibit 67?

17      (Government Exhibit 67 played.)

18          MR. CASEY:  There.  Can we pause, please?

19  Q.  Mr. Russell, who do we see in this video?

20  A.  I'm sorry?

21  Q.  Who do we see in this video?

22  A.  Oh, myself and the defendant.

23  Q.  And where are you standing?

24  A.  I'm standing in front of the ATM.

25  Q.  Where is the defendant standing?

1   A.  He's standing to the side of it, the ATM.

2   Q.  And did you have an impression while you were there why he

3   was standing to the side of the ATM?

4   A.  Yes.  I believe it was to not be in the surveillance view.

5           MR. CASEY:  Can we continue to play?

6       (Government Exhibit 67 played until the end.)

7           THE COURT:  Mr. Casey, we're about ready for a

8   break.  Is this now an appropriate time?

9           MR. CASEY:  It would be fine with me, Your Honor.

10          THE COURT:  All right.  Ladies and gentlemen, we're

11  going to take a 15-minute recess.  During this recess or any

12  other recess you must not discuss this case with anyone,

13  including the other jurors, members of -- of your family,

14  people involved in the trial, or anyone else.  If anyone tries

15  to talk to you about the case, please let me know about it

16  immediately.  And finally, keep an open mind until all the

17  evidence has been received and you've heard the views of your

18  fellow jurors.

19          We'll take 15 minutes.

20      (Jury left the courtroom.)

21      (Recess at 3:14 until 3:31 p.m.)

22          THE COURT:  And to the juror of the squeaky chair,

23  feel free to move.  I just wanted to know where that was

24  coming from.  And I understand, you're going to have to move

25  every once in a while.  So please don't worry about us.  Okay?

1    But thank you for helping identify that issue.

2            All right.  Mr. Casey, sir, please proceed.

3    Q.  Mr. Russell, before the break we were talking about taking

4    money out of a ATM on March 25th, 2011.  Do you recall that

5    conversation?

6    A.  I'm sorry?

7    Q.  Do you recall that conversation?

8    A.  Yes.  Yes.

9    Q.  I'd like to just quickly show you four photographs that

10   have been marked as Government's Exhibit 68, 69 and 70 and 71.

11   If you can begin with Government's 68.  What does that photo

12   show?

13   A.  Me with doing the withdrawal at the ATM, and defendant is

14   on the side.

15   Q.  And 69, what does that show?

16   A.  It shows the same.  It shows the same thing.

17   Q.  And 70?

18   A.  Still making the withdrawal.  The defendant is on the side

19   of the ATM.

20   Q.  And 71?

21   A.  Still the same thing.

22   Q.  After you withdrew the $100 from the ATM, what happened

23   next?

24   A.  We began -- I actually put the money in my wallet, the

25   $100 in my wallet.  I didn't give it to him immediately.

1   Q.  Why not?

2   A.  Just at that point, I wasn't sure, you know, if I would

3   have given him the hundred dollars at that time if there would

4   have been some type of, you know, altercation.  So I just -- I

5   wanted to hold onto it until we were at least almost at the

6   apartment building.

7   Q.  While you were walking back, what did the defendant tell

8   you?

9   A.  He -- he told me that he is the -- the defendant said that

10  he was the guardian of Courtney.  He has been for the past two

11  to three years.  Her parents don't do shit for her, and he's

12  been looking out for her.

13  Q.  And did he say anything that made you think that he might

14  not be her real brother?

15  A.  Yeah.  When he -- when he mentioned something about her

16  parents, you know, he didn't say our parents.  So that was --

17  I was under the presumption that that wasn't her real brother.

18  Q.  As you were walking back did the defendant receive a phone

19  call?

20  A.  Yes.

21  Q.  What did he say after that phone call?

22  A.  He said my whole name, my wife's name, and then our -- our

23  current home address.

24  Q.  Was it your impression that the person on the other end of

25  the phone call was giving him that information?

1   A.  Yes.

2   Q.  What happened when you returned to the -- well, let me

3   back up.  On some point walking back did you give the

4   defendant $100?

5   A.  Yes.

6   Q.  And what happened when you returned to the defendant's

7   apartment?

8   A.  Well, when we returned he got on his phone.  It appears as

9   if he called Courtney, and she came back from -- she came back

10  down to the apartment, from wherever she was, and from there

11  she handed me my keys and -- and my cell phone.

12  Q.  Did he give you a time or date to pay the rest of the

13  $500?

14  A.  Yes.

15  Q.  When were you supposed to pay by?

16  A.  By March the 31st.

17  Q.  And was that going to be a Thursday?

18  A.  Yes.

19  Q.  Was there a time when you were supposed to pay by?

20  A.  It was 4 -- 4:45 in the evening, I believe.

21  Q.  Were you financially able to pay $400 by March the 31st?

22  A.  Due to the -- to the bills and things like that that I

23  had, I wasn't.

24  Q.  Before you left did the defendant tell you to send a text

25  message to anyone?

1   A.   Yes.  He said once I re -- you know, collect the remainder

2   of the money to text Courtney to let her know that I have the

3   money and then there would be some type of location where we

4   could meet.

5   Q.   What did you say?

6   A.   I -- I definitely -- I denied -- or not denied, but I was

7   against texting her anymore, and I asked if I could text him

8   for a location and time to meet.

9   Q.   What did -- how did he respond?

10  A.   At first he -- you know, he said absolutely not.  I'm not

11  going to give you my -- my cell phone number.  I don't know

12  what type of tricks you have up your sleeve.

13  Q.   But then what did he say?

14  A.   Then he said he'll -- he'll just reach out and I'll be

15  contacted at the appropriate time and place.

16  Q.   After March 25th did you hear from the defendant again?

17  A.   Yes.

18  Q.   When?

19  A.   On March the 28th.

20  Q.   How?

21  A.   Text message.

22  Q.   How did you know the text message came from the defendant?

23  A.   Just from the -- from the strong -- the strong reference

24  as to the acts that me and his sister performed, I knew that

25  the -- from the content that it was the defendant.

1  Q. And after that first text message, did you exchange a

2  number of text messages with the defendant?

3  A. Yes.

4  Q. Was a summary of those text messages prepared?

5  A. Yes.

6  Q. Is it your understanding that the summary was prepared

7  from text messages that were recovered from police both from

8  your cellular phone and the defendant's phone?

9  A. Yes.

10  Q. With regard to the content of the messages does the

11  summary accurately record the content of the text messages

12  between you and the defendant?

13  A. Yes.

14  Q. Do you remember sending and receiving the messages on the

15  summary?

16  A. Yes.

17  Q. With regard to the dates and times on the messages, are

18  those dates and times consistent with your recollection of

19  when the messages were sent and received?

20  A. Yes.

21  Q. I would now like to show you Government's Exhibit 61. Do

22  you recognize Government's Exhibit 61?

23  A. Yes.

24  Q. What is it?

25  A. Just the summary of text messages between me and the

1    defendant.

2             MR. CASEY:  Your Honor, I would like to offer

3    Government's Exhibit 61 into evidence.

4             THE COURT:  Any objection to 61?

5             MR. CASKEY:  No, Your Honor.

6             THE COURT:  Thank you.  61 is admitted.

7        (Government Exhibit 61 admitted in evidence.)

8    Q.  If you would like a hard copy to follow along on here.

9    Could you read at the top, state what government -- what

10   Exhibit 61 says?

11   A.  Summary of text messages between A.J. Russell 816-645-2566

12   and Corey McKinney 816-423-1027.

13   Q.  And is that your cellular telephone number at the top?

14   A.  Yes.

15   Q.  And the number listed for McKinney, is that the number

16   that you were receiving messages from, from Mr. McKinney?

17   A.  Yes.

18   Q.  Okay.  On this summary, are the times listed in GMT?

19   A.  Yes.

20   Q.  And is your understanding that that stands for Greenwich

21   Mean Time?

22   A.  Yes.

23   Q.  And is it your understanding that that's roughly five or

24   six hours ahead of Kansas City?

25   A.  Yes.

1   Q.   Depending on the time of year?

2   A.   Yes.

3   Q.   And is that something that's because of how the messages

4   were recovered from your phone?

5   A.   Yes.

6   Q.   Okay.  So this isn't central time, so the time isn't --

7   isn't -- we'd have to -- we'd have to kind of do some math in

8   our head to come up with what it was in Kansas City?

9   A.   Correct.

10  Q.   Okay.  But the dates largely reflect the date that these

11  messages occurred?

12  A.   Yes.

13  Q.   Okay.  So starting with the first message, it's long, but

14  could you please just read it?

15  A.   Good afternoon Mister Russell I have watched the video and

16  have to say that I'm disgusted with your actions.  I had to

17  make sure you wore a condom to make sure my sister doesn't

18  need an STD exam.  Because I am so disgusted have made a

19  digital copy of the movie and sent it to a friend of mine that

20  works at KSHB Channel 9 his name is Justin Robinson.  He is a

21  reporter he is on Facebook you can look him up.  Thursday when

22  you arrive I would like 500 dollars instead of 400.  A.J. I

23  don't wanted you to be my enemy but I'm so disgusted with --

24  excuse me -- I'm so disgusted by you that my anger cannot be

25  contained.  Be here Thursday with the 500 dollars and get the

1    hell outa my life.  I would hate for this video to get to the

2    news.  Honestly I believe Reagan need to see this video I also

3    believe that Tanice Smith need to see this video along with

4    other members of the Davis family other members of the Cooper

5    family need to see this awesome video of your actions.

6    Mister Russell don't disappoint me on Thursday.  It would not

7    be very good for you to do so.

8    Q.  So did the price go up?

9    A.  Yes.

10   Q.  And that last sentence, "It would not be very good for you

11   to do so," what did you understand that to mean?

12   A.  No.  I believe if I wouldn't have paid him the remainder

13   of the money, then, you know, those things that he mentioned

14   would have -- you know, would have taken place.

15   Q.  And would that have damaged your reputation?

16   A.  Yes.

17   Q.  Were you worried about your job security?

18   A.  Yes.

19   Q.  Were you worried about your family?

20   A.  Yes.

21   Q.  Were you worried about going to jail?

22   A.  Yes.

23   Q.  The first message the minute is 17:55, and the next

24   message is 17:59.  Does that indicate that this just came a

25   few minutes later?

1   A.   Yes.

2   Q.   And could you please read that second message?

3   A.   The DVD that I sent to Channel 9 is password protected for

4   your benefit Mister Russell.  If you do not show up on

5   Thursday I will email the password to the reporter so that he

6   can view the video it would be up to them what they do with

7   the video after that and I put a nice little narration in

8   front of the video so that they will know exactly what's going

9   on.  I also attached to the video your Facebook page your

10  wife's Facebook page yo wife linked in account and access to

11  her email address.  Again everything is waiting for my go on

12  Thursday if you're not here at 445 like we agreed at 5 o'clock

13  you'll be very famous.  I hope that you will not disappoint me

14  on Thursday.

15  Q.   Is this text also a threat?

16  A.   Yes.

17  Q.   And what video did you understand he was referring to?

18  A.   The video of me and Courtney having sex.

19  Q.   And that's you having sex with an underage girl?

20  A.   Yes.

21  Q.   Okay.  And does that follow-up with a couple of short

22  messages after that?

23  A.   Yes.

24  Q.   And then at some point do you respond?

25  A.   Yes, I do.

1    Q.  And what do you say?

2    A.  See you at 4:45 sir.

3    Q.  And that's 4:45 on March 31st?

4    A.  Yes.

5    Q.  And this is March 28th?

6    A.  Yes.

7    Q.  Okay.  How does he respond to that?

8    A.  I'm thankful for your cooperation.  After Thursday you'll

9    never see or hear from me again -- see or hear from me or of

10   me again.  Any traces of any videos or recording of you will

11   be destroyed.

12   Q.  Did you believe the video would be destroyed?

13   A.  No.

14   Q.  And so how do you respond?

15   A.  I appreciate you giving me time...I will for sure be there

16   Thursday at 4:45, 500 cash.

17   Q.  So on March 28th, after this flurry of text messages, what

18   did you do?

19   A.  After those series of text messages I go to the police

20   station that evening.

21   Q.  Do you recall who you talked to?

22   A.  Yes.  I spoke to a Officer Burke.

23   Q.  And what did Officer Burke tell you to do?

24   A.  After I gave him the -- you know, the situation that took

25   place, he told me to -- that he said that someone will be in

1    contact with me as far as the next step, where to go with this

2    case.

3    Q.  And some time that week did a detective contact you?

4    A.  Yes.

5    Q.  And do you recall who that detective was?

6    A.  I do not recall.

7    Q.  But do you recall what he told you to do?

8    A.  Yes.

9    Q.  What was that?

10   A.  He told me to stall with the defendant, you know, just to

11   see if I could have until over the weekend to set up a payment

12   for -- for Monday.

13   Q.  So not to pay the money on Thursday?

14   A.  I'm sorry?

15   Q.  He told you not to pay the money on Thursday?

16   A.  Yes.

17   Q.  Did he also tell you to wait for further assistance?

18   A.  Yes.

19   Q.  And ultimately did other detectives contact you?

20   A.  Yes.

21   Q.  Okay.  I'd like to go to the next page, and this is March

22   31st.  Is that the day you're supposed to pay the $500?

23   A.  Yes.

24   Q.  What do you say?

25   A.  Afternoon sir, is there any way I can pay you the $500

1    dollars on Monday, April the 4th?  My mortgage is due and I

2    had Firestone unexpectedly withdraw from my checking account.

3    This weekend will give enough time to ask my parents or

4    grandparents for some money...I will much appreciate this.

5    Q.  Now, was that done at direction of the KCPD?

6    A.  Yes.

7    Q.  How did he respond?

8    A.  Mr. Russell that is absolutely not acceptable.  I'll make

9    you famous and your video with your very identifiable tattoos

10   and great singing voice will go viral after that you don't

11   have to worry about a mortgage from jail.  See you at 4:45

12   sir.

13   Q.  And were you aware that the video would have shown you

14   talking about your tattoos with Ms. Hill?

15   A.  Yes.

16   Q.  And were you aware that you were singing to Ms. Hill and

17   that probably was recorded too?

18   A.  Yes.

19   Q.  So did that indicate that he had seen the video?

20   A.  Yes.

21   Q.  And how did you respond?

22   A.  Sir I cannot pay today...please give me until Monday.

23   Q.  How did he -- what did he say?

24   A.  It will go smoother to ask your folks for the mortgage

25   payment.  Unless you want me to tell them why -- why you want

1    the money.  Don't play this game with me.  You have too much

2    to lose.  I am not your enemy Mr. Russell your lack of

3    restraint is your enemy.

4    Q.  What do you have to lose?

5    A.  You know, just my -- my reputation.  You know, I'm

6    concerned about my job and things like that.

7    Q.  And so is the defendant still threatening you with these

8    texts?

9    A.  Yes.

10   Q.  How do you respond?

11   A.  I'm so sorry sir but Monday is the best I can do...I beg

12   you to give me that extension.

13   Q.  What does the defendant say to that?

14   A.  You already had your favor by fucking a 16 year old girl.

15   You have 35 minutes.

16   Q.  And continue.

17   A.  You have my -- you have tied my hands already.

18   Q.  So these text messages are coming in at a fairly short

19   amount of time; aren't they?

20   A.  Yes.

21   Q.  Okay.  What's the next message from the defendant?

22   A.  I respect you and your patience and honesty but you had --

23   but you had ample preparation for today.  I am a fair man and

24   have considered not moving forward with this but then my sis

25   would go -- would be exploitedly sexually and you will go to

1    jail for rape.  My responsibility in this situation is to

2    protect.  Our agreement is to protect my sister's integrity

3    and your reputation as a decent man.  To stick to the

4    agreement will eliminate the need for protection on behalf of

5    both parties.  I will see you at the front entrance to this

6    building in 24 minutes.

7    Q.  So his actions are actually to protect you, is that what

8    he's saying?

9    A.  Yes.

10   Q.  And he still refers to Ms. Hill as his sister; is that

11   correct?

12   A.  Yes.

13   Q.  What's the next text from him?

14   A.  You are making me ask, should I be concerned for my

15   sister's safety?

16   Q.  Is that because you're not showing up to pay?

17   A.  Yes.

18   Q.  And what did you say?

19   A.  No you shouldn't be concerned...either you can wait until

20   Monday for the money, or do you what you have to do sir.

21   Q.  Please continue.

22   A.  Guaranteed on Monday I will have the money.

23   Q.  How does he respond?

24   A.  You have the money now and 8 minutes.

25   Q.  Please continue.

1   A.  Have the courtesy to show up and tell me face to face.

2   You see that I can be reasonable but please don't insult my

3   intelligence.

4   Q.  And your response is?

5   A.  I have my son and I need to protect my family at all

6   time...can we please do Monday sir?

7   Q.  And his response is, on the next page?

8   A.  I have a son also Mr. Russell.  Come with whatever you

9   have I could have done plenty of damage by now.  I'm being

10   nice.  I don't like being played.  You cannot recover from

11   damage caused by any of the weapons that I have against you.

12   Do a good faith payment of 200 right now and get your 4 extra

13   days.

14   Q.  Now focus on the sentence, "You cannot recover from the

15   damage caused by any of the weapons that I have against you."

16   Did you believe that the defendant could damage you?

17   A.  Yes.

18   Q.  Were you scared?

19   A.  Yes.

20   Q.  But were you going to meet him that day?

21   A.  No.  I was -- I was instructed not to.

22   Q.  Okay.  So do you continue to try to put it off 'til

23   Monday?

24   A.  Yes.

25   Q.  Please -- is the next message from you?

1    A.  Yes.

2    Q.  What did you say?

3    A.  I know you can do major damage...if I give you 200 I won't

4    have money to feed my family...I ask you again please give me

5    'til Monday...after work...I will have full payment I assure

6    you.

7    Q.  And what's his response?

8    A.  My goal is TO NOT CAUSE trouble.  WTF are you trying to

9    prove?

10    Q.  And when you text message something, does all caps mean

11    you're raising your voice or shouting?

12    A.  Yes.  Typically.

13    Q.  And what does WTF mean?

14    A.  It's abbreviation for what the fuck.

15    Q.  So is this text message shouting and cursing at you?

16    A.  Yes.

17    Q.  Please read the next text message.

18    A.  You're not thinking about trying to feed your family when

19    you're fucking my 16 year old sis don't play me A.J. it's not

20    funny anymore.

21    Q.  And this again indicates that you were recorded having sex

22    with a 16 year-old?

23    A.  Yes.

24    Q.  Okay.  What's your response?

25    A.  I have nothing to prove...I'm not playin you...I'm between

1  a rock and a hard place.

2  Q.  There's just a -- next page, a few more here on the 31st.

3  Could you sort of read through the text messages on this page?

4  A.  A.J. I'll say this.  I have to question your intentions

5  because you waited till the last minute to say something.  You

6  had plenty of preparation time before today  I don't like

7  being played I feel like you are insulting my intelligence.

8  Your personal problems are not my concern my concern is our

9  agreement in you ability to follow through.  You have to do

10  something today to convince me that you are not trying to play

11  me.  Bring me what you can and we'll work out the rest of

12  Monday.  Face to face only.

13  Q.  Your response is?

14  A.  Can't we just meet Monday?

15  Q.  And in the next text message does the defendant give a

16  number of names?

17  A.  Yes.

18  Q.  And where was it -- by those names could you tell where

19  they came from?

20  A.  Yes.

21  Q.  Where?

22  A.  They came from Facebook.  They're -- they're a list of my

23  friends on Facebook.

24  Q.  Okay.  And could you please read that message?

25  A.  Areal Mitchell, Ariwna Brown, Aries Caldwell.  Are the

1   next emails that I will send.  Abdul already has a message

2   about a pregnancy test.  Next one is going to a female family

3   member and there are plenty of them available to me.  Emails

4   will stop when I have some kind of cash in my hand Ashley AR

5   Russell is getting a message typed right now.  I asked very

6   nicely to not play me.  $100, $75, or something now.  Once

7   your sis gets the message can you keep -- keep her quiet?

8   Abdul you can keep quiet but not all 308 of Reagan's friends.

9   Q.  And who's Abdul?

10  A.  Abdul is my cousin that lives on the -- lives in North

11  Carolina.

12  Q.  And who's Ashley AR Russell?

13  A.  Is my sister.

14  Q.  And from this did you understand that he'd contacted some

15  of your family members?

16  A.  Yes.

17  Q.  And on this last sentence, "But not all 308 of Reagan's

18  friends," is that about the number of friends she would have

19  had at the time?

20  A.  Yes.

21  Q.  And so was it your understanding that he had been

22  researching people you know?

23  A.  Yes.

24  Q.  You received one last message from him on the 31st?

25  A.  75 is as low as I will go.

1    Q.  Okay.  And then at this point you're just taking a risk

2    that nothing happens; is that right?

3    A.  Yes.

4    Q.  Just waiting to see what's going to happen on the 4th?

5    A.  Yes.

6    Q.  Okay.  While you're receiving all these messages from the

7    defendant, do you also receive a few messages from Courtney

8    Hill?

9    A.  Yes.

10   Q.  Could you just explain what the first couple of messages

11   say?

12   A.  The first -- the first message is, I miss you.

13   Q.  And did you get another one similar to that?

14   A.  Yes.

15   Q.  And did you respond to those messages?

16   A.  No.

17   Q.  And later did you get some -- a couple of other messages

18   from her?

19   A.  Yes.

20   Q.  And what was the nature of those messages?

21   A.  Basically she said I -- you better had as -- better have

22   our money.

23   Q.  Okay.  And did you respond to that?

24   A.  No.

25   Q.  So the later ones were more threatening?

1    A.  Yes.

2    Q.  Okay.  What happens on April 4th?

3    A.  I get a text message from the defendant.

4    Q.  And could you please read the four messages you get on

5    April 4th?

6    A.  I will be in the city today.  I will meet you at 4 p.m.

7    It's Monday, we will meet when you get off of work.  It is

8    disrespectful for you to ignore me.  I am home now.  I would

9    like to finish our business now.

10   Q.  And what happens after that -- you receive that fourth

11   message on April 4th?

12   A.  Later on that evening, about five o'clock, I'm looking out

13   of the window, and I see a black vehicle that's driving

14   slower, in particular, and then I see -- I see it semi-stop in

15   front of my house, and then it turns around, and then it

16   actually parks in front of my house on the street.

17   Q.  What type of vehicle is it?

18   A.  It was a Mercedes Benz.

19   Q.  Can you guess roughly how old?

20   A.  I figure it was a black late '80s S type.

21   Q.  And who is driving the car?

22   A.  The defendant.

23   Q.  What did he do after he pulled over?

24   A.  He came to my door, and he knocked on the door for a few

25   minutes.

1    Q.  What happened?

2    A.  I don't answer the door.  What I do is I -- you know, my

3    whole family is there, so I just make sure that everyone is

4    quiet.  And I look out -- I look out of the peep hole to

5    verify that it's him.

6    Q.  And was your family pretty scared by this?

7    A.  No.  They didn't know what was going on at the time.

8    Q.  Okay.  Were you scared by it?

9    A.  Yes.

10   Q.  And after he knocked for a couple of minutes what happened

11   next?

12   A.  He got back in his car, he drove off.  And then within

13   that hour I got a couple of phone calls from the number, same

14   number I was getting the text messages from.

15   Q.  Did you answer those calls?

16   A.  No.

17   Q.  So the defendant called you a couple times and you didn't

18   answer?

19   A.  Yes.

20   Q.  That's the Monday you were supposed to pay the $500?

21   A.  Yes.

22   Q.  The next day did you meet with detectives in this case?

23   A.  Yes.

24   Q.  And who was that?

25   A.  Detective Mills and Detective Harmon.

1  Q.  And did you give a written statement to Mills and Harmon

2  that day?

3  A.  Yes.

4  Q.  And that day and the next day did you consent to searches

5  of your Facebook and searches of your phone?

6  A.  Yes.

7  Q.  And over those couple of days did Detective Mills and

8  Harmon instruct you to do anything?

9  A.  Yes.

10  Q.  What?

11  A.  Just got the -- you know, at the time I was instructed to

12  set up a date, you know, set up a date to pay him the

13  remainder of the money, the $500.

14  Q.  And at some point, do you do that?

15  A.  Yes.

16  Q.  So it's a direction you reach out to the defendant and

17  say -- to arrange paying the rest of the money?

18  A.  Yes.

19  Q.  What was the purpose of having you do that?  What was the

20  detective's purpose?

21  A.  It appears as if it was -- you know, he was -- you know,

22  for me to be paying the -- you know, the remainder of the

23  money.  You know, he would be arrested for whatever, you know,

24  charges were held up against him.

25  Q.  Okay.  And just before texting him, or in those days April

1    5th, 6th before texting him, did you become aware that the

2    defendant had contacted -- was contacting people on Facebook

3    about you?

4    A.   Yes.

5    Q.   And was that from someone named Teresa Cooper?

6    A.   Yes.

7              MR. CASEY:  Could I show the witness Government's

8    Exhibit 152?

9    Q.   Do you recognize Exhibit 152?

10   A.   Yes.

11   Q.   And what is it?

12   A.   It's a private message from Teresa.

13   Q.   And is this what's called a screen capture?

14   A.   Yes.

15   Q.   So this is basically a photograph of what was on the

16   screen when you got the message?

17   A.   Yes.

18   Q.   And does this picture truly and accurately reflect what

19   that screen looked like?

20   A.   Yes.

21             MR. CASEY:  Your Honor, I offer into evidence

22   Government's Exhibit 152.

23             MR. CASKEY:  No objection.

24             THE COURT:  152 is admitted.

25        (Government Exhibit 152 admitted in evidence.)

1          MR. CASEY:  And can we focus in on the message from

2     Teresa Cooper?

3          THE COURT:  Now this is from Teresa Cooper?

4          MR. CASEY:  Yes.

5          THE COURT:  To the witness?

6          MR. CASEY:  To the witness, yes.

7     Q.  If you'd please read what you -- what she communicated.

8     A.  Hey A.J.!  Not at all trying to get in your business but I

9     thought you needed to know that there's a guy on my friends

10    list named Chef Fireflame Corey (I don't think I actually know

11    him) who put up a status with some horrible accusations

12    against you.  He put your name, age, Reagan's name and your

13    place of employment out there in hopes that someone would tell

14    him where you are.  I'm only telling you this because this guy

15    is being messy and I don't think that that's something you

16    want everybody reading.  Again you don't have to tell me a

17    THING.  Just thought I'd let you know that he's putting some

18    bad stuff out there.  Much love...

19    Q.  That message was on April 6th?

20    A.  Yes.

21    Q.  But also on April 6th, going back to Government's Exhibit

22    61, is that the day that you reached back out to the defendant

23    to let him know you had the money?

24    A.  Yes.

25    Q.  And let's -- let's go ahead and read on page -- where we

1    were, the message you sent, starting, I really have been

2    trying.

3    A.   I really have been trying to get some money together.

4    Q.   And how does he respond?

5    A.   You are a liar I know when I have been played.

6    Q.   And how do you respond?

7    A.   Not like that..I gave you the $100 so I'm not playin.

8    Q.   How does he respond?

9    A.   You're short on time I have a private investigator looking

10   for you.

11   Q.   And does that indicate to you that he hasn't dropped

12   trying to get money from you?

13   A.   Yes.

14   Q.   And what else does he say?

15   A.   You're famous now.  Do your part.

16   Q.   And what is your part?

17   A.   Paying him the $500.

18   Q.   So what do you say?

19   A.   Okay.

20   Q.   And what does he say?

21   A.   Check your FB page, which is abbreviation for Facebook.

22   You pissed off somebody by lying.

23   Q.   Do you recall what he was referring to there?

24   A.   At that time I wasn't sure.

25   Q.   Okay.  And what are the next couple messages from him?

1  A.  24 hours or somebody will be asking you a lot of

2  questions.  Get a Payday Loan or something.  You got folks

3  looking for you now.  Please do your best to not continue to

4  insult my intelligence.  David Park would have no reason to

5  keep you employed after he gets the video.

6  Q.  Who is David Park?

7  A.  David Park is the director over my department.

8  Q.  So he works for the City of Kansas City?

9  A.  Yes.

10  Q.  But is he kind of a publicly known person?

11  A.  No.

12  Q.  So someone would kind of have to look to know who David

13  Park was?

14  A.  Yes.

15  Q.  Okay.  And this last message that says April 7th at 1:06

16  GMT, is it possible that because of the time zones that was

17  actually sent on April 6th rather than the 7th?

18  A.  Yes.

19  Q.  And what do you say in it?

20  A.  I need my job to support my family, please don't send that

21  video out...I have too much to lose...my wife, kids, friends

22  and respect.  I will have your money by tomorrow...calling up

23  my -- my close family as we speak.

24  Q.  And the next day is April 7th.  What was supposed to

25  happen on April 7th?

1    A.   April 7th, later on that evening I was supposed to meet

2    with the defendant at the -- at the DeVry campus and give him

3    the remainder of the money.

4    Q.   As -- as that being the meeting day, is that something

5    that the detectives were trying to facilitate?

6    A.   Yes.

7    Q.   Okay.  So it's your direction to say, today I got the

8    money?

9    A.   Yes.

10   Q.   Okay.  And so what do you say?

11   A.   Good morning sir, I finally got the money together, and I

12   will be ready to meet you after work...just tell me where to

13   meet sir.

14   Q.   And what does he respond?

15   A.   Good morning.  I want this to be over quickly sir.  My

16   intuition is telling me that you have something up your

17   sleeve.

18   Q.   And does that response come just six minutes after you

19   send the text?

20   A.   Yes.

21   Q.   So what do you respond?

22   A.   There is too much at stake for somethin to be up my

23   sleeve...I just wanna pay you so I can move forward with my

24   life.

25   Q.   In the next message does the defendant give you some

1    directions?

2    A.   Yes.

3    Q.   What are those directions?

4    A.   Place the package in two envelopes.  First a security non

5    see through one.  Then place that one inside a manila envelope

6    seal it.  On the outside write the following code D203.  Leave

7    it at the security desk at DeVry University campus on Holmes.

8    Be there at 4:15.  Leave immediately then text me.  If

9    everything is legit I will cancel my meeting city officials.

10   Bob Jackson is retire but a very close friend.  Be

11   careful Mr. Russell I hate playing games with people.

12   Q.   Who's Bob Jackson?

13   A.   I have no clue.

14   Q.   What do you ask in response?

15   A.   Where is the security desk?

16   Q.   What's he say?

17   A.   Inside the front entrance adjacent to the elevator

18   underneath the cameras in the main hallway.  You can't miss

19   it.

20   Q.   And what do you say in response?

21   A.   I gotta say that I don't feel comfortable at all leaving

22   an envelope with $500 cash at a security desk...I'm also very

23   concerned that the flash drive will be still circulated...I

24   need that video so I can make sure -- so I can make sure to

25   destroy it.

1    Q.  And was that particular message recommended to you by the

2    detectives?

3    A.  Yes.

4    Q.  And who recommended you send that message?

5    A.  Detective Mills.

6    Q.  Okay.  What's the next message you received from the

7    defendant?

8    A.  Do your part.  My precautions are to make sure you're not

9    up to anything.  Call it covering my ass.  After the money is

10   verified and delivered safely into my hands then and only then

11   will the video be delivered to you.

12   Q.  How do you respond?

13   A.  How do you expect me to trust you if you're not trusting

14   me?

15   Q.  And could you read the next two messages from the

16   defendant?

17   A.  Trust should be the last thing coming out of the mouth of

18   nigga on camera singing to, drinking in front of and then with

19   tic facsimile in his mouth fucked an underage girl for quite

20   some time.  Do your part.  You will get your flash drive.

21   Q.  Please continue.

22   A.  I will have your flash drive in an envelope with your name

23   on it waiting at the security desk.  Tell the security guard

24   your name and he will give you the end envelope after you

25   flash your ID and money is counted.  Tell him you are part of

1    the scavenger hunt.  The security desk has instructions on the

2    envelope write d03066942 instead of D203.  Do you understand

3    my instructions?

4    Q.  And did you text back that you did?

5    A.  Yes.

6    Q.  So the plan is that you're going to exchange the money

7    through the security guard at the DeVry University?

8    A.  Yes.

9    Q.  You're going to give him an envelope with money and he's

10   going to give you an envelope with the flash drive?

11   A.  Yes.

12   Q.  And you're supposed to give him your ID so the security

13   guard can check your ID?

14   A.  Yes.

15   Q.  Okay.  Do you text back anything later that -- on April

16   7th?

17   A.  Yes.

18   Q.  What do you say?

19   A.  Okay that will work...fully understood sir.

20   Q.  And what does he -- does your -- what's your next message

21   say?  I'm sorry.  I was ahead of you.

22   A.  Understood sir.  Can I please have the digits to put on

23   the manila folder again...I'm unfortunately in the habit of

24   constantly deleting my messages.

25   Q.  Does he give you those numbers again?

1   A.  Yes.

2   Q.  Do you thank him for it?

3   A.  Yes.

4   Q.  Does he ask you if the package is en route?

5   A.  Yes.

6   Q.  And at this point what are you doing?

7   A.  At this point I've met with the -- with the detectives and

8   with the police officer.

9   Q.  And --

10   A.  At a nearby church.

11   Q.  Met at a church parking lot nearby?

12   A.  Yes.

13   Q.  And did they give you the envelope that had money in it?

14   A.  Yes.

15   Q.  Were you -- did they search you?

16   A.  Yes.

17   Q.  And did they direct you to go to DeVry?

18   A.  Yes.

19   Q.  And did you follow his directions?

20   A.  Yes.

21   Q.  And is that when you say, Yes...caught in traffic...will

22   be there shortly?

23   A.  Yes.

24   Q.  Okay.  And at that point do you go to DeVry?

25   A.  Yes.

1   Q.  What happens?

2   A.  As I walk into -- right through the corridor, I -- I go to

3   the security desk.

4   Q.  And is that inside the building?

5   A.  Yes.

6   Q.  Okay.

7   A.  I -- I speak to the security guard, follow my instruction,

8   telling him that I'm in the scavenger -- a scavenger hunt, he

9   asked for my ID.  I show it to him.  And then at that point

10  that's when he counts out the $500 in the envelope.  And then

11  he gives me an envelope back that has a bulge in it.  So I'm

12  under the presumption that it's the flash drive.

13  Q.  What happens next?

14  A.  After I leave, after I walk out of the building, I was

15  instructed to go to the Sun Fresh parking lot and just wait

16  until further instruction.

17  Q.  Before you left did you see the defendant?

18  A.  Yes.

19  Q.  And you saw him in DeVry?

20  A.  Yes.

21  Q.  Did you make eye contact with him?

22  A.  Yes.

23  Q.  And after you left did you text the defendant?

24  A.  Yes.

25  Q.  Was that because you were instructed to?

1   A.  Yes.

2   Q.  And do you text him, Okay.  Just dropped it off sir?

3   A.  Yes.

4   Q.  And do you then add the text, Once again so sorry for

5   disrespecting your household?

6   A.  Yes.

7   Q.  After that point do you have any other contact with the

8   defendant?

9   A.  No.

10   Q.  What happens when you get to the Sun Fresh parking lot?

11   A.  I -- I wait there.  I wait there until Detective Harmon

12   comes, and then from there I -- I have to -- you know, I

13   identify the -- the defendant, and then Corey.

14   Q.  How long do you wait, do you recall?

15   A.  Roughly 30 minutes.

16   Q.  And do you give them the envelope that you received?

17   A.  Yes.

18   Q.  And a few days later, did you meet with the detectives

19   again?

20   A.  Yes.

21   Q.  And did you consent to have them search your cell phone

22   again?

23   A.  Yes.

24        MR. CASEY:  One moment, Your Honor.  No further

25   questions, Your Honor.

1          THE COURT:  All right.  Who will conduct the cross

2     examination?

3          MR. CASKEY:  Judge, I may.  But I'd like to approach

4     the bench on -- for a conference.

5          THE COURT:  Sure.

6       (Bench conference on the record outside the hearing of

7          the jury.)

8          THE COURT:  Step close to my microphone, if you

9     would, sir.

10          MR. CASKEY:  Okay.  I need this marked.  I'm going

11     to show this to the Court.

12          THE COURT:  Why don't you just show it to me and

13     we'll mark it.

14          MR. CASKEY:  Judge, that goes to the motion in 40 --

15     the motion to not go into the sexual history of this witness.

16     And I think they violated their own motion, because they keep

17     talking about his reputation.

18          THE COURT:  Whose reputation?

19          MR. CASKEY:  His reputation in the community.  They

20     keep -- issued the word "reputation" three different times.

21          MR. DALY:  He was reading text messages.

22          THE COURT:  Hold on.  Hold on.  If you talk you got

23     to stand next to the -- no one is allowed to talk unless they

24     talk into there.

25          MR. CASKEY:  He said reputation.  He's worried about

1    his family, he's worried about his job, and he's worried about

2    his reputation in the community.

3              THE COURT:  Sure.  Sure.

4              MR. CASKEY:  Okay.

5              THE COURT:  That's the crux of the whole extortion

6    thing --

7              MR. CASKEY:  Right.

8              THE COURT:  -- is someone is trying to protect their

9    reputation; right?

10             MR. CASEY:  But those are in direct response to the

11   messages he was receiving, Judge.

12             THE COURT:  I understand.

13             MR. CASKEY:  But when he initially started

14   testifying, he was saying that --

15             THE COURT:  Hold on.  Talk into that.

16             MR. CASKEY:  When he was saying he initially -- he

17   said he knew it was a quick friend request, and he kept

18   talking about Chris Matthews.  And the reason he knows about

19   Chris Matthews and all this stuff is he's -- he's met --

20             THE COURT:  Hold on.  Hold on.

21        (End of bench conference.)

22             THE COURT:  I'm sorry.  Could I ask you all not to

23   talk right now?  Just because my court reporter is picking you

24   up and picking us up.

25        (Bench conference on the record outside the hearing of

1          the jury.)

2                MR. CASKEY:  What do you know about his girlfriends?

3                THE COURT:  Thank you.

4                MR. CASKEY:  What do you know about his girlfriends?

5                THE COURT:  This is off the record.  They're talking

6    off the record.

7          (Discussion off the record.)

8                THE COURT:  Okay.  We're on the record.  Okay.  So

9    why don't we --

10               MR. CASKEY:  They bolstered his -- his -- they're

11   bolstering their own witness and using this motion in limine

12   to prevent me from going into the cross.  The reason he knows

13   so much about Facebook and how it works is he's met 35 women

14   on Facebook.

15               MR. CASEY:  That's -- that's -- that's different

16   than the evidence that was disclosed.  And -- and nonetheless,

17   what was disclosed previously.  You know, the reason we filed

18   the motion was to raise the issue before we put the witness

19   on.  I mean, we needed to know whether or not this was going

20   to come up.  And in any event, to suggest that when McKinney

21   says, I'm going to damage your reputation, he knew about the

22   defendant's personal activities?  Of course he didn't.  He was

23   damaging his reputation trying to take the guy's job.  He was

24   trying to get him divorced.  That's what he's --

25               MR. CASKEY:  Okay.  I'd like to mark this.

1          THE COURT:  Okay.  Let's -- let's -- is this

2    something -- we have 45 minutes left before we break.  Are you

3    going to cover anything else before we get into this, or can

4    we talk about this after I release the jury tonight?

5          MR. CASKEY:  I'd like -- I'd like to have a --

6    discuss this with you, because this goes to a lot of his cross

7    examination.  This is --

8          THE COURT:  So here.  Let me make sure I understand

9    your position, so it's crystal clear for me.  You're saying

10   because this witness talked about his reputation and worried

11   about getting his reputation damaged by this information, that

12   that opened the door so you can talk about his sexual history?

13         MR. CASKEY:  No.  No.  He testified on direct

14   examination that he was very familiar with how Facebook

15   worked.

16         THE COURT:  Yes, sir.

17         MR. CASKEY:  Okay.  That was --

18         THE COURT:  He clearly was.

19         MR. CASKEY:  Right.  And the reason that is, is

20   because he's met a lot of women on Facebook.

21         THE COURT:  How is that -- but even if he -- say

22   he's met 200 women on Facebook and they dispute all this, of

23   course, the Government has --

24         MR. CASKEY:  Then I --

25         THE COURT:  Now hold on.  Now hold on.

1          MR. CASKEY:  Okay.  Okay.

2          THE COURT:  Say he's met 200 women on Facebook and

3     had sex with all of them, how does that -- how is that

4     relevant to this?

5          MR. CASKEY:  Well, I'm not saying he -- he's had sex

6     with them.  But he's --

7          THE COURT:  Well, any relation.

8          MR. CASKEY:  He's worried about -- you know, he's

9     holding himself out that he's a God fearing Christian man.

10    Okay?  And without going -- and he's worried about his

11    marriage and that this -- you know, that's what he said.  He's

12    worried about his marriage.

13         THE COURT:  He's worried about his marriage and his

14    job.

15         MR. CASKEY:  Right.  And he can't be too worried

16    about that if -- if -- if he's met 35 women on Facebook.

17         THE COURT:  Yeah.  I don't think that's relevant.

18    I'm sorry.

19         MR. CASKEY:  Well, I'm not -- okay.

20         THE COURT:  I don't think that's proper inquiry.

21         MR. CASKEY:  But we'd like to make an offer of proof

22    outside the presence of the jury.

23         THE COURT:  Sure.  Sure.  We'll do that at the

24    break, if that's all right.

25         MR. CASEY:  Your Honor, I'm just noticing this

1   witness has some --

2           THE COURT:  Okay.  I can't hear.

3           MR. CASEY:  I'm sorry.  This witness has some work

4   problems.  He'd like to -- you know, if we could get him off

5   the stand today, we'd like to.

6           THE COURT:  Well, I can't promise you that.

7           MR. CASEY:  I understand.

8           THE COURT:  What we'll do is, for right now, I'm

9   going to overrule your -- your motion to go into his sexual

10  proclivities, other than this case.  Now, you can make an

11  offer of proof when we're done here, and it may be -- very

12  well be that Mr. Caskey and Ms. Burton may convince me and he

13  needs to come back and address these other issues on cross

14  examination.  But for the next 41 minutes, I want you just to

15  cover something different.

16          MR. CASKEY:  Well, would this be possible is that we

17  just excuse this witness and they can put on Ms. Hill and then

18  we can make a record after that?  Is that --

19          MR. CASEY:  We object, Your Honor.

20          THE COURT:  Well, first off --

21          MR. CASKEY:  I'm not going to get done with this guy

22  in 45 minutes.

23          THE COURT:  That's all right.  But just start.  Just

24  start, and do your best, and follow the Court's direction as

25  to your -- your -- your other issue there, and we'll make a

1   long record, offer of proof after we're done.

2           MR. CASKEY:  Can I just briefly talk to Mr. McKinney

3   about this?

4           THE COURT:  Sure.

5           MR. CASKEY:  About two minutes.

6           THE COURT:  Okay.  I'll give you two minutes.

7       (End of bench conference.)

8           THE COURT:  Now you can all talk amongst yourselves.

9   We're going to take about two minutes, but don't talk about

10  the case, obviously.  How are you all doing over there?

11  Peachy?  Great.  Great.  How's the temperature?

12          A JUROR:  Comfortable.

13          THE COURT:  We still anticipate to be done about

14  5:00 today, I just want to let you know.  So we've got another

15  40 minutes or so.

16          Mr. Caskey, are you about ready?

17          MR. CASKEY:  No, Your Honor.  Can we have two more

18  minutes?

19          THE COURT:  Well, I'm going to -- we're going to --

20  you're going to have to proceed at this time, sir.  I'm sorry.

21  We'll do another 40 minutes, then I'll let you make -- then

22  we'll talk about these other issues.

23          MR. CASKEY:  We don't have any questions, Judge.

24          THE COURT:  All right.  Thank you, sir.

25          All right.  Please call your next witness.

1          MR. CASEY:  Your Honor, may the witness be excused?

2          THE COURT:  Well, would the attorneys please come

3     forward.

4          (Bench conference on the record outside the hearing of

5          the jury.)

6          THE COURT:  You can sit down in the pew over here,

7     if you would, sir.

8          (Bench conference on the record outside the hearing of

9          the jury.)

10          THE COURT:  Mr. Casey, the reason I don't want this

11     witness excused is because Mr. Caskey suggested that he may

12     want to call him later.

13          MR. CASKEY:  Right.

14          THE COURT:  And so I would like to have him

15     available, if Mr. Caskey wants.  But for tonight he's excused,

16     certainly.

17          MR. CASKEY:  Right.  That will work.  We can call

18     him back in our --

19          THE COURT:  Because he had some concerns.

20          MR. CASKEY:  Yes.

21          THE COURT:  And after you make your offer of proof I

22     may change my position.

23          MR. CASKEY:  Okay.

24          THE COURT:  But for now, my position is -- is --

25          MR. CASKEY:  Fair enough.

1          THE COURT:  -- the same.  But I do want him -- could

2    you keep him available so you can produce him for Mr. Caskey?

3          MR. DALY:  I wonder what -- is he going to be cross

4    examined upon -- I mean, this is just --

5          THE COURT:  We'll talk about it at the break.  Okay?

6          MR. DALY:  Okay.

7          THE COURT:  Thank you.

8       (End of bench conference.)

9          THE COURT:  Okay.  Is the government ready to call

10   their next witness?

11         MR. DALY:  We are, Your Honor.  The government calls

12   Courtney Hill to the stand.

13         THE COURT:  All right.  Good afternoon, Ms. Hill.

14   Would you please face our clerk, raise your right hand and be

15   sworn?

16        COURTNEY PAIGE HILL, GOVERNMENT WITNESS, SWORN

17         THE COURT:  Would you please have a seat in the

18   witness chair, Ms. Hill?  And Ms. Hill, would you please begin

19   by speaking your full name and spelling your last name for us?

20         THE WITNESS:  Courtney Paige Hill.  Last name

21   H-I-L-L.

22         THE COURT:  Thank you, Ms. Hill.

23         Mr. Daly, sir.

24                  DIRECT EXAMINATION

25   BY MR. DALY:

1  Q.  Ms. Hill, could you please tell the Court what is it

2  you -- how old are you today?

3  A.  Eighteen years old.

4  Q.  And what is it you do?

5  A.  I work for the United States Marine Corps.

6  Q.  And in your capacity working for the Marine Corps, what's

7  your current title?

8  A.  Private.

9  Q.  And I know you're in the Marine Corps.  Can you tell us

10  where you are in that process?

11  A.  I'm in MOS school in Camp Lajeune, North Carolina.

12  Q.  Okay.  Let's -- let's kind of break that down just

13  briefly.  MOS school for us nonservice men here in the

14  courtroom, what does -- what does MOS school stand for?

15  A.  Military occupational specialty.

16  Q.  And in terms of the process, are you in boot camp, out of

17  boot camp?  Kind of where are you in your Marine career right

18  now?

19  A.  I'm out of boot camp, currently in Camp Lajeune, North

20  Carolina just waiting to pick up class for my job.

21  Q.  And when did you successfully complete boot camp?

22  A.  October 19th, 2012.

23  Q.  And did you -- have you graduated high school?

24  A.  Yes.

25  Q.  Now you're in Camp Lajeune, that's a Marine base; correct?

1    A.   Yes.

2    Q.   And but you're from Kansas City; aren't you?

3    A.   Yes.

4    Q.   And, you know, while you're from here you've moved around

5    a little bit throughout the course of your life; haven't you?

6    A.   Yes.

7    Q.   Let's talk a little bit about that.  Going back to about,

8    say, oh, 2008, where did you live at that time?

9    A.   4440 Flora here in Kansas City.

10   Q.   And who did you live with?

11   A.   My mother.

12   Q.   And what's your mother's name?

13   A.   Carmen Brown.

14   Q.   And where did you -- did your father live with you at the

15   time?  What was the situation there?

16   A.   He was still in the military.  So he was overseas.

17   Q.   And that's in early 2008?

18   A.   Yes.

19   Q.   And were your parents married, separated, divorced?  What

20   was the situation?

21   A.   They were never married.  But they also weren't together.

22   Q.   So you're living with your mother at 40 -- 4040 [sic]

23   Flora, and at that time in 2008 -- and did you eventually ever

24   live with your father?

25   A.   Yes.

1    Q.  And when would that have been?

2    A.  April of 2010 through October 2010.

3    Q.  So at some point 2008 up until April of 2010 you went to

4    move with your father where?

5    A.  Springfield, Missouri.

6    Q.  And why did you go to live with your father in April of

7    2010?

8    A.  Because I was having domestic issues with my mother.

9    Q.  What sort of domestic issues, if you can talk about them,

10   did you have with your mother?

11   A.  She threatened to kill me.

12   Q.  So you went to go live with -- your father had now moved

13   back to the states at this time?

14   A.  Yes.

15   Q.  And you moved out there in April of 2010.  How long did

16   you live in Springfield?

17   A.  Six months.

18   Q.  And why such a short time frame?

19   A.  Because then I started having domestic issues with his

20   wife, which is my stepmother.

21   Q.  And, you know, now you've moved from 4040 -- 4440 Flora to

22   Springfield, and you have an issue there.  When -- did you

23   ever move from Springfield?

24   A.  I'm sorry.  Can you repeat that?

25   Q.  Did you ever move away from Springfield at that time?

1    A.   Yes.

2    Q.   And when was that?

3    A.   October 2010.

4    Q.   And where did you move to?

5    A.   11210 Oak Street.

6    Q.   And we've heard that address before.  Who lived there?

7    A.   Corey McKinney.

8    Q.   And --

9         THE COURT:  I'm sorry.  I know this is difficult.

10   Would you kind of slow your speech down a little bit?  I'm

11   having a hard time understanding you.

12        THE WITNESS:  Yes.

13        THE COURT:  Okay?  Thank you.

14        Please proceed.

15        MR. DALY:  It's a bad combo.  I speak quickly, so

16   I'll slow down as well, Your Honor.

17        THE COURT:  Yes, sir.

18   Q.   Now that you've moved back here in 2010, who did you go to

19   live with?

20   A.   Corey McKinney.

21   Q.   And that's at the Coach House Apartments at 112 and --

22   12th and Oak?

23   A.   Yes.

24   Q.   And as we sit here in court today do you see Mr. Corey

25   McKinney?

1    A.  Yes.

2    Q.  Can you please point him out and describe an item of

3    clothing?

4    A.  He's in a black suit, with a white button up and a

5    burgundy stripe tie.

6    Q.  Thank you.  Now you're 18 years old now, but, you know,

7    you've known Corey McKinney for quite some time; haven't you?

8    A.  Yes.

9    Q.  When did you first meet Corey McKinney?

10   A.  In June of 2008.

11   Q.  How was it you know specifically it was in June 2008?

12   A.  Because it was a month after I graduated from middle

13   school, and I just turned 14.

14   Q.  So you were 14 years old at the time, just a few weeks out

15   of middle school, and you meet this defendant, Corey McKinney?

16   A.  Yes.

17   Q.  Where did you meet him?  Like where -- or how did you meet

18   him?  Do you recall the first time you met him?

19   A.  We met at his car in front of my house.

20   Q.  And where did he live at that time?

21   A.  Across the street.

22   Q.  So he lived across the street from your mother?

23   A.  Yes.

24   Q.  And so you were 14 at the time.  Was there any other

25   significant date around the time of June 2008 that helps you

1   recall when it was you first met him?

2   A.  His birthday.

3   Q.  And how old would Mr. McKinney have turned in 2008 on that

4   birthday?

5   A.  Thirty-two.

6   Q.  Now you're 14, he's 32.  How soon after you meet him do

7   you start having sex with him?

8   A.  Two or three weeks.

9   Q.  And how often were you having sexual activity with

10  Mr. McKinney at that time?

11  A.  Two to three times a week.

12  Q.  And was that over the summer of 2008?

13  A.  Yes.

14  Q.  Did that continue as you started high school?

15  A.  Yes.

16  Q.  Did you ever hang out with his family, his kids, his step

17  kids at that time?

18  A.  Not until after I moved in with him.

19  Q.  Okay.  So not until later on did you hang out with the

20  family.  While you're having sex with him, when you were 14

21  and he was 32, did he ever say anything about your age?

22  A.  Yes.

23  Q.  What did he say?

24  A.  That he wished that I was 18.

25  Q.  And why did he wish you were 18?

1   A.  So it would be legal.

2   Q.  So he knew that having sex with you, given your large age

3   difference, was an illegal thing to do for him?

4   A.  Yes.

5   Q.  And did twice a week having sex, did that continue pretty

6   consistently or would you ever take a break for any reason?

7   A.  We took breaks.

8   Q.  And why was that?

9   A.  Because I was either -- I either had a high school

10  boyfriend, or I was out doing my own thing.

11  Q.  But once you didn't have a boyfriend or if you weren't

12  doing your own thing, you guys would resume the sexual

13  activity while you're 14, 15, 16; correct?

14  A.  Yes.

15  Q.  Now, at some point you moved to Springfield, as we've

16  discussed, in April of 2010.  Would you ever see him again

17  while you were living down in Springfield?

18  A.  Yes.

19  Q.  And how is it you saw him?

20  A.  He would come down to visit or he would take us back up to

21  Kansas City for the weekend.

22  Q.  And how many times would you estimate you saw him while

23  you were -- while you were living in Springfield?

24  A.  Four times.

25  Q.  And on those occasions would you have sexual contact and

1    activity with the defendant?

2    A.  Yes.

3    Q.  So eventually -- and did you talk over the phone a lot of

4    times while you were still in Springfield?

5    A.  Yes.

6    Q.  Eventually you moved back here to Kansas City; isn't that

7    right?

8    A.  Yes.

9    Q.  Why didn't you move back with your mom?

10   A.  Because I still didn't trust her at the time.

11   Q.  Did she have any role to play in your ability to move in

12   with the defendant?

13   A.  No.

14   Q.  Did she sign over any sort of power of attorney to make

15   that happen?

16   A.  Yes.

17   Q.  You know, what was specific about his apartment at 112th

18   and Oak in terms of what you wanted accomplished when you got

19   back here to Kansas City?

20   A.  He was having to live in the Center School district where

21   I wanted to go to school.

22   Q.  And what was so good about Center High School compared to

23   some of the other high school options you had here in Kansas

24   City?

25   A.  The curriculum was better than the inner city schools.

1   Q.  And you're aware that Kansas City schools aren't the best?

2   A.  Yes.

3   Q.  But Center High School is one of the better options that

4   you could have had at that time?

5   A.  Yes.

6   Q.  Who registered you as a student at Center High School?

7   A.  Corey.

8   Q.  And did he bring anything with him when he took you there?

9   A.  Yes.

10   Q.  I want to approach the witness -- or actually, if we can

11   just show the witness Exhibit Number 62.  I'm showing you what

12   we've previously marked as Government's Exhibit Number 62.  Do

13   you recognize this?

14   A.  Yes.

15   Q.  And how is it you recognize this document?

16   A.  It is my birth certificate.

17   Q.  And you were present when you obtained, at least either

18   this or a copy of it, so that you could enroll as a student?

19   A.  Yes.

20   Q.  And obviously the defendant would have seen this and taken

21   it as part of your registration packet to the high school?

22   A.  Yes.

23   Q.  And does this exhibit accurately and fairly reflect your

24   actual birth certificate as issued by the health department --

25   Kansas City Health Department?

1    A.  Yes.

2           MR. DALY:  Your Honor, at this time the government

3    would move to admit Government's Exhibit Number 62.

4           MR. CASKEY:  No objection, Your Honor.

5           THE COURT:  Thank you.  Sixty-two is admitted.

6        (Government Exhibit 62 admitted in evidence.)

7    Q.  Now, if we could zoom in.  If you could state the -- state

8    your name there, as listed.

9    A.  Courtney Paige Hill.

10   Q.  And is that your actual name, legal name?

11   A.  Yes.

12   Q.  And please state your date of birth.

13   A.  May 21st, 1994.

14   Q.  And even though it says Carmen J. Nolan, your mother is

15   Carmen Brown?  She goes by Carmen Brown now?

16   A.  Yes.  That's her married name.

17   Q.  Okay.  So you go to register at Center High School.  Did

18   you go with the defendant when you were registered there?

19   A.  Yes.

20   Q.  And -- and just so we're clear, so you've moved up here

21   now in October of 2010, you were born in 1994.  How old would

22   that make you in October of 2010?

23   A.  Sixteen years old.

24   Q.  And again, you were 16 in September of 2010 as well;

25   correct?

1   A.  Yes.

2   Q.  When -- where did you go to register for high school at

3   Center High School?

4   A.  The registrar building next door to it.

5   Q.  And did the defendant talk to anybody on your behalf when

6   you arrived there?

7   A.  Yes.

8   Q.  And do you recall him explaining the nature of the

9   relationship that you two had?

10  A.  Yes.

11  Q.  And how did he explain that?

12  A.  Because of the power of attorney, he was the legal

13  guardian.

14  Q.  A power of attorney, we've heard that term a couple times.

15  Was it -- was that a sort of filing or a form that your mother

16  had to sign over so that you could be -- he could -- so that

17  Corey McKinney could be recognized as your legal guardian?

18  A.  Yes.

19  Q.  And you're aware of that arrangement that -- that your

20  mother had with this defendant?

21  A.  Yes.

22  Q.  And that he would have brought that with him to the school

23  to register you?

24  A.  Yes.

25  Q.  Now, you've made the decision, and now you are registered

1   and living with the defendant, starting in or about October of

2   2010.  Starting with that time frame, and again I know it's a

3   delicate subject, but how often were you having sexual

4   intercourse or some sort of sexual activity with this

5   defendant?

6   A.  Four to five times a week.

7   Q.  And that was between at least October 2010 through April

8   of 2011, for that six-month period there once -- prior to the

9   arrest and after you started living there?

10  A.  Yes.

11  Q.  What were the living arrangements at the apartment?

12  A.  I would sleep in the bedroom, he would sleep in the living

13  room on the couch.

14  Q.  And how would you describe the apartment?  Is it a studio,

15  one bedroom, two bedroom?

16  A.  One bedroom.

17  Q.  I'm going to show you a series of images, pictures that

18  were taken of the apartment.  Exhibits Number 77 through 95.

19  And do you recall previously looking at these on a previous

20  occasion?

21  A.  Yes.

22  Q.  If you can just flip through those briefly.

23          MR. DALY:  And I apologize, Your Honor.  I should

24  have asked if I could approach.

25          THE COURT:  You're fine.

1   Q.  Ms. Hill, Private Hill, as you look through those

2   exhibits, what do they show?

3   A.  Pictures, images of the living room, the bedroom, the

4   monitor of the computer, another monitor outside the bedroom,

5   the webcam attached to the computer, the bed, another picture

6   of the bedroom, another picture of the bed, the lamp inside

7   the bedroom, the computer set up inside the bedroom, the

8   webcam, where the monitor was in the bedroom, another picture

9   of where the monitor was, the bed, the closet and the bed, the

10  closet, the bed, and the desk where the computer is.

11  Q.  Okay.

12          MR. DALY:  May I approach the witness to recover

13  those items, sir?

14          THE COURT:  Yes, sir.  Yes, sir.

15  Q.  And as you've looked through those items, is it fair to

16  say that at various times those were taken that they fairly

17  and accurately reflect how the apartment that you shared with

18  this defendant looked at that time those pictures were taken?

19  A.  Yes.

20          MR. DALY:  Your Honor, at this time the government

21  would move to admit Government's Exhibits Number 77 through

22  95.

23          MR. CASKEY:  No objection.

24          THE COURT:  Thank you.  77 through 95 are admitted.

25          (Government Exhibits 77-95 admitted in evidence.)

1          MR. DALY:  If we can show the witness Government's

2     Exhibit Number 77, which is already up there.  Thank you,

3     Ms. Welna.

4     Q.  Tell us what we see here, Ms. Hill.

5     A.  The door knocker outside the apartment door.

6     Q.  Okay.  And if we can go to Exhibit -- and that's apartment

7     number 203?

8     A.  Yes.

9     Q.  And again, that's the apartment that was rented out by the

10    defendant?

11    A.  Yes.

12    Q.  Had he rented that apartment out before you got there?

13    A.  Yes.

14    Q.  So you came in to move in with him; correct?

15    A.  Yes.

16    Q.  And it was a one bedroom?

17    A.  Yes.

18    Q.  And what were the living arrangements?  Where did -- you

19    know, did you ever describe -- you say you stayed on where

20    exactly?

21    A.  I slept in the bedroom.  He slept in the living room on

22    the couch.

23    Q.  Okay.  So he -- he brought you in to live with him in

24    October of 2010.  How much did you pay in rent?

25    A.  None.

1    Q.  How much did you pay in electricity?

2    A.  None.

3    Q.  How much did you pay of the water bill?

4    A.  None.

5    Q.  Cable bill?

6    A.  None.

7    Q.  Internet?

8    A.  None.

9    Q.  Home telephone?

10   A.  My mother paid for that.

11   Q.  Your mother paid -- well, home telephone?

12   A.  Oh.  We didn't have one.

13   Q.  Heating?  Did you pay any utilities?

14   A.  No.

15   Q.  What about food expenses?  The defendant, as you know, is

16  a chef, or styles himself as a chef.  Did you pay for any food

17  expenses in the house?

18   A.  No.

19   Q.  Did you pay for any groceries?

20   A.  No.

21   Q.  Did your mother give you any money to pay anything for

22  this kind of arrangement?

23   A.  Yes.  My mother --

24   Q.  I'm sorry?

25   A.  My mother would give -- gave me a hundred dollars to give

1    to Corey for me staying there.

2    Q.  And do you know how much Corey paid in rent at that time?

3    A.  No.

4    Q.  Did you often -- did you -- did you consistently give the

5    defendant that hundred dollars?

6    A.  Yes.

7    Q.  And what would he do with it?

8    A.  Either keep it to buy groceries or he would give it to me

9    if we didn't need it.

10   Q.  Okay.  So now he's taken on a roommate.  You.  You're

11   living there.  But you're not -- you're only paying about a

12   hundred a month towards, you know, various expenses and

13   whatnot.  How was the money situation around the apartment in

14   light of that, you know, money flow situation?

15   A.  It became tight after the new year, because we went from

16   one person to two.

17   Q.  Okay.  So he's got two mouths to feed?

18   A.  Yes.

19   Q.  You're now living there and you guys are probably going

20   out more than a person would if they were just by themselves,

21   going out to eat or doing other stuff?

22   A.  Yes.

23   Q.  And so you need -- you needed to increase your money flow

24   into that place; didn't you?

25   A.  Yes.

1   Q.  Did you try to look for a job?

2   A.  Yes.

3   Q.  Did you have any luck?

4   A.  No.

5   Q.  Did the defendant try to help you get a job?

6   A.  Yes.

7   Q.  And did he have any luck getting you a job?

8   A.  No.

9   Q.  So money was starting to get pretty tight?

10   A.  Yes.

11   Q.  Well, let's step back to about September of 2010.  I'm

12   going to show you what the government has previously marked as

13   Government's Exhibits Number 175 and 176.

14          MR. DALY:  Actually, if we could just -- if we could

15   block out the screen.  Thank you.  Could we show the witness

16   Government's Exhibit Number 175?

17   Q.  We've previously shown you series of videos in this case;

18   haven't we?

19   A.  Yes.

20   Q.  Okay.  We spent some time watching them at various times

21   throughout the video.  I'm showing you what's been previously

22   marked as Government's Exhibit Number 175.  It is a screen

23   capture of -- from one of the videos.  Do you recognize that

24   picture that we see there?

25   A.  Yes.

1    Q. And do you recognize that as being a picture from

2    Government's Exhibit Number 5, which shows who -- well, who do

3    we see in that picture?

4    A. Myself, Corey, and Alicia.

5    Q. Okay. And that's the defendant; correct?

6    A. Yes.

7    Q. And that's a screen that's a still image from a -- from a

8    much larger video that you previously watched?

9    A. Yes.

10         MR. DALY: All right. Now at this time the

11    government would like to show the witness Government's Exhibit

12    176.

13    Q. And similarly, this is -- do you recall this as being a

14    screen capture from a video of the same act but taken from a

15    different angle?

16    A. Yes.

17    Q. And again, as we look at that image, is that a screen

18    capture of a much larger video, that video being Government's

19    Exhibit Number 7?

20    A. Yes.

21    Q. And who do we see there in that video?

22    A. Myself, Corey and Alicia.

23         MR. DALY: Okay. And we will move to admit these

24    shortly, Your Honor.

25    Q. Let's talk about late September 2010. Do you recall a

1    night in particular where you had sex not only with this

2    defendant, but with another individual?

3    A.   Yes.

4    Q.   Who was that other person?

5    A.   Alicia Hester.

6    Q.   And prior to this video and prior to the sexual activity,

7    do you recall seeing her drinking that night?

8    A.   Yes.

9    Q.   And what can you tell us about what we're about to see in

10   some form or fashion of that sexual encounter?

11   A.   The three of us were performing sexual activities with one

12   another.

13   Q.   And how old were at the time this video was taken?

14   A.   Sixteen years old.

15   Q.   And did the defendant know your age at that time and day?

16   A.   Yes.

17   Q.   And was it being recorded?

18   A.   Yes.

19   Q.   As a matter of fact, this sexual act on the night of

20   September 30th, 2010, was recorded from two separate devices

21   at the same time; wasn't it?

22   A.   Yes.

23   Q.   And what were those two devices?

24   A.   A camcorder, and the webcam.

25   Q.   Now, we'll talk about that separately here.  But the

1    webcam, was it hooked up to anything?

2    A.   The computer.

3    Q.   And so the webcam -- and where was that placed, the

4    webcam?

5    A.   On the desk.

6    Q.   And so if you can help us out, as we're thinking of the

7    bedroom, where is the computer desk relative to the bed?

8    A.   To the right, as you're walking into the bedroom.

9    Q.   And so as you first walk in the bedroom, is the bed the

10   first thing you see?

11   A.   Yes.

12   Q.   And as you've just stepped into the bedroom, you're

13   looking at the bed, where is the computer desk relative to

14   where you are now?

15   A.   To the left in front.

16   Q.   Or to your right?

17   A.   Yes.

18   Q.   Okay.  So it's kind of at the corner foot of the bed, and

19   that's where the webcam is as well?

20   A.   Yes.

21   Q.   And is it your understanding the webcam -- what is a

22   computer webcam used to do?

23   A.   Anything you want it to.

24   Q.   Well, I mean -- well, within reason, I mean, stuff that a

25   typical video recording device could do, it records video;

1  doesn't it?

2  A.  Yes.

3  Q.  Or it takes pictures.  But, I mean, you could set up to

4  record video from your computer?

5  A.  Yes.

6  Q.  And do you recall that camcorder being used to record the

7  sexual activity between you, the defendant, and one other

8  person?

9  A.  Yes.

10  Q.  Who started the recording on the computer webcam of that

11  sexual activity?

12  A.  Corey.

13  Q.  Now, right next to that webcam there's also another device

14  you discussed; correct?

15  A.  Yes.

16  Q.  And what is that?

17  A.  The camcorder.

18  Q.  And where is that relative to where the computer table and

19  the camcorder is?

20  A.  Next to it.

21  Q.  And it too is focused on the bed; correct?

22  A.  Yes.

23  Q.  And you're aware that that was also being used to record

24  the sexual activity between you and the defendant and the

25  third person?

1    A.  Yes.

2    Q.  Whose camcorder was it?

3    A.  I don't know.

4    Q.  Was it Corey's?

5    A.  No.

6    Q.  Was it somebody else's?

7    A.  Yes.

8            MR. DALY:  I'd like to show the witness Government's

9    Exhibit Number 88.

10   Q.  Can you tell us what we see here on the screen?

11   A.  The webcam.

12   Q.  And that's a little bit dark.  I'm sorry.  Could we

13   publish to the -- I think it's been previously admitted as

14   a --

15           THE COURT CLERK:  Eighty-eight.

16           MR. DALY:  Yes.

17           THE COURT CLERK:  No.

18           MR. DALY:  Oh, well.

19           THE COURT:  It has been admitted, I think.

20           THE COURT CLERK:  Oh.

21           THE COURT:  We admitted 77 through 95, I believe.

22           MR. DALY:  Okay.

23           THE COURT:  That's all right.

24   Q.  So if we're looking at this picture, it's a little dark

25   what am I pointing at right here?

1    A.   The webcam.

2    Q.   And can you describe it for the benefit of the jury and

3    the transcript?

4    A.   It's small.

5    Q.   Is it round in shape?

6    A.   Yes.

7    Q.   Black in color?

8    A.   Yes.

9    Q.   On top of the Xbox?

10   A.   Yes.

11   Q.   Okay.  And that's the webcam that you know to have been

12   used connected to this computer by this defendant to record

13   all these videos?

14   A.   Yes.

15   Q.   All right.  We'd also like to show Government's Exhibit

16   Number 82 to the witness.  And this one's a little bit darker,

17   but it looks like the webcam in a different place.

18             MR. DALY:  Can you -- Ms. Welna, can you please zoom

19   in right to the middle part?  Thank you.

20   Q.   And again, it's dark, lights appear off.  Is that the

21   webcam as well we see there in the middle of that picture?

22   A.   Yes.

23   Q.   Thank you.  Now, in preparation for trial and in the

24   course of this investigation we all watched the videos; didn't

25   we?

1  A.  Yes.

2  Q.  And as a matter of fact, you've watched some of these

3  videos after they were produced by the defendant and with this

4  defendant; didn't you?

5  A.  Yes.

6  Q.  So not only you've watched them with us, you watched them

7  with this defendant.  And is it your recollection this first

8  video, the threesome video, would have been taken on or about

9  September 30th of 2010?

10  A.  Yes.

11  Q.  And this is a video recorded from the webcam and computer?

12  A.  Yes.

13  Q.  And again, is the defendant the one that sets up both to

14  record this sexual act on September 30th of 2010?

15  A.  Yes.

16  Q.  What are -- again, you've described it briefly, but what

17  do we see in this video?

18  A.  Me --

19  Q.  Who are the people?

20  A.  Me, Corey and Alicia performing sexual activities with one

21  another.

22  Q.  And you've mentioned Alicia, is she the woman -- the other

23  woman that's in the video?

24  A.  Yes.

25  Q.  And do her arms appear to be behind her in some fashion?

1   A.  Yes.

2   Q.  And why is that?

3   A.  They're tied up.

4   Q.  Okay.

5          MR. DALY:  Your Honor --

6   Q.  And again, you've watched this video.  This fairly and

7   accurately shows the sexual activity between you, the

8   defendant and her on September 30th of 2010?

9   A.  Yes.

10          MR. DALY:  Your Honor, at this time the government

11   would move to admit Government's Exhibit Number 5.

12          MR. CASKEY:  No objection.

13          THE COURT:  Exhibit 5 is admitted.

14       (Government Exhibit 5 admitted in evidence.)

15          MR. DALY:  And we're going to play the first minute

16   and five seconds.

17   Q.  And you've watched this video.  You're aware that the

18   video is approximately an hour and 35 minutes in length?

19   A.  Yes.

20          MR. DALY:  Okay.  If you would go ahead and play.

21       (Government Exhibit 5 played briefly.)

22          MR. DALY:  If you could pause it really quick?  I'm

23   sorry.

24   Q.  We just saw somebody walking from, it looked like a

25   sitting position at the desk, kind of click something and then

1    walk away.  Who was that that just walked away?

2    A.  Corey.

3    Q.  Okay.  If you can proceed -- and we see -- let's just --

4    since we have it paused.  We see what appears to be the back

5    part of a leg of somebody right in front of the camera.  Who

6    was that?

7    A.  Myself.

8    Q.  And this woman in the background, who was that?

9    A.  Alicia.

10   Q.  Thank you.

11          MR. DALY:  Go ahead and play.

12      (Government Exhibit 5 played commencing at 5 seconds.)

13          MR. DALY:  Pause it, please.

14   Q.  What did he just say there?

15   A.  Both of them are recording.

16   Q.  And when he says both of them are recording, what is he

17   referring to?

18   A.  The webcam and the camcorder.

19          MR. DALY:  Okay.  Please proceed.

20      (Government Exhibit played commencing at 52 seconds.)

21          MR. DALY:  Pause, please.

22   Q.  And again, it's paused there, but just keep up there just

23   as long as -- please describe who's in that picture, what is

24   happening right now.

25   A.  Me and Corey, and Corey's performing oral sex on me.

1    Q.  Again, you can't see your face, that's Alicia in the

2    background, but that's you in the foreground?

3    A.  Yes.

4         MR. DALY:  Please skip ahead to about ten minutes

5    and just play about five seconds.

6         (Government Exhibit 5 played briefly at 12:01.)

7         MR. DALY:  Okay.  We can take it off.  We can take

8    it off.

9    Q.  Again, it's your recollection this video lasts

10   approximately an hour and a half?

11   A.  Yes.

12   Q.  And much of that time is spent, again, even though we only

13   played a few seconds of it, it does show you engaged in sexual

14   activity, explicit sexual activity with this defendant?

15   A.  Yes.

16   Q.  How old were you at the time this video was taken?

17   A.  Sixteen years old.

18        MR. DALY:  And I'd like to show the -- if we can

19   block out the screen if we could show the witness Exhibit

20   Number 175.

21   Q.  And again, do you recall this as being a screen capture

22   from that video at some point?

23   A.  Yes.

24        MR. DALY:  Your Honor, at this time the government

25   would move for the admission of the screen capture, Exhibit

1    Number 175, which is the screen capture of Exhibit 5.

2            MR. CASKEY:  No objection.

3            THE COURT:  175 is admitted.

4        (Government Exhibit 175 admitted in evidence.)

5    Q.  We're showing -- obviously you see this picture here.

6    Could you please describe who's who in this picture we see?

7    A.  Corey, Alicia and my legs.

8    Q.  And what is Corey doing to your legs at that time?

9    A.  Tying them up, I think.

10   Q.  Okay.  We've described the sexual activity that was

11   recorded now from the webcam, it was also recorded from the

12   Sony camcorder.  This is Exhibit Number 7, called

13   3 way -- I'm sorry.  Let me step back.  You're aware that

14   Government's Exhibit Number 5 is labeled 3 the hard way.wmv?

15   A.  Yes.

16   Q.  And let's talk a little bit about Government's Exhibit

17   Number 7, which was labeled 3 way.mpg, again, this is the same

18   sexual activity that we just saw parts of from that previous

19   video; correct?

20   A.  Yes.

21   Q.  Now, it's just taken from the foot of the bed down rather

22   than kind of at the corner where the webcam is?

23   A.  Yes.

24   Q.  And again, it's your recollection this video would have

25   taken -- been taken on or about September 30th of 2010?

1    A.  Yes.

2    Q.  And was this again recorded using a Sony camcorder?

3    A.  Yes.

4    Q.  And who was it, again, that we see in this video?

5    A.  Me, Corey and Alicia.

6    Q.  Okay.  This -- and you've watched this video in the

7    presence of counsel and witnesses for the government; correct?

8    A.  Yes.

9    Q.  As well as with the defendant previously?

10   A.  Yes.

11   Q.  And it fairly and accurately shows the sexual activity

12   that occurred between you, the defendant and this third

13   person?

14   A.  Yes.

15           MR. DALY:  Your Honor, at this time the government

16   would move for the admission of Government's Exhibit Number 7.

17       (Government Exhibit 7 played briefly.)

18           THE COURT:  Hold on.  Hold on.

19           MR. DALY:  Sorry.  Sorry.

20           MR. CASKEY:  No objection.

21           THE COURT:  Thank you.  Seven is admitted.

22           MR. DALY:  Thank you, Your Honor.

23           THE COURT:  Thank you.

24       (Government Exhibit 7 admitted in evidence.)

25           MR. DALY:  And if we can skip ahead to the one

1    minute and six second mark, please.  That's good.

2         (Government Exhibit 7 played at 1:06.)

3              MR. DALY:  You can pause it.

4    Q.  Now, again, that scene -- it's the same -- is that the

5    same set up we saw in the other video?

6    A.  Yes.

7    Q.  But, again, just it's a different device from a different

8    angle?

9    A.  Yes.

10   Q.  And what do we see there at the very tail end of that

11   clip?

12   A.  Corey performing sexual activity -- sexual activities on

13   me.

14   Q.  And by sexual activity, he's doing what specifically?

15   A.  Oral sex.

16   Q.  Oral sex on you?

17   A.  Yes.

18   Q.  And again, I hate to belabor the point, but how old were

19   you at the time?

20   A.  Sixteen years old.

21   Q.  And the defendant, did he know you were 16 years old at

22   the time?

23   A.  Yes.

24   Q.  And he knew that these devices would be used to record the

25   sexual activity between you two?

1   A.  Yes.

2           MR. DALY:  And if we can black her out.  Thank you.

3   Q.  I'm going to show you what's been previously marked as

4   Government's Exhibit Number 176.  Do you recognize this image

5   as being a still shot from that 3 way.mpg Exhibit 7 video that

6   we just watched?

7   A.  Yes.

8   Q.  And does this accurately show a still frame from that

9   video?

10  A.  Yes.

11          MR. DALY:  Your Honor, at this time the government

12  would move to publish Government's Exhibit 176 to the jury.

13  Move for admission and to publish.

14          MR. CASKEY:  No objection.

15          THE COURT:  176 is admitted.

16      (Government Exhibit 176 admitted in evidence.)

17  Q.  And again, can you describe who we -- I know you can only

18  see really one face, but who do we see in this video?

19  A.  Me, Corey and Alicia.

20  Q.  Okay.  And, again, at time the video was recorded, how old

21  were you?

22  A.  Sixteen years old.

23  Q.  Now, we'll get to in a bit --

24          MR. DALY:  And we can take that down.  Thank you.

25  Q.  But eventually you gave your phone to the government so

1    that they could review it for evidence in this case; didn't

2    you?

3    A.  Yes.

4    Q.  And do you recall a series of pictures taken between you

5    and the defendant on the night of March 21st of 2011?

6    A.  Yes.

7    Q.  And do these photographs -- and I'll just go ahead and

8    bring them to you -- Exhibits Number 26 through 48, do you

9    recall seeing these as we've reviewed these in preparation for

10   trial?

11   A.  Yes.

12   Q.  And do you recall --

13           MR. DALY:  May I approach the witness, Your Honor?

14           THE COURT:  Yes.  And you're saying Exhibits 26

15   through what?

16           MR. DALY:  Through 48.

17           THE COURT:  Through 48.  Thank you.

18   Q.  Now, as you're looking through those, these were taken --

19   these were found on your phone, some of them taken by you and

20   the defendant; isn't that true?

21   A.  Yes.

22   Q.  And they show a progression of -- of acts between you and

23   the defendant going from -- anywhere from kissing to oral sex

24   being performed on both of you; correct?

25   A.  Yes.

1  Q.  And is it fair to say that those pictures take place over

2  the course of, say, about an hour and a half, eventually

3  winding up in the shower --

4  A.  Yes.

5  Q.  -- together?  And some of these are focused specifically

6  on your vaginal area?

7  A.  Yes.

8  Q.  And you've seen them all before?

9  A.  Yes.

10  Q.  And again, time on March 21st, 2011, how old were you?

11  A.  Sixteen years old.

12  Q.  And how old did the defendant know you were?  Did the

13  defendant know how old you were?

14  A.  Yes.

15  Q.  And again, that's under the age of 18?

16  A.  Yes.

17          MR. DALY:  At this point, Your Honor --

18  Q.  And these fairly and accurately reflect the sexual

19  activity that occurred between you and the defendant, Exhibit

20  26 through 48; correct?

21  A.  Yes.

22          MR. DALY:  Your Honor, at this time the Government

23  would move to admit Government's Exhibits Number 26 through

24  48.

25          MR. CASKEY:  No objection.

1          THE COURT:  Thank you.  Exhibit 26 through 48 are

2     admitted.

3          (Government Exhibits 26-48 admitted in evidence.)

4     Q.  Okay.  And let's go one by one.  If we can show you

5     Exhibit Number 26.  And I'll approach to recover those

6     pictures.  Who do we see in this picture?

7     A.  Me and Corey.

8     Q.  And this is Exhibit Number 26?

9     A.  Yes.

10    Q.  If we go to Exhibit Number 27, who's in that picture?

11    A.  Me and Corey.

12    Q.  And what are you doing?

13    A.  Making a kissy face to the camera.

14    Q.  And if we go to Exhibit Number 28, who's in that picture?

15    A.  Me and Corey kissing.

16    Q.  And Exhibit Number 29, who's this?

17    A.  Me and Corey.

18    Q.  And you're just kind of laying next to him in that

19    picture?

20    A.  Yes.

21    Q.  And Exhibit Number 30, who's that?

22    A.  Corey again.

23    Q.  And you would have taken that picture?

24    A.  Yes.

25              THE COURT:  It's about five -- it's five o'clock.

1          MR. DALY:  Okay.

2          THE COURT:  This is going to go on for a little bit

3     longer, I suspect?

4          MR. DALY:  Well, this portion will last just

5     literally a few more minutes.  It would probably be a good

6     breaking point.  We're getting to the Count 3 and then a whole

7     other series, if you don't mind, Your Honor.

8          THE COURT:  Can you do it in five minutes?

9          MR. DALY:  Sure.  Absolutely.

10          THE COURT:  All right.

11          MR. DALY:  Yeah.

12     Q.  And we'll go through these last few.  So I think we were

13     on Exhibit Number 31 now.  And that's another picture you took

14     of the defendant?

15     A.  Yes.

16     Q.  And Exhibit Number 32, who's in that picture?

17     A.  Me.

18     Q.  Did you take that picture?

19     A.  No.

20     Q.  And what are we focusing on there?

21     A.  My private area.

22     Q.  And when you say private area, we need to say it.  If you

23     could please say it for the jury.

24     A.  Vagina.

25     Q.  And the next Exhibit 33, who's in this picture?

1   A.  Me and Corey.

2   Q.  And again, are you taking this picture here?

3   A.  No.

4   Q.  Who's taking that picture?

5   A.  Corey.

6   Q.  And again, it's -- it's his face next to what?

7   A.  My private area.

8   Q.  And Exhibit Number 34, which has been designated as

9   Government's Count Number 3, who do we see here?

10  A.  Me and Corey.

11  Q.  And did you take this picture?

12  A.  No.

13  Q.  Okay.  What is Corey doing to you or about to do to you?

14  A.  Perform oral sex.

15  Q.  And Exhibit Number 35, Exhibit Number 30 -- what's --

16  what's happening there?  We'll just -- I'll say the exhibit.

17  If you could say who's in the pictures and what's happening.

18  A.  Me and Corey.  Me performing oral sex on Corey.

19  Q.  Exhibit Number 36?

20  A.  Me performing oral sex on Corey.

21  Q.  Thirty-seven?

22  A.  Me performing oral sex on Corey.

23  Q.  Thirty-eight?

24  A.  Me performing oral sex on Corey.

25  Q.  Thirty-nine?

1    A.  Corey's penis.

2    Q.  Forty?

3    A.  Corey's penis.

4    Q.  Forty-one?

5    A.  Corey's penis.

6    Q.  Forty-two?

7    A.  Corey.

8    Q.  Forty-three?

9    A.  Corey.

10   Q.  Forty-four?

11   A.  Me.

12   Q.  Forty-five?

13   A.  Me.

14   Q.  Forty-six?

15   A.  Me and Corey.

16   Q.  Forty-seven?

17   A.  Me and Corey.

18   Q.  And 48?

19   A.  Me and Corey.

20   Q.  Now, as we look through those exhibits, and this is March

21   21st, 2011, so a few days before you met A.J., but how old --

22   how old were you on that night?

23   A.  Sixteen years old.

24   Q.  And you were not 18?

25   A.  No.

1  Q.  The defendant did not know how old you were -- or knew how

2  old you were?

3  A.  Yes.

4  Q.  Knew that you weren't 18?

5  A.  Yes.

6  Q.  And again, by the angle of some of those pictures the

7  defendant took a number of those pictures that we just looked

8  at, Exhibits 26 through 48; correct?

9  A.  Yes.

10         MR. DALY:  Your Honor, at this time I think would

11  be -- this is a clean break.

12         THE COURT:  Okay.  We'll take a break.

13         Ladies and gentlemen of the jury, during this recess

14  or any other recess you must not discuss this case among -- or

15  discuss this case with anyone, including the other jurors,

16  members of your family, people involved in the trial, or

17  anyone else.  If anyone tries to talk to you about the case,

18  please let me know about it immediately.

19         And finally, keep an open mind until all the

20  evidence has been received and you've heard the views of your

21  fellow jurors.  We will start promptly at nine o'clock

22  tomorrow morning.  I would like you to be here a little bit

23  early.  Everybody goes through security, as you know, so kind

24  of factor that into your timetable.  But if you could be here

25  where Ms. Francis can find you in the jury room about 10 'til,

1   that would be great.

2           Any questions about logistics here?  All right.

3   Have a good evening.  Thank you.

4       (Jury left the courtroom.)

5           THE COURT:  What shall we do with your witness,

6   Mr. Daly?  I don't think we need her for this.

7           MR. DALY:  No.  I can have one of our -- we have

8   agents on standby.  They can bring her back for the night.

9           THE COURT:  Thank you.  And we'll see you tomorrow.

10  Okay?

11          THE WITNESS:  You're welcome.

12          THE COURT:  Please be seated.  Now, we discussed an

13  offer of proof that you would like to make, Mr. Caskey.

14          MR. CASKEY:  I don't think I need to make that right

15  now, Judge.

16          THE COURT:  Okay.  Is there --

17          MR. DALY:  I'm sorry.  What did he say?

18          THE COURT:  He says he doesn't think he needs to

19  make that at this time.

20          A JUROR:  Excuse me.

21          THE COURT:  Thank you, Ms. Welna.  Whoops.  Did they

22  lock you out?

23          A JUROR:  Yeah.  I'll go out -- would that way be

24  okay?

25          THE COURT:  There may be a -- there may be a push

1    pull thing there too, sir.  You might try it the other way.

2              A JUROR:  Okay.  Great.  Thank you.

3         (Juror left the courtroom.)

4              MS. SHELDON-SHERMAN:  I open that door every day.

5              THE COURT:  Okay.  So Mr. Caskey does not wish to

6    make an offer proof at this time.

7              MR. CASEY:  Your Honor, so -- just a little

8    confused.  Can we then excuse A.J. Russell?

9              THE COURT:  Okay.  So you'd like to -- you'd like to

10   excuse him?

11             MR. CASEY:  Excuse him for all purposes, yes, Your

12   Honor.

13             THE COURT:  Okay.  Mr. Caskey?

14             MR. CASKEY:  Oh, I'd like to make that decision in

15   the morning.

16             THE COURT:  Okay.

17             MR. CASEY:  Your Honor, it's -- he's asking -- he's

18   already asked to reserve cross on a witness for after another

19   witness's testimony.  I mean --

20             THE COURT:  Well, he's abandoned his -- he's already

21   said he's not going to do a offer of proof.  So the Court

22   doesn't have anything else to consider in making the ruling.

23   I told him I would reconsider my ruling depending on the offer

24   of proof.  He's not going to make the offer of proof.  In

25   fairness, it's not like Mr. Russell lives in Sheboygan; right?

1   Mr. Russell lives in the Kansas City area, I understand,

2   and -- and in fairness, I would like you to make him

3   available.  This is -- his testimony is pretty important.  I

4   don't know that Mr. Caskey's going to call him.

5             MR. CASKEY:  Right.

6             THE COURT:  But I would like him to be available for

7   Mr. Caskey.  What's the inconvenience or the problem with

8   that?

9             MR. CASEY:  Well, I'm sorry.  I mean, Mr. Russell

10  has work considerations.  And I don't think -- you know, it's

11  a -- where we can just have him spend the next -- take the

12  next three days off work.

13            THE COURT:  No.  He should go to work.

14            Mr. Caskey, do you intend to call him tomorrow?

15            MR. CASKEY:  Yes.

16            THE COURT:  You do?

17            MR. CASKEY:  Well, I mean, I would imagine I would.

18  I mean, I need to talk with him.

19            THE COURT:  Well, hold on.  Hold on.  Now, I'm going

20  to -- Mr. -- I agree with the government, we need to be a

21  little more specific.  But Mr. Caskey, on his defense, doesn't

22  know when you're going to be done with your case.  You have

23  communicated this with him.  You don't know how long the cross

24  examination is going to be.  It hasn't been very long so far.

25  But he can go to work as long as he can be here in a couple

1    hours.  How about that?

2            MR. DALY:  Well, he didn't endorse any witnesses,

3    Your Honor.  So is he going to call a government witness in

4    his rebuttal case?

5            MR. CASKEY:  Yes.

6            MR. CASEY:  I'm just confused about procedurally

7    what we're doing here.

8            MR. CASKEY:  I mean, I don't think it's

9    inconveniencing Mr. Russell to reappear tomorrow.

10            MR. CASEY:  It's not a question -- Your Honor, at

11    this point it's not a question of inconvenience, it's kind of

12    a question of just trial rules and respecting the trial

13    process.

14            THE COURT:  Well, I understand.  I understand.

15            MR. CASKEY:  We wanted to meet Mrs. Hill -- now, my

16    understanding that she didn't want to meet us, and -- and --

17            THE COURT:  Well, we're back to Mr. Russell again

18    now.

19            MR. CASKEY:  Okay.

20            THE COURT:  Ms. Hill is here and you're going to

21    have a shot at cross examination.

22            MR. CASKEY:  Right.

23            THE COURT:  What about Mr. Russell?

24            MR. CASKEY:  I think I'm going to call him in our

25    case-in-chief.

1    THE COURT:  Okay.

2    MR. CASKEY:  Whenever they finish.

3    THE COURT:  Okay.

4    MR. CASEY:  Your Honor, he could have endorsed him

5  as a witness at any point along this trial.

6    THE COURT:  I understand.

7    MR. CASEY:  And we could have dealt with this while

8  Mr. Russell was on the stand.  I mean, typically if defense,

9  you know, is calling, you know, case-in-chief testimony, they

10  do it during their cross period, and they have time to ask,

11  you know, opening questions and elicit testimony.  I mean,

12  this is kind of a back door way to bring in later on issues

13  that we've already briefed.  I mean, we filed the motion in

14  limine to avoid the issue.

15    THE COURT:  Well, the issue is done.

16    MR. CASKEY:  Yeah.  That is done.

17    THE COURT:  The Court's ruled on the particular

18  issue, the issue about his sexual history with other women.

19  We've already dealt with that issue.

20    MR. CASEY:  And then --

21    THE COURT:  Let me inquire --

22    MR. CASEY:  -- he didn't have any other questions,

23  Your Honor.

24    THE COURT:  Let me inquire of Mr. Caskey.  Now,

25  Mr. Caskey, you know much more about this case than I do, sir.

1    But from what I can tell, Mr. Russell testified completely

2    consistent with how you expected him to testify today; true?

3             MR. CASKEY:  Correct.

4             THE COURT:  There was no -- there was nothing that

5    Mr. Russell testified that you didn't anticipate he would

6    testify to, I would suspect; is that a fair statement?

7             MR. CASKEY:  That's a fair statement.

8             THE COURT:  And the government's concern is that you

9    haven't endorsed any witnesses, and now after Mr. Russell's

10   done, you're thinking you want to call him.  May I ask what

11   purpose for which you will call Mr. Russell?

12            MR. CASKEY:  Well, some -- some of the cross would

13   be on -- I mean, they've --

14            THE COURT:  Some of the direct examination?

15            MR. CASKEY:  Yeah.  And they've indicated that they

16   may be calling a -- a Jackson County prosecutor, because

17   apparently he hasn't been charged.

18            THE COURT:  It's a female Jackson County prosecutor,

19   I believe.

20            MR. CASEY:  Your Honor, that was as a rebuttal

21   witness if they --

22            THE COURT:  Let's let him finish -- let's let

23   Mr. Caskey finish.

24            MR. CASKEY:  So, I mean, you know, it was

25   approximately like 4:10 when they got done with Mr. Russell.

1   I wanted to make that offer of proof.  I mean, I pretty much

2   have clean hands on this.  I think the cross was going to take

3   over past five o'clock.

4           MR. DALY:  We continued --

5           THE COURT:  The cross on who?

6           MR. CASKEY:  Mr. Russell.  It will take longer than

7   that.

8           MR. CASEY:  The solution on that was --

9           THE COURT:  Well, hold on.  Hold on.  Now,

10  Mr. Caskey, you said you didn't have any cross for

11  Mr. Russell, and so I'm kind of here with the government on

12  this part of it.  You said, "Judge, we don't have any cross."

13  We let him go.  Now, if you have a new subject for which you

14  would like to call Mr. Russell on your case-in-chief,

15  something that you couldn't accomplish in the cross, really,

16  the government's very correct on this as far as we can't just

17  keep letting witnesses go when you say you don't have cross

18  and you keep asking them to come back to -- to the witness

19  stand.  Do you see what I'm saying?

20          MR. CASKEY:  Yes.

21          THE COURT:  So here's what we're going to do.  I'm

22  going to give you a chance to sort this out, Mr. Caskey.  I

23  would like to have Mr. Russell on notice, for now.  He may not

24  ever get to testify, based on the offer of proof you make when

25  you decide to call him on your case-in-chief.  I don't know.

1    But I do want him within two hours of the courthouse.

2              MR. CASEY:  We'll --

3              THE COURT:  Can you do that?

4              MR. CASEY:  We will.  We'll do our best, Your Honor.

5              MR. CASKEY:  Thank you.

6              THE COURT:  So we're going to do that.  Now, Mr.

7    Caskey I don't want to lead you astray here, because you may

8    say, Judge, I want to call -- cross examine Mr. Russell.  I

9    may say no.  You understand that?

10             MR. CASKEY:  Yes.

11             THE COURT:  But we're going to talk about that,

12   because that's something you could have accomplished while he

13   was here, even though it went past the five hour, we would

14   bring him back the next day.

15             MR. CASKEY:  Correct.

16             THE COURT:  So I expect all of the crosses to be

17   done contemporaneously with the direct generally; right?  So

18   let's think about that.  And that may not even be a bridge we

19   have to cross.  We'll wait to hear from the defense on that.

20   Okay?  Anything else we need to talk about from the

21   government?

22             MR. DALY:  No, Your Honor.

23             THE COURT:  Okay.

24             MR. CASKEY:  No, Judge.

25             THE COURT:  All right.

1          MR. CASKEY:  Thank you.

2          THE COURT:  Have a good evening.  And if you all

3    remember my rules of trial say 8:30 on the second day.  Try to

4    navigate parking --

5          MR. CASKEY:  We will be here.

6          THE COURT:  -- and all that before then so we can

7    get cracking on this.  All right?  Thank you, gentlemen, and

8    ladies.  Thank you.

9          MR. DALY:  Thank you.

10       (Proceedings concluded at 5:10 p.m.)

11                    C E R T I F I C A T E

12       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

13   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

14

15   /s/Regina A. McBride, RDR, CRR   March 1, 2013
     REGINA A. MCBRIDE, RDR, CRR       DATE
16   Official Court Reporter

17

18

19

20

21

22

23

24

25