1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF MISSOURI
2                          WESTERN DIVISION

3

     UNITED STATES OF AMERICA,      )  Case No. 4:11-CR-00109-DGK-1
4                                   )
              Plaintiff,            )
5                                   )
     VS.                            )
6                                   )
     COREY MONROE MCKINNEY,         )
7                                   )  January 16, 2013
              Defendant.            )  Kansas City, Missouri
8

9            *****************************************

10                          VOLUME II
             TRANSCRIPT OF JURY TRIAL AND CHANGE OF PLEA
11                      BEFORE GREG KAYS
                 UNITED STATES DISTRICT JUDGE
12
             *****************************************
13
     APPEARANCES:
14   For United States:        Patrick Daly
                               Brian P. Casey
15                             U.S. Attorney's Office
                               400 E. 9th Street, Suite 5510
16                             Kansas City, Missouri  64106

17   For Defendant:            K. Louis Caskey
     [Defendant present.]      14 Dockside Drive
18                             Lake Tapawingo, Missouri  64015
                                        and
19                             Stephanie Burton
                               Law Office of Stephanie Burton, LLC
20                             4743 Troost Avenue
                               Kansas City, Missouri  64110
21

22                   Regina A. McBride, RDR, CRR
                        Official Court Reporter
23                 400 East 9th Street, Room 8652
                      Kansas City, MO  64106
24                          816.512.5623

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

1                        I N D E X

2    Pretrial conference - Page 134
     Change of plea - Page 217
3    Reporter Certificate - Page 268

4    WITNESSES:

5    COURTNEY PAIGE HILL
          Further Direct Examination by Mr. Daly - Page 138
6         Cross Examination by Ms. Burton - Page 193
     DETECTIVE REBECCA MILLS
7         Direct Examination by Mr. Daly - Page 196

8

9    EXHIBITS ADMITTED:

     Government Exhibit 154 - Screen capture from
10     John Doe.wmv - Page 149
     Government Exhibit 60 - Handwritten copies of text
11     messages - Page 154
     Government Exhibit 96 - Phone conversation 7/6/11 - Page 169
12   Government Exhibit 98 - Phone conversation 7/12/11 - Page 169
     Government Exhibit 100 - Phone conversation 7/15/11- Page 169
13   Government Exhibit 102 - Phone conversation 7/15/11- Page 169
     Government Exhibit 104 - Phone conversation 7/16/11- Page 169
14   Government Exhibit 106 - Phone conversation 7/17/11- Page 169
     Government Exhibit 108 - Phone conversation 7/20/11- Page 169
15   Government Exhibit 110 - Phone conversation 7/22/11- Page 169
     Government Exhibit 114 - Phone conversation 7/23/11- Page 169
16   Government Exhibit 118 - Phone conversation 7/27/11- Page 169
     Government Exhibit 128 - Phone conversation 8/8/11- Page 169
17   Government Exhibit 97 - Transcript from Exhibit 96 - Page 171
     Government Exhibit 99 - Transcript from Exhibit 98 - Page 171
18   Government Exhibit 101 - Transcript from Exhibit 100- Page 171
     Government Exhibit 103 - Transcript from Exhibit 102- Page 171
19   Government Exhibit 105 - Transcript from Exhibit 104- Page 171
     Government Exhibit 107 - Transcript from Exhibit 106- Page 171
20   Government Exhibit 109 - Transcript from Exhibit 108- Page 171
     Government Exhibit 111 - Transcript from Exhibit 110- Page 171
21   Government Exhibit 115 - Transcript from Exhibit 114- Page 171
     Government Exhibit 119 - Transcript from Exhibit 118- Page 171
22   Government Exhibit 129 - Transcript from Exhibit 128- Page 171
     Government Exhibit 132 - 7/27/11 letter from CV - Page 179
23   Government Exhibit 19 - Video from Oct weekend - Page 188
     Government Exhibit 180 - Screen capture from video from
24     Oct weekend - Page 188

25

1        (Begin proceedings in open court at 8:30 a.m.)

2            THE COURT:  Thank you all for being here.  All

3    right.  What do we need to talk about?  Anything from the

4    government?

5            MR. DALY:  Nothing from the government, Your Honor.

6            THE COURT:  Give me a roadmap today, if you would,

7    of how this day looks to you.

8            MR. DALY:  Yes, Your Honor.  We anticipate as a

9    roadmap we're going to obviously continue with the direct

10   examination of Private Hill.

11           THE COURT:  How much more do you think you got with

12   her?

13           MR. DALY:  I would say the way the evidence has been

14   coming in, I would estimate roughly an hour, maybe slightly

15   more.

16           THE COURT:  Okay.

17           MR. DALY:  Because it depends on how long the story

18   takes to get out.  We have a number of phone calls to play at

19   the back end.  But we've compressed those substantially.

20           THE COURT:  Thank you.

21           MR. DALY:  So I would say roughly an hour.  You

22   know, minimal amount of CP evidence through her, I would say a

23   quick clip from the Russell.wmv just for identification

24   purposes of her engaged in sexual activity with A.J.  But from

25   there -- from here on out with her, it's going to be mostly

1    telephone calls and just testimonial evidence.  So we'll be

2    able to spare the Court and the jury of any extensive

3    pictures.

4              THE COURT:  We're done really for the most part with

5    the pictures and the videos?

6              MR. DALY:  Through this witness, yes, Your Honor.

7              THE COURT:  Okay.  Very good.

8              MR. DALY:  And I'd say after that, you know,

9    obviously the defense hopefully cross her immediately after

10   that.  We would then bring on Detective Rebecca Mills, who's

11   our expert witness, to testify about human trafficking.  We

12   have a number of law enforcement witnesses we're going to

13   attempt to compress them through the morning and hopefully get

14   done with them in the morning.  And then I would say in the

15   afternoon, a number of lay witnesses that have had some

16   contact with the defendant in some capacity as well as -- and

17   a summary of our case agent.  So hopefully by mid afternoon,

18   late -- late afternoon we would be able to rest our case.

19             THE COURT:  Wow.

20             MR. DALY:  That's again, Your Honor --

21             THE COURT:  That's ambitious.  I won't hold you --

22             MR. DALY:  That's ambitious.  It's assuming things

23   move as they've moved so far.  But I think that's a pretty

24   fair --

25             THE COURT:  I won't hold you to any of that.  I

1    appreciate kind of the roadmap, and I hope -- I hope we get

2    done in that fashion.

3              MR. CASKEY:  I do too.

4              THE COURT:  What do you think, Mr. Caskey, is there

5    anything we need to talk about in your case, from the

6    defendant's case?

7              MR. CASKEY:  No.

8              THE COURT:  We're all ready to go?

9              MR. CASKEY:  We're ready to go.

10             THE COURT:  Now, have you thought about this witness

11   Russell any more since we talked?

12             MR. CASKEY:  I -- we've discussed that.  I went out

13   to CCA last night and -- and we'd like to -- we're going to

14   revisit that and revisit that after Ms. Hill gets done

15   testifying.

16             THE COURT:  Okay.  Okay.  Now, I told them -- I just

17   want you to keep in mind, this is really kind of out of the

18   ordinary that I let you call a witness that's already here.

19   We -- we're not going to make a practice of that, certainly.

20             MR. CASKEY:  No, I won't.

21             THE COURT:  I expect you to cross whoever you can.

22   But I guess my point is, under the -- under the heading of, I

23   don't want this jury to wait, when you think that you're going

24   to call him, you need to keep us busy for a couple of hours

25   with other witnesses.

1          MR. CASKEY:  Right.

2          THE COURT:  And let the government know, at least

3     two hours ahead of time, or maybe the night before.  Like

4     maybe tonight you can say, hey, listen, I'm going to call this

5     guy at this time, so he can make arrangements and the

6     government can make arrangements; right?

7          MR. CASKEY:  Right.

8          THE COURT:  And maybe you don't want to call him.  I

9     don't know.

10         MR. CASKEY:  Right.  Right.  I would say we will

11    know that by noon.

12         THE COURT:  Okay.  Very good.  Very good.  Okay.

13    Anything else we need to talk about?

14         MR. CASKEY:  No.

15         THE COURT:  All right.  Well, then, if the jury gets

16    here early we'll start early.  If they're not, we'll start at

17    9:00, and if that's all right?

18         MR. DALY:  That's perfect, Your Honor.  Thank you.

19       (Recess at 8:33 until 9:00 a.m.)

20         THE COURT:  How is everything going for the jury

21    this morning?

22         A JUROR:  Good.

23         A JUROR:  Good.

24         THE COURT:  We like to report it's going to be a

25    little bit warmer day, but we're all going to be in here

1    working.  But hopefully you'll get out a little bit when you

2    get home.

3              All right then.  Mr. Daly, sir.

4              MR. DALY:  Yes, Your Honor.  The government -- she's

5    still under oath.  But the government recalls Courtney Hill to

6    the stand.

7              THE COURT:  Very good.

8              And also, ladies and gentlemen of the jury, thank

9    you for being here on time.  We appreciate that.

10             Ms. Hill, we'll ask that you retake the witness

11   stand.  And I'll remind you you're still under oath from

12   yesterday.  And to begin with, if you will, begin by speaking

13   your full name and spelling your last name for us again.

14             THE WITNESS:  Courtney Paige Hill.  Last name

15   H-I-L-L.

16             THE COURT:  Thank you, Ms. Hill.

17             Mr. Daly.

18             MR. DALY:  Thank you.

19    COURTNEY PAIGE HILL, GOVERNMENT WITNESS, PREVIOUSLY SWORN

20                    FURTHER DIRECT EXAMINATION

21   BY MR. DALY:

22   Q.  Ms. Hill, we're going to kind of pick up after kind of

23   where we left off yesterday.  But let me -- if I could briefly

24   revisit one issue.  It was the camcorder that was used in that

25   Exhibit Number 7.  The Sony camcorder that we spoke about.

1   You testified that was not the defendant's camcorder; correct?

2   A.   Yes.

3   Q.   And is it your understanding he borrowed that camcorder

4   from somebody?

5   A.   Yes.

6   Q.   Okay.  So now let's go into the -- how you first met A.J.,

7   the story there.  How was it you first met A.J. Russell?

8   A.   Through Facebook.

9   Q.   And when you say through Facebook, tell us a little bit

10  about that.  How do you identify him as a friend?  How does he

11  come on your radar screen?

12  A.   There's -- there's a list on the side of Facebook site

13  that shows people that you may know, and he popped up on that

14  list.

15  Q.   So like, you know, use that TV screen as an example.  I

16  mean, imagine that's a computer screen.  You have the gray

17  bars on the left and right side.  Where would, like I say, the

18  people you may know pop up as you're looking at a Facebook

19  profile screen?

20  A.   To the right.

21  Q.   Okay.  So is it a listing of people that Facebook, through

22  a variety of ways, has identified maybe have common friends,

23  or for whatever reason, common interests, this is a person you

24  may know, ,think of adding them?

25  A.   Yes.

1    Q.   Is that how it works?

2    A.   Yes.

3    Q.   And then you can add them as a friend or go to their

4    Facebook profile or send them a message?

5    A.   Yes.

6    Q.   Did you reach out and add him or message him on Facebook?

7    A.   Yes.

8    Q.   And the jury's already heard extensive discussion about

9    this, but did you -- how would you characterize the

10   conversation and how it moved on and how it evolved?

11   A.   Friendly and then flirty.

12   Q.   So you were flirting with him.  As you're flirting with

13   him, you know, what are you kind of thinking?  What are your

14   intentions in terms of getting to know him?

15   A.   Hmm.  Just look for a new friend.

16   Q.   And not only a friend, but a potential partner, is that a

17   fair -- at some point did he become a potential sexual partner

18   for you?

19   A.   Yes.

20   Q.   And as you're kind of flirting with him, at that time are

21   you thinking you might in any way that you're going to make

22   money off of having sex with him?

23   A.   No.

24   Q.   So, again, not to be judgmental, but, you know, you're

25   open minded to, say, having a sexual not --

1    no-strings-attached relationship with somebody, but you're not

2    thinking of it as a money making thing?

3    A.  No.

4    Q.  Did you eventually make plans with him over Facebook and

5    text message to come over that night?

6    A.  Yes.

7    Q.  And now I know, you know, in the messages you referenced,

8    you know, you're living at your, was it your brother's place?

9    A.  Yes.

10   Q.  And but obviously you're living with the defendant.  Did

11   you ever say anything to the defendant about the fact that

12   A.J. Russell would be coming over?

13   A.  Yes.

14   Q.  And what did you tell him?

15   A.  I told him that A.J. was coming over.

16   Q.  What did he say about that?

17   A.  He asked if we were going to have sex.  I say yes.

18   Q.  And when you said you were going to have sex with him, how

19   did he respond?

20   A.  Are you going to record it?

21   Q.  And what did you say?

22   A.  Yes.

23   Q.  Was it your idea to record it?

24   A.  No.

25   Q.  Was it his idea to record it?

1   A.  Yes.

2   Q.  Did the defendant ever ask how old A.J. was?

3   A.  Yes.

4   Q.  And what did you tell him?

5   A.  Thirty-one.

6   Q.  And what did he say about that?

7   A.  A.J. was younger than him.

8           THE COURT:  I'm sorry.  I didn't understand what you

9   said.

10          THE WITNESS:  A.J. was younger than him.

11          THE COURT:  Okay.

12  Q.  A.J. was younger than the defendant?

13  A.  Yes.

14  Q.  Now, how did -- how did money come into the equation.  How

15  did -- you know, how did a no strings attached kind of sexual

16  encounter on Facebook become a money thing?

17  A.  Me and Corey were talking about me and A.J.'s sexual

18  relationship, and then he said that if A.J. would ever try

19  anything then we'd go blackmail him with the video.

20  Q.  So before A.J. even comes over, who brings up the idea of

21  money?

22  A.  Corey.

23  Q.  And was it because of the knowledge that there's a

24  substantial age difference between you two and you and A.J.?

25  A.  Yes.

1    Q.  And again, there is a substantial age difference.  He was

2    almost twice your age; right?  I mean, you're 16 at the time?

3    A.  Yes.

4    Q.  A.J. is in his early 30s, but the defendant's older than

5    A.J.?

6    A.  Yes.

7    Q.  When you're speaking to A.J., how old did you tell him you

8    were?

9    A.  Seventeen.

10   Q.  And why did you say you were 17?

11   A.  Because there was the rumor around town that 17 was the

12   legal age of consent.

13   Q.  You know, you're 16, you probably hang out with other 16

14   year olds and 17 year olds at this time; right?

15   A.  Yes.

16   Q.  So people are kind of starting to figure out, you know,

17   when the right age or appropriate age is to start having sex

18   with people older?

19   A.  Yes.

20   Q.  Much like, you know, you know when you're 18 you can buy

21   cigarettes, when you're 17 you can have sex with an older

22   person; right?

23   A.  Yes.

24   Q.  Under Missouri law?

25   A.  Yes.

1   Q.  So in terms of this money plan, you know, how -- what was

2   the defendant's plan in terms of how this was all going to go

3   down the night A.J. comes over?

4   A.  It wasn't decided the first night.

5   Q.  Well, obviously there's a decision to be made to make

6   money and record the sexual act; right?

7   A.  Yes.

8   Q.  How was that plan going to be executed?

9   A.  That he would come over and we would have sex and it would

10  be recorded.

11  Q.  And who was going to record it?

12  A.  The webcam.

13  Q.  And who was going to set up the webcam?

14  A.  Corey.

15  Q.  And what was Corey supposed to do?  Was he going to go

16  somewhere?

17  A.  Yes.

18  Q.  And what was the original plan in terms of where Corey was

19  supposed to go?

20  A.  I don't know.

21  Q.  He was going -- but he was going to leave the apartment?

22  A.  Yes.

23  Q.  How much money was the plan to make off of A.J. at that

24  time?

25  A.  Five hundred dollars.

1    Q.  And obviously the $500 was eventually demanded from A.J.

2    after the sex; right?

3    A.  Yes.

4    Q.  But the defendant didn't leave the apartment that night;

5    did he?

6    A.  No.

7    Q.  I'm going to show you what's been previously admitted as

8    Government's Exhibit Number 9.  We're going to play the first

9    30 seconds of this, and then we'll -- we'll pause it.

10           MR. DALY:  And before we -- if we could pause it

11   really quick.  I'm sorry, Ms. Welna.

12   Q.  You're familiar with this video that we're watching here

13   in a second?

14   A.  Yes.

15   Q.  And you've previously seen this?  This accurately shows

16   what you've watched in the presence of the government as well

17   as other people?

18   A.  Yes.

19   Q.  Okay.

20           MR. DALY:  Can we play the first 30 seconds?

21      (Government Exhibit 9 played to 30.5 seconds.)

22   Q.  Now, we just saw somebody doing what appears to be setting

23   up the recording.  Who was that setting up that recording?

24   A.  The camera was already on when he walked in front of it.

25   Q.  Well, at the start of the video as he starts clicking it,

1   who was that clicking at the keyboard and the mouse when --

2   when the recording starts?

3   A.  Corey.

4   Q.  And it appears this person's wearing jean shorts and a

5   blue sweatshirt?

6   A.  Yes.

7   Q.  Is that what Corey was wearing that night?

8   A.  Yes.

9           MR. DALY:  And Ms. Welna, if we could skip forward

10  to the 2:38 mark?

11      (Government's Exhibit 9 started at 2:30, stopped at

12      3:06.)

13          MR. DALY:  Pause it.

14  Q.  Were you able to hear a sound there at the -- at the tail

15  end of that video clip we just saw?

16  A.  No.

17      (Government Exhibit 9 started at 2:30 and stopped at

18      3:03.)

19  Q.  Okay.  We just heard the clip there.  Were you able to

20  hear a sound towards the end of that clip we just watched?

21  A.  Yes.

22  Q.  And what was that sound?

23  A.  The closet door.

24  Q.  And how do you know that was the closet door?  Have you

25  ever used that closet door before?

1    A.  Yes.

2    Q.  And that's the closet door in the bedroom?

3    A.  Yes.

4    Q.  Why was that closet door being shut?

5    A.  I'm assuming he went in there.

6    Q.  Was that Corey, was he going in the closet?

7    A.  Yes.

8    Q.  And you arrived in the room shortly after he enters the

9    closet; correct?

10   A.  Yes.

11   Q.  And as you are in the room, are you able to see

12   anything -- see that the video camera and the webcam on the

13   computer is recording?

14   A.  No.

15   Q.  And why aren't you?

16   A.  Because you can minimize the screen.

17   Q.  And --

18            THE COURT:  Because you can what?

19            THE WITNESS:  Minimize the screen.

20            THE COURT:  Okay.

21   Q.  And had the defendant minimized the screen before he

22   walked into the closet?

23   A.  Yes.

24   Q.  And was anything playing on the -- on the video on the

25   screen?

1   A.  No.

2           MR. DALY:  Now if we could just skip forward to a

3   random place.  Okay.

4   Q.  What do we see in that clip just there?

5   A.  Me and A.J. having sex.

6   Q.  And again, you were how old at the time?

7   A.  Sixteen.

8   Q.  Under the age of 18?

9   A.  Yes.

10          (Government Exhibit 9 played at 26:36.)

11  Q.  Now, we're going to show a portion towards the end of this

12  video.  Again, this is at about the hour and 26-minute mark on

13  this video.  Do you hear the voices kind of talking in the

14  background?

15  A.  Yes.

16  Q.  Is that you?

17  A.  Yes.

18  Q.  Now, we just heard that noise again.  What is that we just

19  heard?

20  A.  The closet door.

21  Q.  Is that the closet door opening from the defendant leaving

22  the closet?

23  A.  Yes.

24  Q.  And it appears we're about to see somebody walk in front

25  of the camera.  Who is this person?

1    A.  Corey.

2    Q.  Now, we just saw what appeared to be a man handling the

3    webcam and moving it away quickly.  Who was that we just saw

4    doing that?

5    A.  Corey.

6         MR. DALY:  And if I can -- if we could black out the

7    screen, Alexandria.  Thank you.

8    Q.  And I'm going to show you what's been previously marked as

9    Government's Exhibit Number 154.  Do you recognize this image

10   that I'm showing you?

11   A.  Yes.

12   Q.  You've seen this prior to today?

13   A.  Yes.

14   Q.  And does this fairly and accurately show a screen capture

15   of the person that just took down the camera?

16   A.  Yes.

17        MR. DALY:  Your Honor, at this point the government

18   would like to admit Government's Exhibit Number 154.

19        MR. CASKEY:  No objection.

20        THE COURT:  Thank you.  154 is admitted.

21        MR. DALY:  Thank you, Your Honor.

22      (Government Exhibit 154 admitted in evidence.)

23   Q.  Who do we see here in this picture?

24   A.  Corey.

25   Q.  Now, after the defendant stopped this recording of Exhibit

1    9, what happened then?  Did you guys talk?

2    A.  Yes.

3    Q.  What did you talk about?

4    A.  Me and A.J. having sex.

5    Q.  And what did he say about that?

6    A.  He said that me and A.J. did some things that me and Corey

7    never did.

8    Q.  Certain positions?

9    A.  Yes.

10    Q.  And there are things that he wanted to do with you later

11    on?

12    A.  Yes.

13    Q.  At that time after that night, did you see whether or not

14    the defendant did any research on A.J.?

15    A.  No.

16    Q.  You didn't see him do any research on A.J. or his wife?

17    A.  No.

18    Q.  Online?  He wasn't looking online, on any websites about

19    information about A.J.?

20    A.  No.

21    Q.  So now you guys had the plan to make the money off the

22    sexual activity.  Whose plan was it to have A.J. come back?

23    A.  Mine.

24    Q.  And the defendant's; correct?

25    A.  Yes.

1   Q.  You guys both planned to do that?  How was the meeting

2   supposed to happen?

3   A.  Corey was supposed to walk in on me and A.J. having sex.

4   Q.  So the plan is to have A.J. come back over, you guys were

5   going to be in the midst of having sex again, and at that

6   moment the defendant's going to bust into the room and catch

7   you coincidentally in the act?

8   A.  Yes.

9   Q.  And the plan was the defendant was going to confront A.J.

10  and ask for the money at that time?

11  A.  Yes.

12  Q.  How much money was he going to ask for?

13  A.  Five hundred dollars.

14  Q.  And what was the agreement in terms of the $500?  Is it

15  going to be split up in any way?

16  A.  Corey was supposed to use some to get his brakes fixed and

17  then give the rest to me.

18  Q.  And why were you going to get the rest?

19  A.  Because he said that I earned it.

20          THE COURT:  I'm sorry.  I didn't understand that.

21          THE WITNESS:  Because he said that I earned it.

22          THE COURT:  Okay.

23  Q.  Okay.  So, again, just like the original plan, the

24  defendant during the recording is supposed to leave, the

25  actual plan didn't wind up that way.  Did the defendant bust

1    in while you guys were actually having sex?

2    A.  No.

3    Q.  At what point did he come into the room?  What was

4    happening in the room at that time?

5    A.  Me and A.J. were standing up talking, naked.

6    Q.  And how did he refer to you?

7    A.  As his little sister.

8    Q.  How old did he say that you were?

9    A.  Sixteen.

10   Q.  And how did he refer to himself?

11   A.  As his brother.  I mean, as my brother.

12   Q.  And what was his name?

13   A.  Monroe.

14   Q.  And the jury's already heard substantial amount about the

15   discussion back and forth.  But was the demand for $500 made

16   to A.J.?

17   A.  I'm sorry.  Can you repeat that?

18   Q.  Well, let me just -- there's -- there's a discussion with

19   A.J. about a defendant, about how much trouble he could be in

20   for having sex with a 16 year-old girl?

21   A.  Yes.

22          MR. DALY:  And I'm going to approach the witness

23   with what's been previously marked as Government's Exhibit

24   Number 60.

25   Q.  Do you recognize this?  Do you recognize those pages?

1   A.  Yes.

2   Q.  And what are they a copy of?

3   A.  Me and A.J.'s text messages.

4   Q.  And do you recognize the handwriting in these papers?

5   A.  Yes.

6   Q.  And how is it you recognize this handwriting?

7   A.  That's my handwriting.

8   Q.  And would you say there's approximately 20 or so pages of

9   handwritten notes?

10  A.  Yes.

11  Q.  And you transcribed all this; correct?

12  A.  Yes.

13  Q.  How long did it take you?

14  A.  About a day.

15  Q.  And who told you to do this?

16  A.  Corey.

17  Q.  And why did he tell you to do this?

18  A.  I guess for evidence.

19  Q.  And these -- again, this is your handwriting and this

20  reflects your handwriting of these text messages on your

21  phone?

22  A.  Yes.

23          MR. DALY:  Your Honor, at this time the government

24  would move for the admission of Government's Exhibit Number

25  60.

1      MR. CASKEY:  No objection.

2      THE COURT:  Sixty -- sixty is admitted.

3    (Government Exhibit 60 admitted in evidence.)

4  Q.  And as we're looking through this --

5      MR. DALY:  And if we could show the first page,

6  Ms. Welna.

7  Q.  You know, again, there's a lot of pages here.  We won't go

8  through each one by one.  But do these reflect the text

9  message communications that you had with A.J. after you kind

10  of moved off Facebook, but before and after he came over the

11  morning of the 24th?

12  A.  Yes.

13  Q.  And were these text messages used during the confrontation

14  on the 25th when he came back for a second time?

15  A.  Briefly.

16  Q.  But again, it's to show that you guys had already built up

17  some evidence about the sexual activity that you'd had?

18  A.  Yes.

19  Q.  While the -- after the money demand was made, where did

20  you go when A.J. and the defendant walked away to get the

21  money?

22  A.  Upstairs.

23  Q.  And is it your understanding they were going to an ATM

24  machine?

25  A.  Yes.

1    Q.  As a matter of fact, you went to get his wallet out of his

2    car to give it to him?

3    A.  Yes.

4    Q.  To get -- to get -- so he could get the ATM card and then

5    you would hold onto the wallet?

6    A.  Yes.

7    Q.  And you didn't see A.J. again after they came back from

8    the ATM; correct?

9    A.  Correct.

10   Q.  But you did see the defendant?

11   A.  Yes.

12   Q.  Did he give you any money?

13   A.  Yes.

14   Q.  How much money did he give you?

15   A.  A hundred dollars.

16   Q.  And when he gave you that hundred dollars, what did he say

17   about it?

18   A.  It's yours.

19   Q.  And why did he say it was yours?

20   A.  Because I earned it.

21   Q.  For having sex with A.J.?

22   A.  Yes.

23   Q.  Now, after that night of the 25th, there's a number of

24   communications with A.J.  Do you recall receiving a text

25   message from the defendant that's written to A.J. about the

1    money and the money that he owes?  Do you recall being copied

2    on a text message that the defendant sent to A.J. about how

3    disgusted he was about all this and everything else?

4    A.  Yes.

5    Q.  But you weren't copied on all the texts that the defendant

6    sent to A.J.; were you?

7    A.  No.

8    Q.  Were you aware in the days and week or so after this March

9    25th date that he had been texting A.J. directly and doing

10   things over Facebook?

11   A.  Yes.

12   Q.  And eventually, were you asked to send your own text

13   messages to A.J.?

14   A.  No.

15   Q.  You didn't -- you -- you -- did you send text messages to

16   A.J.?

17   A.  Yes.

18   Q.  And didn't the defendant ask you to do those?

19   A.  No.

20   Q.  And during this time were you aware of any sort of

21   research into A.J.'s background or where he worked for?

22   A.  Yes.

23   Q.  Now, eventually, did the defendant tell you that there

24   was -- you were finally going to get the money, the rest of

25   the money that he demanded from A.J.?  In late -- in the early

1  April did he tell you that you guys had now a meeting set up

2  to go get the money from the defendant -- or from A.J.?

3  A.  Yes.

4  Q.  And how did he let you know about that?

5  A.  He sent the text message.

6  Q.  And that would have been on or about April 7th?

7  A.  Yes.

8  Q.  And did you have any planning in terms of the where, the

9  how much, anything in terms of how this meeting was supposed

10  to go down on April 7th?

11  A.  No.

12  Q.  When did you learn it was supposed to happen?

13  A.  That day.

14  Q.  And what time -- what did defendant tell you in that text

15  in terms of where to be?

16  A.  To come straight home.

17  Q.  And when you came home, what did you see in the apartment?

18  A.  Tools, wood pieces, the bed out of the bed frame and all

19  the blinds open.

20  Q.  Had you ever seen that before in the apartment?

21  A.  Yes.

22  Q.  He'd done that before?  He'd been disassembling the bed on

23  prior occasions?

24  A.  Yes.

25  Q.  What else did you see beyond the bed being taken apart and

1    the blinds are being open?

2    A.  Cleaning supplies, and the video on the computer.

3    Q.  When you say the video was on the computer, was the

4    defendant doing anything with that video on the computer?

5    A.  Yes.  He was editing it.

6    Q.  And when you say he's editing it, what was he doing

7    specifically in terms of how to edit that video?

8    A.  Taking himself out of the beginning?

9    Q.  And the end?

10   A.  Yes.

11   Q.  Did he take you out of the video?

12   A.  No.

13   Q.  Just himself?

14   A.  Yes.

15   Q.  And did he make multiple copies of this video?

16   A.  Made two.

17   Q.  And what was he doing with those copies?

18   A.  Keeping them all for evidence and then one for A.J.

19   Q.  And now that the copies were made, where do you go at this

20   time?

21   A.  To the meeting site.

22   Q.  And did the defendant tell you how much you were supposed

23   to -- you guys were going to get out of A.J.?

24   A.  Yes.

25   Q.  How much was that?

1   A.  Five hundred dollars.

2   Q.  And did you tell the defendant not to do this?

3   A.  Yes.

4   Q.  How did you guys get to DeVry?

5   A.  He drove.

6   Q.  Whose car?

7   A.  His.

8   Q.  What kind of car does he have?

9   A.  A black Mercedes.

10  Q.  Now, when you arrived at DeVry, where do you go?  Where

11  does the defendant go?  If you could just briefly walk us

12  through what happens at DeVry the day the defendant and you

13  were placed under arrest?

14  A.  Can you repeat that?

15  Q.  What happens when you guys arrive at DeVry in the

16  afternoon of April 7th?

17  A.  Nothing.  We go upstairs to talk to the other leadership

18  societies.

19          THE REPORTER:  To the other?

20          THE COURT:  I'm sorry.  I didn't...

21          THE WITNESS:  Leadership societies.

22  Q.  Now you said leadership --

23          THE COURT:  Hold on.  Hold on.  I didn't -- I didn't

24  under -- I'm having a hard time understanding you.  I'm sorry.

25  I know you're trying.  What about the leadership societies?

1          THE WITNESS:  We went upstairs to talk to them.

2          THE COURT:  Okay.  Thank you.

3   Q.  And we'll just take a brief discussion on that, leadership

4   societies.  How often would you typically go to DeVry with or

5   without the defendant during the time you lived with him?

6   A.  Almost every day.

7   Q.  And you said leadership society.  Were you a part of some

8   sort of organization that the defendant was part of at DeVry?

9   A.  Yes.

10  Q.  Now, when you're -- when you're arriving at his school,

11  you know, you're half his age, how would he describe you to

12  classmates or people at the school?

13  A.  I was his niece.

14  Q.  And so you -- you know, you're familiar with DeVry and the

15  surroundings there.  You've been there a lot?

16  A.  Yes.

17  Q.  Do you see the defendant is -- are you aware that

18  defendant drops off the drive in a -- in an envelope with the

19  security desk?

20  A.  Yes.

21  Q.  And you're not there for the whole exchange and everything

22  else that happens, but do you see anything unusual in the

23  moments leading up to, you know, when everything kind of came

24  to a head?

25  A.  Yes.

1  Q.  What is unusual that you kind of pick up on when you're

2  there?

3  A.  Detective Mills and Detective Harmon were sitting in the

4  background.

5  Q.  Now, you know their names now?

6  A.  Yes.

7  Q.  And is Detective Harmon here in the courtroom?

8  A.  Yes.

9  Q.  That's him right there?

10 A.  Yes.

11 Q.  And obviously you spoke to them a little bit after -- soon

12 after this all happened?

13 A.  Yes.

14 Q.  And were you -- you placed under arrest initially?

15 A.  Yes.

16 Q.  Now, when you first talked to the detectives on the night

17 of April 7th, how did you describe your relationship with this

18 defendant?

19 A.  He was my brother.

20 Q.  And what did you say about this idea, this whole plan,

21 this whole scheme, whose idea did you say it was?

22 A.  Mine.

23 Q.  And did you tell the detectives who was actually doing the

24 recording on the computer?

25 A.  Yes.

1    Q.  And who did you say that person was?

2    A.  Me.

3    Q.  And did you tell the detectives whose computer it actually

4    was?

5    A.  No.

6    Q.  You didn't -- did you say it was your computer --

7    A.  Yes.

8    Q.  -- that he bought for you?

9    A.  Yes.

10   Q.  But, in reality, that computer was there in that apartment

11   before you got there; wasn't it?

12   A.  Yes.

13   Q.  Subsequent to that you actually testified in a -- in a

14   court proceeding in this case; didn't you?

15   A.  Yes.

16   Q.  Did you testify in that capacity that this defendant

17   was -- was your brother?

18   A.  Yes.

19   Q.  And that you said that he was your brother in that

20   previous court proceeding in this case?

21   A.  I don't remember.

22   Q.  Okay.  Well, previously, in a previous proceeding, you

23   admitted that you had been sexually active with this defendant

24   at some point, but beginning actually in February of 2011.

25   Didn't you say that prior to today?

1   A.  Yes.

2   Q.  But that's not true; is it?

3   A.  No.

4   Q.  As a matter of fact, you know, in the consultation in the

5   course of this case, you know, we've had a chance to look

6   through your Facebook records.  Do you recall that?

7   A.  Yes.

8   Q.  And are you aware of discussion you had with Akia

9   (phonetic) Brown, a friend of yours?

10  A.  Yes.

11  Q.  And is it fair to say that discussion occurred

12  approximately early September of 2010?

13  A.  Yes.

14  Q.  And were you with the defendant when you ran into Akia

15  Brown?

16  A.  Yes.

17  Q.  And who is Akia Brown?

18  A.  My childhood best friend.

19  Q.  And how old is she?

20  A.  Nineteen.

21  Q.  She's 19 now?

22  A.  Yes.

23  Q.  And how old would she have at the time back in September

24  of 2010 when you met her with the defendant?

25  A.  Seventeen.

1          THE COURT:  I'm sorry.  What did you say?

2          THE WITNESS:  Seventeen.

3          THE COURT:  Seventeen.

4    Q.  And I know it's tough.  If you could speak just slightly

5    slower.  Just slow it down just a -- just a little bit.  Did

6    she meet the defendant when she was with you -- when you were

7    with him?

8    A.  Yes.

9    Q.  And did he ask about her?

10   A.  Yes.

11   Q.  And did he ask how old she was?

12   A.  Yes.

13   Q.  And did you tell him?

14   A.  Yes.

15   Q.  And did he ask about making a video with her?

16   A.  Yes.

17   Q.  And again, this -- you know, we've looked through the

18   Facebook records of that -- that conversation is kind of

19   alluded to in the course of this communication with her;

20   right?

21   A.  Yes.

22   Q.  And in that conversation, you know, she asks, you know,

23   who is that guy you were with; right?

24   A.  Yes.

25   Q.  And do you tell her that you guys had been, quote,

1   secretly dating for the last two years?

2   A.  Yes.

3   Q.  And you tell her that he's 34?

4   A.  Yes.

5   Q.  And again, is there some discussion about her being

6   videotaped with him?

7   A.  Yes.

8   Q.  Now, after he is arrested --

9       MR. DALY:  And Your Honor, this may be a point just

10  if we could take possibly a quick break, because of the audio

11  issue.  If we could just straighten this out to make sure.

12      THE COURT:  Okay.  And when you say quick break?

13      MR. DALY:  Like a few -- like a minute or a couple

14  minutes.  Like maybe five minutes to just make sure the audio

15  works, because it seemed like it was jumping a little bit.

16      THE COURT:  Okay.  Ladies and gentlemen, why don't

17  we take a short break, and that way you won't have to wait in

18  here while we do all this.

19      During this recess or any other recess you must not

20  discuss this case with anyone, including the other jurors,

21  members of your family, people involved in the trial, or

22  anyone else.  If anyone tries to talk to you about the case,

23  please let me know about it immediately.  And finally, keep an

24  open mind until all the evidence has been received and you've

25  heard the views of your fellow jurors.

```
 1            We'll take about 10 minutes, okay?  Will that be
 2    enough time?
 3            MR. DALY:  That's fine.  Yeah.  Absolutely.
 4         (Recess at 9:32 until 9:44 a.m.  Jury not present.)
 5            MR. DALY:  May we approach on another matter?
 6            THE COURT:  And you all can be seated, if you'd like
 7    to or -- thank you.
 8         (Bench conference on the record outside the hearing of
 9          the jury.)
10            MR. DALY:  As my defendant was -- or defendant.  As
11    the victim was being led back to the holding conference room
12    back there, she indicated while she was testifying on the
13    stand the defendant's mother was mouthing words to her as
14    she's testifying.
15            THE COURT:  Okay.  I'll address that.
16            MR. DALY:  Okay.
17            THE COURT:  Okay?  Hold on, before you leave.  I
18    just want to make sure, remind you all that when you talk --
19    we're trying to make a good record here obviously.  And when
20    you do speak, whoever is speaking, like if you're going to
21    speak you can come closer to -- closest to the microphone.
22    And you can speak up because we have this white noise around
23    here.
24            MR. DALY:  Okay.
25            THE COURT:  Which is really nice, and they can't
```

1    hear you.  So if you speak too loud, I'll tell you.  But

2    really we can talk pretty freely like that.  Okay?

3            MR. DALY:  Okay.

4            THE COURT:  I just want to alert you to that.

5            MR. DALY:  Thank you.

6            THE COURT:  Very good.

7        (End of bench conference.)

8            THE COURT:  Is the defendant's mother here in the

9    courtroom?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  Ma'am?

12           MS. SHELBY:  Yes.

13           THE COURT:  I know this is a difficult time for you,

14   and we're glad you're here to support your son.  We've had an

15   indication that you may be trying to communicate with the

16   witness while they're testifying.  Now, I'm not going to get

17   into that.

18           MS. SHELBY:  Oh, the witness.  I don't know her.

19           THE COURT:  But if we catch you trying --

20   communicating or mouthing any words, you could fall into the

21   Court's contempt power.  So please be very careful.  Okay?

22   And I'm not saying you did it or didn't do it, but I just want

23   to let you know that's been brought to our attention.  And we

24   want you to be here for this, if you choose to be.

25           MS. SHELBY:  Yes, sir.

1          THE COURT:  But just be mindful of that, no contact

2     directly or indirectly with any witnesses.

3          MS. SHELBY:  So I can't look over here?

4          THE COURT:  You can't make any contact.

5          MS. SHELBY:  I don't know her, so...

6          THE COURT:  Okay?  So that's the deal.

7          MS. SHELBY:  Okay.

8          THE COURT:  All right.  Let's bring them in.

9      (Jury present.)

10          THE COURT:  Mr. Daly, sir, please proceed.

11          MR. DALY:  Thank you, Your Honor.

12     Q.  Now, Ms. Hill, after this matter -- after the defendant

13     had been placed -- and you have been placed under arrest, it

14     was some time before you heard from him again; wasn't it?

15     A.  Yes.

16     Q.  And eventually you received a series of telephone calls

17     and correspondence, letters, poems from him; didn't you?

18     A.  Yes.

19     Q.  And in the course of the preparation for this trial and

20     our investigation, we've had opportunity to play a number of

21     these recorded telephone calls with you in your presence;

22     haven't we?

23     A.  Yes.

24     Q.  And in listening to them you're able to identify not only

25     your voice on the telephone calls but also the defendant's

1  voice?

2  A.  Yes.

3  Q.  And in many instances, you spoke with him, you recalled

4  the actual conversations you were having at that time and kind

5  of what was happening in your life; right?

6  A.  Yes.

7  Q.  And as you listen to those phone calls, do they fairly and

8  accurately reflect the conversations you were having?  Is it

9  an accurate recording of those conversations?

10  A.  Yes.

11          MR. DALY:  At this point, Your Honor, the Government

12  would move to admit Government's Exhibits -- and this is just

13  the phone calls.  The transcripts are supplements to them.

14  But 96, 98, 100, 102, 104, 106, 108, 110, 114, 118, and 128.

15          THE COURT:  Any objection to those?

16          MR. CASKEY:  No objection.

17          THE COURT:  So 96, 98, 100, 102, 104, 106, 108, 110,

18  114, 118, 128 are all admitted.

19          MR. DALY:  That's correct.

20      (Government Exhibits 96, 98, 100, 102, 104, 106, 108,

21      110, 114, 118 and 128 admitted in evidence.)

22  Q.  And Ms. Hill, you know, we've listened to these phone

23  calls.  There's obviously a number of phone calls that we

24  didn't list as exhibits.  But for the -- for the ease of court

25  we're just going to play snippets of this in much the same way

1    we eventually did in the course of preparation.  So if you

2    could -- we'll play the first call extensively and you can

3    kind of identify who's on the phone.  Does that sound like a

4    good way to do this?

5    A.  Yes.

6            MR. DALY:  Okay.  At this point, if we can please

7    play, Ms. Welna, the first minute, 47 seconds of Exhibit

8    Number 96.

9    Q.  And it's your recollection this is a telephone call

10   recorded on July 6, 2011?

11   A.  Yes.

12   Q.  Thank you.

13       (Government Exhibit 96 played momentarily.)

14           THE COURT:  If you can turn the volume down just a

15   little bit, maybe.

16           MR. DALY:  Yeah.  If we can pause that real quick,

17   Ms. Welna.

18   Q.  Ms. -- Ms. Hill, in the course of listening to these phone

19   calls, eventually you were also made available transcripts

20   that accompany these phone calls to help you make out what was

21   being said in these telephone calls?

22   A.  Yes.

23   Q.  And do those transcripts, for the most part, accurately

24   reflect the audio that we hear on those telephone calls?

25   A.  Yes.

1    Q.  And they correctly identify you as the female voice and

2    the defendant as the male voice?

3    A.  Yes.

4            MR. DALY:  Your Honor, at this time the government

5    would move to admit Government's Exhibits Number 97, 99, 101,

6    103, 105, 107, 109, 111, 114, or excuse me 115, 119 and 129.

7            MR. CASKEY:  No objection.

8            THE COURT:  Very well.  97, 99, 101, 103, 105, 107,

9    109, 111, 115, 119 and 129 are admitted.

10           (Government Exhibits 97, 99, 101, 103, 105, 107, 109,

11           111, 115, 119 and 129 admitted in evidence.)

12           MR. DALY:  That's correct.  And the odd numbers go

13   with the even numbers that precede them.  So I'm going to play

14   what's been marked as Government's Exhibit Number 96 with the

15   accompanying transcript, Exhibit Number 97.  If we can

16   reinitiate that call.  Thank you.

17           (Government Exhibit 96 played until 29.18 seconds.)

18   Q.  Now, we're going to do kind of touch and go here.  What do

19   you hear -- who was the name identified right there as being

20   the caller on this telephone call?

21   A.  Ryan.

22   Q.  And immediately after that you hear St. Clair County Jail.

23   Now, do you recognize the voice saying it's Ryan?

24   A.  Yes.

25   Q.  And you know who's staying at the St. Clair County Jail at

1    that time?

2    A.  Yes.

3    Q.  Who is that?

4    A.  Corey.

5    Q.  And you recognize that as being his voice?

6    A.  Yes.

7    Q.  Is there any significance with him using the name Ryan?

8    A.  That was supposed to be the name of our first daughter.

9    Q.  Okay.

10            THE COURT:  That was the name of your first

11   daughter?

12            THE WITNESS:  Yes.

13            THE COURT:  Okay.

14      (Government Exhibit 96 played and stopped at 1:07.4.)

15   Q.  Now, did he just identify himself there in that phone

16   call?

17   A.  Yes.

18   Q.  And how does he respond when you ask if it's Corey?

19   A.  Most of the time.

20   Q.  Now, you said "Oh, my gosh."  Why are you surprised?

21   A.  Because I didn't expect to hear from him.

22   Q.  And why didn't you expect to hear from him?

23   A.  Because he's in jail.

24   Q.  And were you supposed to have any contact with him?

25   A.  No.

1          (Government Exhibit 96 played until 1:46.9.)

2     Q.   Now, you had a chance -- obviously right there what did he

3     tell you in terms of what was happening in that phone call?

4     A.   It was being recorded.

5     Q.   And that's the case, as you're aware, that not only that

6     call but every other call you're going to have with him is

7     going to be recorded in the future?

8     A.   Yes.

9          (Government Exhibit 96 played at 8:32 and stopped at

10         8:50.)

11    Q.   He mentions Courtney, but as he's talking to you at this

12    time he clearly -- he knows it's you he's talking to; correct?

13    A.   Yes.

14    Q.   But he mentions Courtney in the third person; right?

15    A.   Yes.

16    Q.   Why is that?

17    A.   Because we're not supposed to be talking.

18         (Government Exhibit 96 played at 10:54 and stopped at

19         11:27.7.)

20    Q.   Now, he just called you Ms. Mercury there.  What's the

21    significance of Ms. Mercury?

22    A.   That was part of Ryan's name.

23    Q.   And what is -- say -- say Ryan's full name.

24    A.   Ryan Mercury McKinney.

25    Q.   And who was that supposed to be?

1  A.  Our daughter.

2  Q.  And you talked about having a daughter eventually.  If you

3  ever had a daughter with him that was the name you were going

4  to give the daughter?

5  A.  Yes.

6  Q.  And there was something about fiancée questions there.

7  What's that about?

8  A.  I was his fiancée.

9  Q.  And again, how old are you at this time?

10  A.  Sixteen.

11      (Government Exhibit 96 played at 12:03 and stopped at

12      12:18.)

13  Q.  And again, he's talking about communicating with Courtney,

14  and that's you on this phone call?

15  A.  Yes.

16  Q.  And he's clearly saying he's not supposed to be talking to

17  her?

18  A.  Yes.

19      (Government Exhibit 96 played at 15:20 until the end.)

20          MR. DALY:  Okay.  We're going to move on to a phone

21  call a little less than a week later.  It's been previously

22  marked as Government's Exhibit Number 98.  And this would have

23  been on -- is a phone call recorded on July 12th, 2011.

24  Q.  And as we're paused here, how frequently did you and the

25  defendant talk on the phone while he was in custody?

1   A.  It would vary between two to three or four to five times a

2   week.

3   Q.  Okay.

4       (Government Exhibit 98 played at 10:43 and stopped at

5       13:45.)

6   Q.  Now, there's a mention there about how May of next year,

7   this being May of 2012, was an especially significant date.

8   What was significant about May of 2012?

9   A.  I turned 18.

10  Q.  And how is that part of his strategy?

11  A.  Because the assumption was that I didn't have to testify.

12  Q.  Okay.

13           MR. DALY:  We go to Government's Exhibit Number 100.

14  This is a phone call recorded three days later on July 15th,

15  2011.

16      (Government Exhibit 100 played and stopped at 1:01.)

17  Q.  He mentions you getting a letter.  Do you recall receiving

18  letters and poems from the defendant during this time?

19  A.  Yes.

20  Q.  And again, he's speaking about Court -- he -- you're

21  Courtney and he's talking to you on this phone, and he's

22  talking about Courtney in the third person; correct?

23  A.  Yes.

24  Q.  As if he's not really talking to you?

25  A.  Yes.

1          (Government Exhibit 100 played at 2:54 and stopped at

2          4:34.)

3   Q.   Now, we heard obviously earlier in the call when you're

4   talking about getting a letter and then he just gave you what

5   he called instructions to do with that letter and you picked

6   it up; correct?

7   A.   Yes.

8   Q.   And there's a reference to a code, about two different

9   types of sexual activity you would have possibly had with the

10  defendant, and that would be a number or numbers that only you

11  or he would know; right?

12  A.   Yes.

13  Q.   And just so there's no secrecy, what was the eventual

14  code -- how do you crack the code on that one?  What was the

15  number?

16  A.   One.

17  Q.   Okay.  We're going to play you Exhibit Number 102.  That's

18  a telephone call also, July 15th, later on that day.

19          MR. DALY:  If we could just start -- start the phone

20  call.

21          (Government Exhibit 102 played and stopped at 1:53.)

22  Q.   So again, this is a repeat of the code that you'd given

23  previously?

24  A.   Yes.

25  Q.   If we can move forward to a phone call the next day on

1  Exhibit 104.  There's a phone call on -- bless you -- on July

2  16th.

3       (Government Exhibit 104 played at 7:04 and stopped at

4       7:53.)

5  Q.  Now, again, at this point you've in some way or fashion

6  have started to decode the letter and poem that he had sent

7  you previously?

8  A.  Yes.

9  Q.  And then he was going to give you instructions about a

10 week later as to what to do with that information?

11 A.  Yes.

12 Q.  We move forward to a phone call the next day, Exhibit

13 Number 106, which is a July 17th phone call.

14      (Government Exhibit 106 played at 1:50 and stopped at

15      2:58.)

16 Q.  So, again, there's a slight translation problem, and you

17 eventually learn that the word you missed was actually video;

18 right?  Is that reflected in that phone call?

19 A.  Yes.

20 Q.  And that he was going to give -- he's -- what does FC

21 mean?  There was some reference to FC.  What he's talking

22 about there?

23 A.  Federal courthouse.

24 Q.  And he was going --

25            THE COURT:  I'm sorry?

1           THE WITNESS:  The federal courthouse.

2           THE COURT:  Okay.

3    Q.  He was going to give you instructions on what to do with

4    this information in the near future?

5    A.  Yes.

6    Q.  Okay.  We'd like to play Exhibit Number 108.  This is a

7    telephone call dated July 20th.

8           (Government Exhibit 108 played and stopped at 1:01.)

9           MR. DALY:  If we can go to Exhibit Number 110.  It's

10   dated two days later on July 22nd.

11          (Government Exhibit 110 played at 9:16 and stopped at

12          9:44.)

13   Q.  So now this is in reference to the information that he had

14   put in that coded message to you; right?

15   A.  Yes.

16   Q.  And he's telling you to forward this information to his

17   attorney?

18   A.  Yes.

19   Q.  And eventually you did that?

20   A.  Yes.

21   Q.  I show you -- or have you listen to Exhibit Number 144.

22   That's a telephone call the next day on July 23rd, 2011.  I'm

23   sorry, 114.

24          (Government Exhibit 114 played at 1:36 and stopped at

25          2:26.)

1    Q.  So now you sent a statement after this phone call, don't

2    you?

3    A.  Yes.

4    Q.  And he told you not to answer any personal questions about

5    your relationship with him?

6    A.  Yes.

7    Q.  Now, eventually, a day or two later -- and that phone call

8    was on July 23rd, 2011.  Do you recall sending a message -- a

9    statement in to his attorney?

10   A.  Yes.

11   Q.  And, you know, I'm going to --

12            MR. DALY:  May I approach the witness, Your Honor?

13            THE COURT:  Yes, you may.

14   Q.  I hand you what's a printout of that statement that you

15   sent via email.  Does it accurately reflect the statement that

16   you sent to his attorney?

17   A.  Yes.

18            MR. DALY:  Your Honor, at this time the government

19   would move for the admission of Government's Exhibit Number

20   132.

21            MR. CASKEY:  No objection.

22            THE COURT:  Very well.  132 is admitted.  Thank you.

23        (Government Exhibit 132 admitted in evidence.)

24   Q.  Now, let's look at the top of this statement.  What's the

25   date on this statement?

1    A.    July 24th, 2011.

2    Q.    And you submitted this statement after -- sorry.  I'll

3    move this microphone over.  You submitted this statement after

4    you received all those telephone calls with the coded messages

5    and everything else?

6    A.    Yes.

7    Q.    Now, and there's no other really way to put it.  There's a

8    number of lies in this statement, aren't there?

9    A.    Yes.

10   Q.    And -- and frankly, some of your assertions in this

11   statement are not consistent with what actually happened in

12   this case; did it?

13   A.    No.

14   Q.    Let me go through, and I'm going to mark some of these

15   particular ones.  First you say, your client, referring to the

16   defendant, was not involved in such schemes and did not

17   participate in any activities he was allegedly accused of.

18            That's not true; is it?

19   A.    No.

20   Q.    As a matter of fact, he was involved in the scheme and he

21   did absolutely fully participate in these schemes; didn't he?

22   A.    Yes.

23   Q.    As we go through, you say he was only giving you

24   protection and that he was the only victim in this case.  Is

25   that true?

1    A.   No.

2    Q.   And there's plenty of other victims in this case; correct?

3    A.   Yes.

4    Q.   And he was just doing so to protect you.  Now, isn't it

5    true he handed out a USB drive of sexual activity with you and

6    a strange man to a person after he had taken himself off of

7    there?

8    A.   Yes.

9    Q.   He was protecting himself, he wasn't protecting you; was

10   he?

11   A.   No.

12   Q.   You say you're old enough to make decisions.  At that time

13   you're still 16; right?

14   A.   Yes.

15   Q.   You couldn't legally consent to having sex with an older

16   man; could you?

17   A.   No.

18   Q.   Couldn't buy cigarettes or alcohol?

19   A.   No.

20   Q.   So there's plenty of things you -- you were not old enough

21   to make decisions for on your own; correct?

22   A.   Yes.

23   Q.   You say it's my -- all the content was on your phone.

24   Now, you've learned since that some of this content was on the

25   defendant's phone; right?

182

1   A.  Yes.

2   Q.  You say it was on my computer.  Again, was that your

3   computer this stuff was saved on?

4   A.  No.

5   Q.  You said it was in my possession.  Did you possess that

6   computer?

7   A.  No.

8   Q.  Did you possess his phone?

9   A.  No.

10  Q.  Now, let me back up.  You said I was old enough to make

11  decisions.  In 2011, actually you're about a month removed

12  from turning 17.  You turned 17 in late May of 2011; right?

13  A.  Yes.

14  Q.  But again, at the time all this stuff happened, you were

15  not old enough to do this stuff; correct?

16  A.  No.

17  Q.  As a matter of fact, even when you're 17 you're still not

18  old enough to be videotaped or recorded having sex under

19  federal law?

20  A.  No.

21  Q.  Okay.  You said the attorneys had the federal court pay

22  you off.  Now, when you've previously come here today -- or

23  not today, but on previous occasions, you were reimbursed for

24  your testimony; correct?

25  A.  Yes.

1 Q.  And it was a standard payment that you know you're offered

2 as a witness traveling to and from court appearances; correct?

3 A.  Yes.

4 Q.  It was nothing special above and beyond what anybody else

5 gets?

6 A.  No.

7 Q.  And this video that was eventually made on Russell, it

8 wasn't for his own purposes; was it?  Your own purposes?  You

9 guys were -- I mean, the defendant wanted to make money after

10 you having sex with him, and wanted to make sure he had

11 evidence of it; didn't he?

12 A.  Yes.

13 Q.  You said that your client never watched the video.  Well,

14 it's your testimony today he edited that video eventually;

15 right?

16 A.  Yes.

17 Q.  So to edit you'd have to at least watch it while you're

18 editing it; correct?

19 A.  Yes.

20 Q.  So that's not true.  And again, you're aware that your

21 mother signed over power of attorney to him?

22 A.  Yes.

23 Q.  You also say later on that the only reason A.J. went the

24 route he did is because you were, quote, coincidentally caught

25 getting ready to have sex again.  That was no coincidence that

1   you guys were caught almost in the act, was it?

2   A.  No.

3   Q.  Now, we listened to about -- a number of phone calls.

4   Let's go back to the phone calls.  We can go to Exhibit Number

5   118.  And this is a telephone call three days after you sent

6   this letter; correct?

7   A.  Yes.

8           MR. DALY:  And if we can -- bear with me one moment.

9   If we can play, Ms. Welna, this is a phone call July 27th.  If

10  you can start, Ms. Welna, at 5:35.

11      (Government Exhibit 118 played at 5:35 and stopped at

12      7:29.)

13  Q.  Now, he's asking you to not only send it to his attorney

14  but send it to other people?

15  A.  Yes.

16  Q.  And who's Bonnie Shelby?

17  A.  His mother.

18  Q.  And you've met her on previous occasions?

19  A.  Yes.

20  Q.  And I'm going to show you what's been marked as

21  Government's Exhibit Number 128.  And that's a telephone call

22  dated August 8th of 2011.

23          MR. DALY:  And Ms. Welna, if we could play at the

24  start of the phone call.

25      (Government Exhibit 128 played from the beginning and

1          stopped at 15 seconds.)

2     Q.   And again, this is about -- say about a week and a half,

3     maybe two weeks after you've already now sent this letter.

4     And you've written this whole -- whole letter with all these

5     assertions in it, and this comes after -- this phone call is

6     after you've already sent this letter; correct?

7     A.   Yes.

8          (Government Exhibit 128 played at 15 seconds to 2:38.)

9     Q.   So now even after sending this letter, the defendant's

10    telling you you still haven't done enough?

11    A.   Yes.

12         (Government Exhibit 128 played at 3:42 to 4:13.)

13              MR. DALY:  And if we can play the call starting at

14    277.

15         (Government Exhibit 128 played at 4:37 to the end.)

16    Q.   Now, throughout this case you've talked to law enforcement

17    a number of times; right?

18    A.   Yes.

19    Q.   You've given previous testimony under oath in this case;

20    haven't you?

21    A.   Yes.

22    Q.   And even after that you -- you still tried to protect this

23    defendant; didn't you?

24    A.   Yes.

25    Q.   You -- you lied about the nature of your relationship;

1  correct?

2  A.  Yes.

3  Q.  You initially, even under oath, lied about when it was you

4  first were sexually active with him; didn't you?

5  A.  Yes.

6  Q.  And was that all done to try to protect him?

7  A.  Yes.

8  Q.  And in that last phone call he's still saying you didn't

9  do enough; didn't he?

10  A.  Yes.

11  Q.  Now, since all this has happened, have you -- were you

12  able to graduate high school?

13  A.  Yes.

14  Q.  And you're currently in the Marines; right?

15  A.  Yes.

16  Q.  Probably looking forward to getting back?

17  A.  Yes.

18  Q.  We're going to show you -- we're going to show you -- and

19  again, this letter of lies right here, it's because of all

20  those phone calls because he asked you do it; isn't it?

21  A.  Yes.

22  Q.  You test -- before we get to this last point, you

23  mentioned something to the defendant during that quick break

24  you felt you might want to correct with your earlier testimony

25  or earlier today.  Is there any issue that you wanted to

1   correct while you're still here on the stand?  Is there a

2   question I asked you you felt that you didn't give an

3   appropriate answer to?

4   A.  No.

5   Q.  About the defendant looking online?

6   A.  No.

7   Q.  Okay.  There wasn't -- you didn't say anything about him

8   doing research online previously?

9   A.  No.

10  Q.  About him doing research about A.J., did you testify

11  correctly?

12  A.  Yes.  I testified correctly.

13  Q.  Okay.  All right.  So you testified earlier, though, today

14  that the defendant borrowed a Sony camcorder in late September

15  from a friend?

16  A.  Yes.

17  Q.  And that was the camcorder on September 30th that was used

18  to record that threesome video; right?

19  A.  Yes.

20  Q.  And about two days later he -- he recorded another video

21  with you; didn't he?  You and a couple other girls on October

22  2nd near a lake?

23  A.  Yes.

24  Q.  And you've previously seen that video, Exhibit Number 19,

25  as well as the picture in Exhibit Number 180 that's the screen

1    capture of that video and what occurred on that date; didn't

2    you?

3    A.  Yes.

4    Q.  And it accurately reflects what happened on that date on

5    October 2nd again, just two days after that threesome video

6    was taken?

7    A.  Yes.

8              MR. DALY:  Your Honor, at this point the government

9    would move for the admission of Government's Exhibits 19 and

10   180.

11             MR. CASKEY:  No objection.

12             THE COURT:  19 and 180 are admitted.

13      (Government Exhibits 19 and 180 admitted in evidence.)

14   Q.  And you're in that video?

15   A.  Yes.

16   Q.  Who else is in that video?

17   A.  His stepdaughters and his daughter.

18             THE COURT:  I'm sorry.  Who else?

19             THE WITNESS:  His stepdaughters and his daughter.

20             THE COURT:  His stepdaughters and his daughter?

21             THE WITNESS:  Yes.

22             THE COURT:  Okay.

23             MR. DALY:  Can you play the video?

24      (Government Exhibit 19 played and stopped at 46.5

25       seconds.)

1       MR. DALY:  No further questions.

2       THE COURT:  Thank you.

3       Mr. Caskey or Ms. Burton, would you like to inquire?

4       MR. CASKEY:  I think Ms. Burton will.

5       THE COURT:  You know, now might be a good time for a

6  recess, so we won't go over our two hour -- we usually try not

7  to go over two hours at a time.  I know we've taken one

8  earlier.  Let's take another one and we'll let Ms. Burton do

9  her cross examination after that.

10      During this recess or any other recess you must not

11 discuss this case with anyone, including the other jurors,

12 members of your family, people involved in the trial, or

13 anyone else.  If anyone tries to talk to you about the case,

14 please let me know about it immediately.

15      And finally, keep an open mind until all the

16 evidence has been received and you've heard the views of your

17 fellow jurors.

18      We'll take about 15 minutes.  Thank you.

19    (Jury left the courtroom.)

20      THE COURT:  Very good.  We'll be in recess.

21    (Recess at 10:37 until 10:53 a.m.  Jury not present.)

22      THE COURT:  Please be seated.  We'll talk about

23 this.  What is the legal matter, Ms. Burton?

24      MS. BURTON:  Yes, Your Honor.  Your Honor, we'd like

25 to take up an issue about Exhibit Number 132, which is the

1    statement that Courtney Hill wrote to Mr. Ross.  And we'd like

2    the Court to take judicial notice that we're not the attorneys

3    that -- that's being referenced when they say she sent the

4    letter to an attorney.

5            THE COURT:  Well, I mean, you all can enter some

6    stipulations of fact, but you can also maybe bring that out in

7    cross examination.  I don't know that that's something I'm

8    going to take judicial notice of.  But you can -- you can

9    certainly cross examine her on that.

10           MS. BURTON:  Okay.

11           THE COURT:  Or you can all enter an agreement or you

12   can present evidence to that effect.

13           MS. BURTON:  Okay.  I can -- well, I mean, I think I

14   can clear it up pretty easy by asking her cross just --

15           THE COURT:  Sure.

16           MS. BURTON:  -- just for clarification.

17           THE COURT:  Sure.

18           MR. CASKEY:  My only concern, Judge, is she may not

19   know -- you know, the reason I was thinking an alternative way

20   to do that would be that our entries -- we didn't enter this

21   case until the fall of -- of 2012, and this letter was written

22   on July 24th, 2011.

23           THE COURT:  How is that going to help the trier of

24   fact in this case, that information?

25           MR. CASKEY:  Well, I've discussed that with my

1    client, but...

2         THE COURT:  There might be a relevance issue here, I

3    guess is my point.  Maybe there's something I don't understand

4    about the case that will assist the trier -- trier of fact

5    understanding the issues.  Anything else before I let Mr. Daly

6    address that?

7         Mr. Daly.

8         MR. DALY:  Your Honor, I'm in an interesting

9    position.  I don't necessarily have a true objection to this,

10   but I agree.  I don't know -- it might confuse them.  I mean,

11   the defendant's the one on trial and he's the subject of the

12   letter who it was going to and who his attorney was at the

13   time.  I mean, you know, whether or not the jury knows that he

14   may have had five attorneys or three attorneys or two, it

15   doesn't really matter.  I just don't see the relevance of it.

16   I don't have a strong feeling.

17        THE COURT:  I think a proper question would be,

18   Mr. Daly, if they say to this last witness, who did you send

19   the letter to?  What attorneys?  If you want to do that.

20        MR. DALY:  Right.

21        THE COURT:  That would be appropriate.

22        MS. BURTON:  Okay.

23        MR. DALY:  And then leave it at that.

24        THE COURT:  But as far as exploring that issue,

25   there might be a relevant -- I don't see the relevance of

1    that.  I know you've made a record that you weren't the

2    attorneys who received it when you entered here today, just

3    now.  But I don't -- I think that's a -- that's a rabbit we

4    don't need to chase.

5            MR. CASKEY:  There you go, Judge.

6            THE COURT:  All right?  Anything else?

7            MS. BURTON:  But I can't just ask the one question

8    about that; right?

9            THE COURT:  Sure you can.

10           MS. BURTON:  Okay.  I just wanted to make sure.

11           THE COURT:  Sure.  If she knows.  If she knows, you

12   bet you.

13           MS. BURTON:  Okay.

14           THE COURT:  You bet you.  All right.  Well, thank

15   you for checking with us, Ms. Burton.  I appreciate that.

16           Let's bring the witness in and we'll bring the jury

17   in.

18        (Jury present.)

19           THE COURT:  Ladies and gentlemen, how are you doing

20   over there?

21           A JUROR:  Good.

22           THE COURT:  How is Alex doing?

23           A JUROR:  Okay.

24           THE COURT:  That's what -- I usually get one of

25   those.  She does good work for us (indicating).  All right.

1    How's the temperature?

2              A JUROR:  Fine.

3              THE COURT:  All right.  You came prepared with extra

4    layers; didn't you?  Very good.

5              Okay.  Ms. Burton, please proceed.

6              MS. BURTON:  May it please the Court?

7              THE COURT:  Yes, ma'am.

8                        CROSS EXAMINATION

9    BY MS. BURTON:

10   Q.  Good morning, Ms. Hill.

11   A.  Good morning.

12   Q.  My name is Stephanie Burton.  I, along with Mr. Caskey,

13   represent the defendant.  I'm just going to ask you a few

14   questions.  I won't take a lot of time.  I have maybe seven,

15   maybe eight questions to ask you, and then I'll be out of your

16   way.  Okay.  Ms. Hill, you mentioned earlier that it was your

17   intention to meet A.J. for casual sex prior to the plan for

18   money; is that right?

19   A.  Yes.

20   Q.  Okay.  And on the night when A.J. and Corey returned from

21   the ATM, you didn't actually see any money being exchanged

22   between A.J. and Corey; did you?

23   A.  No.

24   Q.  Okay.  And moving forward to the day at DeVry, you were

25   there with the defendant completing the transaction; is that

1    right?

2    A.  Yes.

3    Q.  And you testified previously that there were two copies

4    made of the video; is that correct?

5    A.  Yes.

6    Q.  Okay.  And would it be a fair statement to say that you

7    had one of those copies in your possession when you were

8    arrested; is that right?

9    A.  Yes.

10   Q.  Okay.  And just to clear up something from -- something

11   earlier, regarding your statement that was sent to

12   Mr. McKinney's attorney, that was a previous attorney, not

13   myself or Mr. Caskey; is that right?

14   A.  Correct.

15   Q.  Okay.  And then in the phone conversations that you had

16   with Mr. McKinney at the St. Clair County jail, he asked you

17   in those phone calls for you to tell the truth; is that

18   correct?

19   A.  Yes.

20   Q.  Okay.  And then there was a reference in one of the phone

21   calls to stick to the plan.  Was that plan for you to enter

22   the military and complete school?

23   A.  Not necessarily.

24   Q.  Okay.  All right.  Thank you.  That's all I have for you.

25                THE COURT:  Thank you, Ms. Burton.  Do you have any

1    redirect?

2              MR. DALY:  No redirect, Your Honor.

3              THE COURT:  All right.  Thank you.

4              MR. DALY:  Your Honor, may this witness be excused

5    for all purposes?

6              THE COURT:  Yeah.  She can be excused.

7              MR. DALY:  Thank you.

8              THE COURT:  Thank you, ma'am.

9              MR. DALY:  Your Honor, at this time the government

10   would like to call Detective Rebecca Mills.

11             THE COURT:  Detective Rebecca Mills.

12             Detective, if you'll come around this way, and right

13   about there.  If you'll face our clerk, raise your right hand

14   and be sworn, please.

15      DETECTIVE REBECCA MILLS, GOVERNMENT WITNESS, SWORN

16             THE COURT:  And Detective, if you'll have a seat

17   here in the witness chair.  Good morning.

18             THE WITNESS:  Good morning.

19             THE COURT:  Would you please begin by speaking your

20   full name and spelling your last name for us?

21             THE WITNESS:  Absolutely.  It's Rebecca Mills.  The

22   last name is M as in Mary, I-L-L-S.

23             THE COURT:  Thank you, Detective Mills.

24             Please proceed.

25                      DIRECT EXAMINATION

1  BY MR. DALY:

2  Q.  Detective Mills, you've already stated your title.  Can

3  you please state your full title and the department that you

4  work for?

5  A.  Yes.  I'm a detective with the Kansas City, Missouri

6  Police Department.  I work in the narcotics and vice unit, but

7  I'm specifically assigned to the vice unit.

8  Q.  And just for the benefit of the jury and the Court, can we

9  break that down a little bit?  What does the vice unit

10  specifically deal with and what do you deal with in your

11  capacity as a detective?

12  A.  We do a variety of things, anywhere from liquor, tobacco

13  stuff, to the area that I work in, which would be online

14  prostitution and human trafficking.

15  Q.  And when did you first -- we'll talk about -- let's talk a

16  little bit about your qualifications.  When did you first join

17  the KCPD?

18  A.  I started the academy in 2002, graduated February of '03.

19  Q.  And did you attend college here in the area?

20  A.  I did.

21  Q.  Where did you go?

22  A.  University of Missouri, Kansas City.

23  Q.  And what did you earn your degree in?

24  A.  Criminal justice.

25  Q.  Now, you said you graduated from the academy in 2003 and

1    became a police officer?

2    A.  Yes.  That's when I graduated.

3    Q.  And in that capacity how long have you worked in your

4    entire career as a police officer, not only as a patrol

5    officer but detective in vice-related activities?

6    A.  For about 10 years.

7    Q.  So even prior to you becoming a vice detective you were

8    still, even as a patrol officer, working in -- in the vice

9    area?

10   A.  Yes.

11   Q.  And what can you tell us about that?  And let's go back to

12   when you were a patrol officer, before you're assigned to work

13   specifically on these matters.  How do you start working in

14   the vice area of crime prevention and investigation?

15   A.  I'm sorry.  When I was on patrol as well?

16   Q.  Yes.  Uh-huh.

17   A.  During that time I knew that the vice unit was something I

18   was interested in.  So at times they need help or an extra

19   person, so I would either contact them, just advising that I'm

20   interested, and if they had anything that they needed help

21   with, or just to observe and to learn about it.

22              THE COURT:  Hold on.

23              MR. CASKEY:  Judge, can counsel approach a minute?

24              THE COURT:  Sure.

25          (Bench conference on the record outside the hearing of

1    the jury.)

2         THE COURT:  Yes, sir.

3         MR. CASKEY:  If we could just have like maybe a

4    10-minute recess.  I think the defendant wants to change his

5    plea of not guilty to guilty.

6         THE COURT:  How about an early lunch?

7         MR. CASKEY:  Okay.

8         THE COURT:  Well, hold on.  Let me think -- let me

9    think here logistically.  Why don't we do -- how long is this

10   witness going to be?

11        MR. DALY:  This witness is about a 15-minute

12   witness.

13        THE COURT:  Why don't we do this witness then we'll

14   take an early lunch.

15        MR. DALY:  If he --

16        THE COURT:  I mean, we're -- I don't want to send --

17        MR. CASKEY:  Fifteen minutes, that would be fine.

18        THE COURT:  Let's talk about this.  Let's talk about

19   this.  He's going to -- he's going to plead to every count?

20        MR. CASKEY:  Yes.

21        THE COURT:  Okay.

22        MR. DALY:  No objection to that.

23        MR. CASKEY:  Well, that's -- there hasn't been a

24   plea offer since March -- December 7th.

25        THE COURT:  Yeah.  So what we're going to do is I

1  want to finish this witness.

2          MR. DALY:  Okay.

3          THE COURT:  Then we'll take a lunch recess.  It's

4  still early.  We just got back from another recess.

5          MR. DALY:  Sure.

6          THE COURT:  And I want to finish this witness, then

7  we'll take a lunch recess.  Okay?

8          MR. CASKEY:  Okay.

9          MR. DALY:  Okay.  Thank you.

10       (End of bench conference.)

11         THE COURT:  Very well.  Please proceed.

12         MR. DALY:  Thank you.

13  Q.  Now, when we left off you were describing you're a patrol

14  officer and you're doing some degree of vice activities even

15  as a patrol officer.  Real quick, what does a patrol officer

16  do when they first join the police department?

17  A.  Usually you respond to calls for service, as well as

18  proactive work.

19  Q.  Okay.  And so when you're doing vice activities, what does

20  that entail?  How were you helping out the vice unit at that

21  time as a patrol officer?

22  A.  At times I was working as a -- basically an undercover

23  capacity working as a decoy, and like a -- an observer at

24  times.

25  Q.  So as a decoy is this in prostitution activities?

1    A.  Yes.

2    Q.  And explain to the jury when you're a decoy in an

3    undercover capacity in prostitution activities, what does

4    that -- what sort -- what sort of activity does that entail?

5    A.  Usually it's working as a decoy undercover as a

6    prostitute, whether it's on the street or in a hotel room,

7    doing like online Internet ads.  And then you would have johns

8    that are looking for that respond to us.

9    Q.  And so in that capacity you're coming in contact with

10   other -- actually with -- well, you're coming in contact with

11   actual prostitutes who are actually already on the street

12   working as prostitutes; correct?

13   A.  Yes.

14   Q.  You're coming in direct contact with johns, people that

15   are seeking sexual favors from prostitutes?

16   A.  That's correct.

17   Q.  And who else are you coming in contact with?  Would it be

18   pimps?

19   A.  Yeah.  I was just going to say, other -- whether it's

20   pimps or sometimes another girl that they might be working

21   with as a partner.  But most of the time like we would come in

22   contact with several pimps.

23   Q.  And how often would you work as a decoy when you were a

24   patrol officer?

25   A.  As a -- like time frame how many?

1    Q.  How often?  How frequently?

2    A.  Oh, okay.  I would say about once a month.  Sometimes it

3    could be one -- once every two months, but for the most part

4    it's a pretty steady once-a-month deal.

5    Q.  So and then you became a detective.  And once you were a

6    detective were you assigned to the vice unit?

7    A.  Yes.

8    Q.  So what are you doing now as a detective to investigate

9    crimes of prostitution, human trafficking?

10   A.  Now we do the same kind of setup, but we work more of the

11   cases now.  So I still every once in a while work as a decoy,

12   but a lot of times we'll have fresh new faces like a patrol

13   officer that kind of wants to learn new things, have us help,

14   and then we work the case file.  So we do the training aspect

15   and interviews.

16   Q.  And in terms of -- what sort of victim contact are you

17   having during the course of your work as a detective?  When

18   you investigate these crimes of human trafficking and

19   prostitution, what kind of contact are you having with the

20   victims of these cases?

21   A.  We have several different types of -- we come into contact

22   with them.  Usually at the very beginning, whether it's a --

23   you know, if they were a prostitute and under arrest we would

24   come into contact from there.  And then once we realize that

25   they were a victim of human trafficking there's several

1    interviews that kind of go along after that.

2    Q.  Okay.  And do you come in contact also with the johns

3    and/or the pimps during the course of your investigations of

4    these cases?

5    A.  Yes.

6    Q.  And how often would that happen?

7    A.  I would say a good -- most of the time we would -- they

8    would -- they were either dropped off by the pimp or some --

9    the pimp is somewhere close by.  Or after some of the

10   investigation and interviews we would learn of the identity of

11   the pimp.

12   Q.  And in the course of these investigations, how many

13   times -- how many victims would you say that you've

14   interviewed or worked with in the course of investigating some

15   of these crimes of prostitution and human trafficking?

16   A.  Sev -- tons.  Too many to count.  I would say definitely

17   over 50.

18   Q.  And you've also talked to and spoke to various times the

19   johns in these transactions as well as the pimp that offered

20   the women up?

21   A.  Yes.

22   Q.  And I just use women.  Is it common that more often than

23   not the victims in human trafficking are women?

24   A.  It is.

25   Q.  And what is the age range you would say that you're

1  dealing with in terms of the victims of human trafficking or

2  prostitution?

3  A.  Anywhere from as young as 13 to adults.

4  Q.  And so part of your investigations you conduct -- where do

5  you go to look for evidence or investigate crimes of human

6  trafficking and/or prostitution?  What sort of places do you

7  look as you proactively investigate these cases?

8  A.  There's different adult sites, and then there's sites like

9  Craigslist, Backpage where they are advertising like sexual

10  activity.  There's certain groups online that kind of talk and

11  gather about those such crimes.

12  Q.  And in the course of that, beyond looking out on the

13  street or on websites, in your capacity as a detective you've

14  had a chance to conduct and initiate some pretty large scale

15  operations in your own right; haven't you?

16  A.  Yes.

17  Q.  Are you a member of various task forces in the area?  And

18  if so, could you please describe them?

19  A.  I am.  They are human trafficking task force, ones with

20  the FBI, and we kind of work together, different cities.  We

21  come together and we work with the same -- same human

22  trafficking, and usually help each other out on different

23  cases.

24  Q.  And have you -- in your capacity in working with the FBI

25  and other large scale operations, have you ever had any

1  specialized training in human trafficking or prostitution

2  activities?

3  A.  Yes.  I've done different training classes around the city

4  that are in regard to that, as well as just being -- working

5  undercover as a decoy and working with fellow law enforcement

6  with the cases you -- you learn so much that way as well.

7  Q.  Have you helped organize and execute and initiate a large

8  scale operation called Operation Guardian Angel?

9  A.  Yes.

10  Q.  Can you please describe for the jury what that operation

11  entails?

12  A.  Sure.  Operation Guardian Angel is basically us detectives

13  are working, again, in an undercover capacity.  We pose as

14  johns, and we have minor children available, unfortunately,

15  for sexual reasons.  And people contact us for those purposes,

16  and it's usually something in exchange, whether it's money in

17  exchange for the -- for sexual favors or something.  And then

18  obviously they -- they respond to us, and they are placed

19  under arrest at that time.

20  Q.  And you've had a number of prosecutions result from some

21  of those investigations?

22  A.  Yes.

23  Q.  Now that we've talked a little bit about your expertise

24  and qualifications in the area of human trafficking and

25  prostitution, let's talk a little bit about your personal

1    experience and what you're able to extrapolate from some of

2    that, those experiences.  You've -- you've discussed

3    interviewing a number of victims in human trafficking or

4    prostitution cases; right?

5    A.  Yes.

6    Q.  Not only is it a plural number of victims, oftentimes how

7    many interviews does it take as you're talking to a victim

8    that's been victimized in -- in a human trafficking or

9    prostitution capacity?

10   A.  It could take several.

11   Q.  And tell us a little bit about why that is.

12   A.  Usually they're in a situation with a pimp, and they've

13   kind of been groomed.  It's an actual term that -- that is

14   used.  It's a grooming process they go through.

15          The victim has maybe came from a situation, whether

16   it's at home or somewhere else, that has not been ideal.  They

17   now are taken, you know, they found this pimp.  And he has

18   come across to, you know, protect her, take care of her.  He

19   gives her maybe a roof over her head, food to eat, clothes,

20   lets her get her hair done, nails done.  Just -- just excuse

21   me, different things that makes them feel loved.  They also

22   show that kind of a love.  They give them attention.  And now,

23   you know, they see this person that loves them, and this

24   person also comes across as a boyfriend, a fiancé, a family

25   member, and that's how they kind of view each other as in the

1    beginning.  So it's really hard for once we've determined that

2    this person is a victim for them to kind of break away and

3    maybe still see it that way.

4              They see that they're at fault, and they're the one

5    to blame.  Usually we have some type of evidence that might

6    show something different.  So as we help this person and maybe

7    get them into some type of a custody that can help them find a

8    job, get them in school and out of the bad situation, a lot of

9    times they will just grow a little bit and start to tell us

10   the truth of what happened and what kind of situation they are

11   in.  We just start to learn a little bit more of the truth.

12   They feel a little more comfortable with kind of telling us

13   what happened, and especially that happens when they've had

14   time apart from the actual pimp.

15   Q.  So now it's fair to say that the initial interview that

16   you have is often not going to be the true story, and it takes

17   a while to get to that true story; right?

18   A.  Yes, it does.

19   Q.  And so based on that, is it your opinion and experience,

20   is it common for the victim in that initial interview or even

21   the first couple times to meet with them to lie to protect

22   that person?

23   A.  Yes.  Very.

24   Q.  And -- and do they also try to downplay the role of the

25   trafficker?  And can you talk a little bit about that process?

1   I think you've already talked about it -- a little bit about

2   it, but expand on that if you can.

3   A.  Sure.  They definitely try to protect them.  A lot of

4   times they're afraid that if something was to happen to them,

5   they no longer will have a place to stay.  They have nowhere

6   to go.  Maybe they've been abused, whether it's physically,

7   mentally, emotionally abused, and they know that if it was to

8   come out, the truth, then that would happen again, or keep

9   happening.

10          And like I said, a lot of times they're worried that

11  they will lose a place to go, or maybe they'll be awarded --

12  you know, they'll stay -- they use the term like I'll be a

13  ward to the state or I'll be in foster care.  You know, if he

14  goes to jail where am I going to go, what am I going to do?

15  And he's going to be mad at me.  It's just, you know, a

16  different way of thinking, the part of the whole grooming

17  process.

18  Q.  And part and parcel of that, obviously we've talked a

19  little bit about prostitution and trafficking.  But there's --

20  there's a commercial component to this too.  This isn't just

21  people out having sex with people, people are making money.

22  They're making money off this process, aren't the pimps?

23  A.  Absolutely.

24  Q.  Tell us a little bit, in your experience, how does the

25  money issue come into play in terms of the breakdown, in terms

1    of who gets paid?  How does that work out in a typical

2    pimp-prostitute relationship?

3    A.  Well, usually in the beginning when they are just

4    starting, the -- the victim is told by the pimp that, well,

5    you get the money, you get this.  If you do this, you know,

6    think of all the money you'll make, all the things you can

7    buy.  But then what happens is when they get the money, they

8    usually have to give it to the pimp right away, because

9    they've either, you know, accrued like a tab, basically,

10   because then they'll say, well, remember, we got your hair

11   done, we got your nails done, or we have to pay something, and

12   so now you owe me.  Or I'm the one that drove you here, so I

13   need gas money.  I need to fix my car.

14             They make a long list of excuses why the role has to

15   give that money up.  Then a lot of times it goes from there to

16   where they don't have to make excuses.  It's just she has to

17   hand over the money right then, or, you know, they keep a tab.

18   Q.  And what is -- when you first confront a victim with

19   evidence that money has changed hands for the sex act, what's

20   the typical response they often give as a way to protect the

21   trafficker?

22   A.  That it's their money.  They get to keep all the money,

23   and it was -- it was their choice as you know what they do

24   with the money.

25   Q.  And again, there's some -- over time there's some

1   concession that there was a breakdown and then splitting up of

2   that money as well?

3   A.  Yes.

4   Q.  Now, specific to this case you've had a chance to be there

5   to interview the victim when this arrest first occurred?

6   A.  I have.

7   Q.  And is it fair to say -- how would you characterize her

8   initial position towards the defendant in this case?

9   A.  It was definitely along the lines of a typical victim that

10  is trying to protect somebody at first as well as worried

11  about where they're going to go afterwards or what's going to

12  happen.  And then, you know, eventually that story would

13  change.

14  Q.  And as you learned more of the truth and in terms of the

15  payment system, is that consistent again with the -- the

16  payment issues you've seen, the payment arrangements you've

17  seen in past trafficking cases?

18  A.  It is.

19  Q.  And as you've had a chance to talk to the victim over

20  time, is the evolution and changing of her story consistent

21  with your other experiences with other victims of human

22  trafficking?

23  A.  It is.  Yes.

24  Q.  And you're aware that at some point the victim stepped

25  back and attempted to continue to protect the defendant in

1  this case after she had been recontacted by the defendant?

2  A.  Correct.

3  Q.  Again, in your experience, is that consistent with what a

4  trafficking victim would do in similar circumstances?

5  A.  It is.

6  Q.  Now, and let's talk about briefly your actual interactions

7  in this case.  You first interacted with A.J. Russell when

8  this case was first brought to your attention?

9  A.  Yes.

10  Q.  And you were also working with him and helped facilitate

11  some of the communications with the defendant?

12  A.  Yes.

13  Q.  And when you were contacted by A.J. were you made aware of

14  a Facebook posting made by the defendant about A.J. Russell in

15  this case?

16  A.  Yes, I was.

17  Q.  And what did you do when you -- when you first heard about

18  that?

19  A.  When he advised me that there was a post made, I went and

20  looked at the profile on Facebook of the defendant, and I did

21  observe a post that he had made on his public Facebook page.

22  Q.  And so you had a chance to go look at the defendant's

23  Facebook page while that post was still up?

24  A.  Correct.

25  Q.  Did you have a chance to do a screen capture of that

1   message on there?

2   A.  I did not.  By the time I got to the equipment to do so,

3   it had been deleted.

4   Q.  And Detective Mills, again, you've had a variety -- you

5   obviously weren't here for the earlier testimony, but you've

6   had a chance to work in a large -- in a large capacity in the

7   trafficking area as well as have a great deal of contact with

8   this victim.  Would you -- how would you characterize this

9   victim's experiences and actions as compared to the other

10  victims?  Is it consistent with other victims of human

11  trafficking?

12  A.  It is.  It's very consistent.

13  Q.  Okay.

14          MR. DALY:  No further questions for this witness.

15          THE COURT:  Thank you.

16          Would you like to inquire?

17          MR. CASKEY:  No, Your Honor.  No questions.

18          THE COURT:  All right.  Ladies and gentlemen -- and

19  you're excused at this time.  Thank you.

20          THE WITNESS:  Oh, thank you, sir.

21          THE COURT:  Ladies and gentlemen, there's an

22  instruction I gave you that said while you are waiting, we are

23  working.  It turns out now is a good time to take a lunch

24  recess.  So we're going to take a little early lunch.  And so

25  it will be one hour.  And if you'll be here a little bit,

1    maybe five minutes 'til so Alex can get you back in here.  But

2    we'll take a lunch recess at this time.  There are some things

3    that we need to take care of.

4            I'll remind you of the instruction, which I've read

5    to you many times at this point.  During this recess or any

6    other recess you must not discuss this case with anyone,

7    including the other jurors, members of your family, people

8    involved in the trial, or anyone else.  If anyone tries to

9    talk to you about the case, please let me know about it

10   immediately.

11           And finally, keep an open mind until all the

12   evidence has been received and you have heard the views of

13   your fellow jurors.

14           We'll see you back here in one hour.  Thank you.

15       (Jury left the courtroom.)

16           THE COURT:  Mr. -- Mr. Caskey, there has been a

17   development in this case, and it's my understanding that your

18   client wishes to change his plea?

19           MR. CASKEY:  Right.  And if -- if we could have like

20   maybe 15 minutes before we actually do the guilty plea, just

21   so there won't be any problems?

22           THE COURT:  I'll give you 15 minutes, then I'm going

23   to be kind of pushy --

24           MR. CASKEY:  No problem.

25           THE COURT:  -- because we're all going to have to

1    have lunch if we're going to go on with this trial, obviously.

2              MR. CASKEY:  Right.

3              THE COURT:  But I'll give you a 15-minute window to

4    do that.  Okay?

5              MR. CASKEY:  Okay.  Thank you.

6              THE COURT:  So we'll be in recess for 15 minutes.

7    At that time --

8              MR. CASKEY:  Okay.

9              THE COURT:  -- we'll take up a plea; right?

10             MR. CASKEY:  Correct.

11             THE COURT:  Very good.  Thank you.

12             And the ladies and gentlemen who are in the

13   courtroom, I'm going to order that you do not discuss this

14   with anybody because we do have a jury who still may have to

15   come back to work here.  There's uncertainty in these matters

16   until the plea is finally accepted by the Court.  So I'm going

17   to order that everyone in this courtroom not have any contact

18   with the jurors, of course, and not speak of these things

19   outside of the courtroom.  Thank you.

20             MR. CASKEY:  Thank you, Judge.

21         (Recess at 11:23 until 11:40 a.m.  Jury not present.)

22             MR. CASKEY:  May counsel approach?

23             THE COURT:  Sure.  Let's wait -- wait for your

24   client to get in here.  Come on up if you need.

25         (Bench conference on the record outside the hearing of

```
 1          the gallery.  Mr. Daly not present.)

 2              THE COURT:  Yes, sir.

 3              MR. CASKEY:  It's my understanding that Pat is

 4    upstairs preparing --

 5              THE COURT:  You have to speak up a little bit.

 6              MR. CASKEY:  It's my understanding that Mr. Daly is

 7    upstairs preparing a written plea offer where the defendant is

 8    going to plead to 1 and 5.  And we haven't seen it and had a

 9    chance to go over and have the client sign it.

10              THE COURT:  I'm not doing it.  I'll just tell you,

11    we have a jury going on.  We're going to go down the road.  If

12    you guys work something out, that's fine.  But I'm not going

13    to wait -- I'm not going to have this jury wait.

14              MR. CASKEY:  Oh, well, he can plead -- he can plead

15    to 1 and 5.

16              THE COURT:  And I don't want to rush him into

17    anything.

18              MR. CASKEY:  He's not rushing.

19              THE COURT:  And I'm just saying is, I'm having a

20    trial.  And one, in 45 minutes when that jury comes back we're

21    going to continue with this trial.  Because what happens is,

22    if I wait, and it turns south on us, we wasted our jury time.

23    So I'm just telling you, I don't want to rush him, I don't

24    want rush you.

25              MR. CASKEY:  It's a done deal.
```

1          THE COURT:  In 45 minutes that jury is going to sit
2     back down here and I'm going to want you to present more
3     evidence.
4          MR. CASEY:  Oh, and we're prepared to, Your Honor.
5          THE COURT:  Okay.
6          MR. CASEY:  Mr. Daly will have the agreement done
7     here, we expect it in 15 minutes.  I mean, our intent is to go
8     ahead and have it done --
9          THE COURT:  Whatever you all decide to do is fine.
10    But in 45 minutes I want this jury to be working.  Because if
11    we delay this --
12         MR. CASKEY:  We're not delaying.
13         THE COURT:  -- and it goes -- I know -- and it goes
14    south on me, I'm wasting jury time.  I'm not wasting jury
15    time.  That's my position.
16         MR. CASKEY:  I mean, we -- we can plead without a
17    written memorandum if that is what the Court wants.
18         THE COURT:  I mean, I wouldn't mind starting -- I
19    wouldn't mind just start the preliminary parts of the plea
20    under Rule 11 where I give him his individual rights and then
21    he can look at the plea agreement and execute that if you want
22    him to.
23         MR. CASKEY:  Okay.
24         THE COURT:  And I'll start doing that.  But I've
25    done this before.  I've been a judge for this is my 19th year,

1    and we've delayed this.  And sometimes defendants change their

2    mind.  And God bless them, they have that right to do that.

3    But I'm not -- I'm telling you in 45 minutes we're going to

4    have a trial; right?

5             MR. CASKEY:  Uh-huh.

6             MR. CASEY:  That's understood.

7             THE COURT:  So unless his plea is done.  Now, I

8    don't want to put him under any pressure.

9             MR. CASKEY:  You're not, Judge.

10            THE COURT:  I don't want him to rush this.  But I

11   got a jury here and we're going to work them.  So if you want

12   to start this plea, I'll be happy to, because it takes a

13   little while under the Rule 11 -- Rule 11 advisement of

14   rights.  And I'll start that, then you can bring the plea

15   bargain -- plea agreement in.  He can look at it.  If he

16   approves it, he can sign it, then we'll go over it with him at

17   that time; right?

18            MR. CASKEY:  Yes.

19            MR. CASEY:  Absolutely.

20            THE COURT:  So do you want start?

21            MR. CASKEY:  We're ready to proceed.

22            THE COURT:  Right now?

23            MR. CASKEY:  Yes.

24            THE COURT:  Okay.

25        (End of bench conference.)

1          THE COURT:  Let's have your client come forward and

2     stand at the podium.  And Mr. McKinney, would you please face

3     our clerk, raise your right hand and be sworn?

4               COREY MONROE MCKINNEY, SWORN

5          THE COURT:  Would you please state your full name

6     for the record?

7          THE DEFENDANT:  Corey Monroe McKinney.

8          THE COURT:  Mr. McKinney, you are the defendant in

9     this case, and you have been sitting through this whole trial;

10    is that true?

11         THE DEFENDANT:  That's true.

12         THE COURT:  There's two things I want to start off

13    with here with you.  Number one, it's very important you and I

14    communicate.  So if you have any questions about any of this,

15    now is the time.  Okay?  And I'll try to answer any of your

16    questions.  I'm confident that your attorneys can answer your

17    questions.  But stop us if you have a question or concern

18    about anything we're doing.  Will you do that?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  If you don't stop us, we're going to

21    presume that you understand everything that's going on and are

22    comfortable with those things.  Okay?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  The second thing is you've just taken an

25    oath.  Everything you say from this point forward must be

1    truthful, otherwise you could be prosecuted in a separate case

2    for the crime of perjury.  Do you understand that?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Now, let me tell you what's going on

5    here, Mr. McKinney, because I know you were sitting there.

6    Mr. Caskey told me and Mr. -- Ms. Burton and Mr. Casey told me

7    that you intend to plead guilty with a negotiated plea

8    agreement; is that true?

9              THE DEFENDANT:  That's true, Your Honor.

10             THE COURT:  You intend to withdraw your plea of not

11   guilty and enter a plea of guilty to two counts; is that true?

12             THE DEFENDANT:  That's true.

13             THE COURT:  Now, I'm a little hesitant about this,

14   to be honest with you, because we're in the middle of a trial,

15   and I want this jury working the whole time they're here;

16   right?  And they're going to be back in 45 minutes.  On the

17   other hand, I'm not going to -- I don't want you to be

18   pressured to agree to anything or to read anything quickly.  I

19   want you to have plenty of time to think about this.  Is this

20   a decision you've had plenty of time to think about?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  So first and foremost, you've got to

23   understand, it doesn't matter to me what you do here today.

24   Do you understand that?

25             THE DEFENDANT:  I understand.

1          THE COURT:  You have a constitutional right to

2    trial, and my job is to preside over that trial and make sure

3    that your constitutional rights are afforded to you and we've

4    been endeavoring to do that since we started this.  You

5    understand that?

6          THE DEFENDANT:  I understand.

7          THE COURT:  But you have decided to plead guilty;

8    right?

9          THE DEFENDANT:  That's correct.

10          THE COURT:  Okay.  So we're going to cover some of

11   these things that I'm required to cover with you until they

12   get the plea agreement down here, then we're going to let you

13   look at that.  You understand that?

14          THE DEFENDANT:  I understand.

15          THE COURT:  But in 45 minutes, no matter where

16   you're at or I'm at, we're going to continue this trial.  And

17   the government I've told them I expect them to be prepared to

18   do that and they said they will be.  You understand?

19          THE DEFENDANT:  I understand.

20          THE COURT:  So, Mr. McKinney, any questions about my

21   position on this or about what's going on right now?

22          THE DEFENDANT:  Not right now, sir.

23          THE COURT:  Okay.  So Count 1 of the indictment

24   you're going to plead guilty to, and that's production of

25   child pornography; is that true?

1          THE DEFENDANT:  That's correct.

2          THE COURT:  And then you're going to plead guilty to

3   Count 6, which is really now Count 5, because they've

4   dismissed some counts, and the parties have agreed so the jury

5   wouldn't think there were more counts pending.  That we would

6   call Count 6 Count 5.  And Count 6, now Count 5 is called sex

7   trafficking of a child.  You're going to plead guilty to that

8   count as well; is that true?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Okay.  So where are you from?

11         THE DEFENDANT:  Kansas City, Missouri.

12         THE COURT:  Have you lived here your whole life,

13   sir?

14         THE DEFENDANT:  No, sir.

15         THE COURT:  Where were you born?

16         THE DEFENDANT:  I was born in Kansas City.

17         THE COURT:  Kansas City.  Where else have you lived?

18         THE DEFENDANT:  Groton, Connecticut and Great Lakes,

19   Illinois.

20         THE COURT:  Where?

21         THE DEFENDANT:  Groton, Connecticut.

22         THE COURT:  Okay.  I can't -- as you can tell by

23   this trial, the judge has a hard time hearing.  Could you

24   repeat that again?

25         THE DEFENDANT:  Groton, G-R-O-T-O-N, Connecticut.

1              THE COURT:  Okay.  Groton, Connecticut.  And where

2    else?

3              THE DEFENDANT:  Great Lakes, Illinois.

4              THE COURT:  Was this -- were you in the military?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Okay.  Was this part of your military

7    service there?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  Okay.  Very good.  What's the highest

10   level of education which you've completed?

11             THE DEFENDANT:  Three years of college.

12             THE COURT:  Three years of college.  Where did you

13   study at?

14             THE DEFENDANT:  DeVry University.

15             THE COURT:  Okay.  Did you receive any degrees or

16   certification?

17             THE DEFENDANT:  I have a degree -- a certification

18   in culinary arts.

19             THE COURT:  Okay.  Very good.

20             THE DEFENDANT:  I was essentially 12 credit hours

21   short of a bachelor's degree in business.

22             THE COURT:  Very good.  What kind of work do you do?

23             THE DEFENDANT:  I was a private chef and a full-time

24   student.

25             THE COURT:  Okay.  The last job you had was what?

1          THE DEFENDANT:  Executive chef for a restaurant down
2    on 18th and Vine.
3          THE COURT:  Okay.  What's the name of the
4    restaurant?
5          THE DEFENDANT:  Harper's.
6          THE COURT:  Harper's.
7          THE DEFENDANT:  It's closed now.
8          THE COURT:  What kind of food would you have there?
9          THE DEFENDANT:  I would say it's -- it was health
10   food.  It was a twist on -- it was a fusion type restaurant.
11         THE COURT:  Okay.
12         THE DEFENDANT:  But it specialized in health food.
13         THE COURT:  And when's the last time you worked?
14         THE DEFENDANT:  March of 2011.
15         THE COURT:  Okay.  And describe your physical health
16   for us today.  Are you in good physical condition?
17         THE DEFENDANT:  Yes, Your Honor.
18         THE COURT:  Describe your mental health.  Do you
19   suffer from any mental illness or disease?
20         THE DEFENDANT:  No, Your Honor.
21         THE COURT:  So as you stand before the Court today,
22   is it a fair statement to say that you're in good physical and
23   mental health, you're not seeing a doctor, you're not taking
24   prescription medication or over-the-counter medication?
25         THE DEFENDANT:  I am seeing a doctor.

1          THE COURT:  Okay.

2          THE DEFENDANT:  Well --

3          THE COURT:  Let's talk about that.

4          THE DEFENDANT:  -- let me clarify that.

5          THE COURT:  What kind of doctor are you seeing?

6          THE DEFENDANT:  For post-traumatic stress disorder

7    from the military.

8          THE COURT:  Have you been diagnosed with having

9    post-traumatic stress disorder?

10          THE DEFENDANT:  Yes, I have.

11          THE COURT:  How long ago were you -- was this

12   diagnosis made?

13          THE DEFENDANT:  It was made retroactive for January

14   9th of 2005.

15          THE COURT:  January 2005.  It was -- that was --

16   it's retroactive to that date.  When was it made?  When did

17   the doctor say, hey, Mr. McKinney, we're now telling you

18   you've had this since 2005?

19          THE DEFENDANT:  October 2010.

20          THE COURT:  October 2010.  Who was the doctor that

21   made that diagnosis or where were they at?

22          THE DEFENDANT:  At the VA Medical Center in Kansas

23   City, Missouri.

24          THE COURT:  Very good.  And were you in a

25   conflict --

1                    THE DEFENDANT:  Yes.

2                    THE COURT:  -- in January 2005?

3                    THE DEFENDANT:  No.  I was in a conflict on

4      September 9th -- September 19th of 2001.

5                    THE COURT:  Okay.  Was that Desert Storm?

6                    THE DEFENDANT:  It was Afghanistan, sir.

7                    THE COURT:  Afghanistan.  Okay.  And so since

8      October 2010 someone's made an official diagnosis, but you

9      knew that these symptoms were -- were there from January 2008;

10     is that fair to say?

11                   THE DEFENDANT:  They've been there since 2001.

12                   THE COURT:  2001.

13                   THE DEFENDANT:  Since after the conflict.

14                   THE COURT:  What are these symptoms?

15                   THE DEFENDANT:  Trouble making decisions.  I have --

16     I get detached emotionally.  Sometimes it's really difficult

17     to react in a group setting.  I suppose I'm a loner.  I like

18     to be alone.

19                   THE COURT:  Okay.  And this was different than the

20     way you were before Afghanistan; is that fair?

21                   THE DEFENDANT:  Yes, Your Honor.

22                   THE COURT:  Okay.  So as part of the therapy for

23     post-traumatic stress disorder, do you see a doctor regularly?

24                   THE DEFENDANT:  Yes, Your Honor.

25                   THE COURT:  What kind of doctor do you see?

1          THE DEFENDANT:  It would be a -- I suppose to

2     describe it as a psychotherapist.

3          THE COURT:  Okay.  And has that doctor prescribed

4     medication to help you with these symptoms?

5          THE DEFENDANT:  I have been prescribed Trazodone,

6     and a antidepressant that I can't recall the name of at the

7     moment.

8          THE COURT:  Okay.

9          THE DEFENDANT:  But it's in my medical records.

10         THE COURT:  How long have you been taking this

11    medication?

12         THE DEFENDANT:  I stopped taking them on April 7th,

13    2011.

14         THE COURT:  Why?

15         THE DEFENDANT:  Because I got arrested.

16         THE COURT:  Since that time you've been unable to

17    take it?

18         THE DEFENDANT:  Unable, yes, sir.

19         THE COURT:  Okay.  Has it affected your ability to

20    understand what we're doing here today?

21         THE DEFENDANT:  No, sir.

22         THE COURT:  Okay.  I mean, Mr. McKinney, I don't

23    know you but you seem very articulate today.  Is it fair to

24    say that while this medication helps you with some of the

25    symptomatology, you're able to understand what's going on here

1   and able to communicate in a meaningful way with your

2   attorneys?

3           THE DEFENDANT:  Yes, I am.

4           THE COURT:  Okay.  In fact, we had a competency

5   hearing in this case; is that true?

6           THE DEFENDANT:  We did.

7           THE COURT:  And you were adjudged to be competent by

8   a doctor?

9           THE DEFENDANT:  Dr. Morrow.

10          THE COURT:  Dr. Morrow who -- is he a psychiatrist?

11          THE DEFENDANT:  He's a psychologist.

12          THE COURT:  Psychologist.  And the judge reviewed

13  that, and I reviewed that, and we all agreed with Dr. Morrow;

14  right?

15          THE DEFENDANT:  That's correct, sir.

16          THE COURT:  Okay.  So -- and you believe you're

17  competent here today; is that true?

18          THE DEFENDANT:  That's correct, sir.

19          THE COURT:  Okay.  Ms. -- Ms. Burton, during your --

20  how long have you had -- enjoyed an attorney-client

21  relationship with this gentleman?

22          MS. BURTON:  Since October of 2012, Your Honor.

23          THE COURT:  And during the course of that time, have

24  you found him to be competent, clear headed and able to

25  understand and communicate with you effectively?

1      MS. BURTON:  Yes, I have, Your Honor.

2      THE COURT:  Okay.  Mr. Caskey, how long have you

3  represented --

4      MR. CASKEY:  Same amount of time, Your Honor.

5      THE COURT:  And same question.  During the course of

6  your representation have you found him to be competent, clear

7  headed and able to understand the gravity of what you were

8  talking about and communicating with him?

9      MR. CASKEY:  Yes.

10      THE COURT:  Okay.  No questions in your mind about

11  his competence; is that fair?

12      MR. CASKEY:  None.

13      THE COURT:  Is that fair, Ms. Burton?

14      MS. BURTON:  That's fair, Your Honor.

15      THE COURT:  All right.  So you -- you haven't been

16  taking this medication since you've been in jail.  How has

17  that changed you?

18      THE DEFENDANT:  Well, being in jail it's like being

19  on a submarine.  It's really you see the same people every

20  day.

21      THE COURT:  Sure.

22      THE DEFENDANT:  So I was comfortable.

23  Unfortunately, that's really a horrible metaphor, but I was

24  comfortable like I was on a submarine.

25      THE COURT:  Okay.

1          THE DEFENDANT:  You see the same people do the same

2     thing, the same routine on day in day out.  It's just like

3     being underwater on a submarine.

4          THE COURT:  So the jail experience changes you in

5     many ways in a social way, perhaps in other ways?

6          THE DEFENDANT:  That's correct.

7          THE COURT:  But the fact you're not taking your

8     medication you can't tell any real difference in that?

9          THE DEFENDANT:  I hide it very well in jail.

10         THE COURT:  Okay.  What difference is it since you

11    stopped taking the medication?

12         THE DEFENDANT:  Well, I talk less.  I'm only

13    engaging in games that -- play games that require forethought

14    and strategy.  I don't play simple card games.

15         THE COURT:  Okay.

16         THE DEFENDANT:  It's either chess or something, some

17    advance form of games.

18         THE COURT:  Okay.

19         THE DEFENDANT:  And I -- I study a whole lot more,

20    you know, a lot of reading and active with just workbooks and

21    mental puzzles and things like that.

22         THE COURT:  Sounds like you're more productive?

23         THE DEFENDANT:  It would appear to be so.

24         THE COURT:  Okay.

25         THE DEFENDANT:  I had a really fantastic life before

```
1    jail, so...
2              THE COURT:  Very good.  You've had a chance, I know,
3    Mr. McKinney, just from previous dealings with you, to go over
4    this superseding indictment with your attorneys; true?
5              THE DEFENDANT:  That's correct, sir.
6              THE COURT:  And as a person who's awaiting trial and
7    preparing for trial, is it fair to say that you've studied
8    this indictment and you have had a chance to spend a lot of
9    time and talk to your attorneys about this indictment; is that
10   true?
11             THE DEFENDANT:  That's true.
12             THE COURT:  Do you have any questions about this
13   indictment you'd like to ask me?
14             THE DEFENDANT:  No, sir.
15             THE COURT:  Let's go -- well, first, let me -- let's
16   talk about your attorneys.  Mr. Louis Caskey and Ms. Stephanie
17   Burton, they've represented you for quite some time in this
18   case; is that right?
19             THE DEFENDANT:  Yes.  Yes, sir.
20             THE COURT:  How long has that been?
21             THE DEFENDANT:  Since October.
22             THE COURT:  October 2000?
23             THE DEFENDANT:  Three months.  Four months right
24   now.  October 13th, I believe.
25             THE COURT:  October 13th, 2012?
```

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And are you satisfied with their

3   representation?

4          THE DEFENDANT:  I am, sir.

5          THE COURT:  Do you have any complaints about

6   anything they did do or did not do on your behalf?

7          THE DEFENDANT:  Well, not now.  I expected trial to

8   be somewhat closer to what I saw on TV where there's a little

9   more defense and whatnot.  But that was my expectations, which

10  you warned the jury about yesterday.  And but I am satisfied

11  in every degree of their -- their representation of me.

12         THE COURT:  Okay.  And it's fair to say,

13  Mr. McKinney -- and that's a good point you make, I think.

14  That you had certain expectations how a trial would work, and

15  because you're not in trial a lot and you're not in court a

16  lot, what you saw was not consistent with your expectations?

17  It was different?

18         THE DEFENDANT:  That's correct.

19         THE COURT:  But that wasn't something that

20  Mr. Caskey or Ms. Burton had control of?  It's more a function

21  of how the court system works; you understand that?

22         THE DEFENDANT:  I understand.

23         THE COURT:  So when I asked the question, if you

24  have any complaints about anything they did or did not do, you

25  really don't have any complaints?

1           THE DEFENDANT:  I have no complaints.

2           THE COURT:  Have they spent sufficient time with you

3    to talk to you about your case, your options, your plea, your

4    defenses?

5           THE DEFENDANT:  Yes.

6           THE COURT:  Now, there have been other attorneys who

7    have helped you with this case; is that true?

8           THE DEFENDANT:  I would -- I wouldn't say help.

9           THE COURT:  Okay.  Let's talk about that.

10          THE DEFENDANT:  But there were attorneys appointed.

11          THE COURT:  Who else have been involved -- what

12   other attorneys have been involved in your case?

13          THE DEFENDANT:  Daniel J. Ross, LLC.  He was the

14   first paid attorney.

15          THE COURT:  Daniel J. Ross.  Who else?

16          THE DEFENDANT:  Ronna Holloman-Hughes.  R-O-N-N-A.

17   Holloman-Hughes of the public defender's office.

18          THE COURT:  Sure.  Who else?

19          THE DEFENDANT:  That's all before these two.

20          THE COURT:  And those two are not -- they're not

21   connected or associated together in the practice of law?  One

22   of them is a public defender, Ms. Hughes --

23   Ms. Holloman-Hughes, and the other is Mr. Ross, who you hired;

24   right?

25          THE DEFENDANT:  That's correct.

1      THE COURT: Okay. Let's talk about these attorneys.

2  Are you satisfied with their work?

3      THE DEFENDANT: No, sir.

4      THE COURT: Okay. With neither one of them?

5      THE DEFENDANT: Neither one.

6      THE COURT: Okay. And tell me -- let's talk about

7  Ms. Hughes, ladies first, since she was the first one to

8  represent you. What complaints do you have about her work,

9  her services?

10      THE DEFENDANT: Ms. Hughes -- it appeared Ms. Hughes

11  was unwilling to visit and share any discovery, which has been

12  my chief complaint from the beginning of this. And she also

13  entered into an agreement for a continuance 23 days before she

14  even spoke to me in any direction. And say lack of

15  communication, contact with the public defender's offices.

16  Insanely difficult.

17      THE COURT: Okay. And so there's some different

18  parts of this, but mainly failure to communicate with you in

19  what you felt like was an important way, in a meaningful way;

20  is that fair?

21      THE DEFENDANT: That's fair.

22      THE COURT: Let's talk about -- any other complaints

23  about Ms. Holloman-Hughes before I leave that?

24      THE DEFENDANT: No, sir.

25      THE COURT: Next let's talk about Mr. Ross, because

1    I remember you and I had a hearing I think on May 30th --

2           THE DEFENDANT:  That's correct.

3           THE COURT:  -- with Mr. Ross.  What are your

4    complaints about Mr. Ross?

5           THE DEFENDANT:  Mr. Ross lied to me, just straight

6    out.

7           THE COURT:  Okay.

8           THE DEFENDANT:  Just straightforward he lied to me.

9           THE COURT:  Can I ask you what he lied to you about?

10          THE DEFENDANT:  The discovery, the availability of

11   the discovery.  He lied about witness statements, what he

12   perceived to be witness intentions.  He lied about his

13   communication with the prosecutor.  He lied to me about

14   elements of the case.  He lied about visitation, his frequency

15   of visitation.  And I expected to see him on some days, he

16   promised, and never showed up.  And he lied about how much

17   money I owed him is pretty much.

18          THE COURT:  There was an issue about money?

19          THE DEFENDANT:  Yes.  His fee was paid up-front.

20   Contractually he was supposed to represent me through trial

21   and whatnot.  And at the end of his -- at the termination of

22   his services he requested more money.

23          THE COURT:  Okay.

24          THE DEFENDANT:  Just prior to.

25          THE COURT:  So if we look at both of those -- let's

1    talk about Ms. Holloman-Hughes, your complaints about her.

2    How the -- how has that affected the -- has that prejudiced

3    you in some way in the outcome of this case today?

4             THE DEFENDANT:  No, it hasn't.  Because I understand

5    that all the attorneys are -- wouldn't be attorneys if they

6    didn't want to be attorneys.  And the public defender's office

7    is incredibly busy, and I expected they wouldn't be able to

8    match five faces to five files.  It doesn't negate my

9    experience with the trial court in any direction whatsoever.

10            THE COURT:  Okay.  What about Mr. Ross, his -- the

11   issues related to what you perceive is his truthfulness with

12   you, the issues related to your relationship financially, has

13   any of that prejudiced your case or changed the outcome of how

14   this case would be disposed of today, do you think?

15            THE DEFENDANT:  Yes.

16            THE COURT:  Okay.

17            THE DEFENDANT:  If I had of been informed of the

18   discovery -- if I had seen the discovery earlier, I would have

19   been able to make a decision a long time ago pertaining to

20   this.  And at this stage, it -- it really looks like I've

21   wasted the Court's time.  That's what it looks like.

22            THE COURT:  You know, first, let me say this to you,

23   Mr. McKinney.  This thing that we talk about here, that

24   Mr. Caskey, Ms. Burton, Mr. Casey, Mr. Daly and that I talk

25   about, this -- these -- this Constitution, about your rights

1    at trial, I don't think anybody is going to begrudge, and I'm

2    not going to begrudge you your right to exercise trial right.

3    And so I understand that you're telling me now if you had have

4    saw this discovery sooner, you would be -- you'd have pled

5    guilty earlier; is that what you're telling me?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  Okay.  Now, you saw it with Mr. Caskey

8    and Ms. Burton, though; right?

9            THE DEFENDANT:  That's right.

10           THE COURT:  Three months ago.  And didn't you and

11   your clients entertain plea -- plea offers from the -- from

12   the government, at least a short period of time?

13           THE DEFENDANT:  We did.  But that's -- I didn't

14   accept that plea at that time because I had not finished

15   reviewing the rest of the discovery.

16           THE COURT:  Okay.

17           THE DEFENDANT:  And I don't know if that's because

18   there was stuff still coming, the -- the prosecution was still

19   doing their investigation.  And not that Mr. Caskey or

20   Ms. Burton didn't make it available to me.  As soon as they

21   got something it became available to me.  But I didn't have

22   enough information at that time, even six weeks ago to make a

23   decision about this or not at all to accept a plea.

24           THE COURT:  So you're -- this would have been

25   different in that you would have pled guilty earlier; right?

1          THE DEFENDANT:  If I had of known what I know

2    today --

3          THE COURT:  You would have pled guilty?

4          THE DEFENDANT:  -- I would have did this -- I would

5    have been done with this a long time ago.

6          THE COURT:  Okay.  Anything else how this has --

7    this -- Mr. Ross's conduct has prejudiced your case?

8          THE DEFENDANT:  No.  As far as Mr. Ross is

9    concerned, nothing.

10         THE COURT:  Anything else about Ms. Holloman-Hughes?

11         THE DEFENDANT:  No, sir.

12         THE COURT:  Okay.  Mr. Casey, do I need to ask any

13   other questions about this particular area?

14         MR. CASEY:  I don't believe so, Your Honor.

15         THE COURT:  Okay.  Okay.  All right.  Now, while

16   Mr. Caskey and Ms. Burton I think can give you good legal

17   advice, they -- there's one thing they can't do for you, they

18   can't decide for you to plead guilty.  That has to be one

19   person's decision and one person's decision alone.  And I'm

20   looking at him; right?  Mr. McKinney, you are the only one who

21   can make that decision.  I hoped you've listened to Mr. Caskey

22   and Ms. Burton.  I hope you've considered their professional

23   advice, but it has to be your decision to plead guilty.  Is it

24   your decision and your decision alone to plead guilty here

25   today, sir?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right.  I want to go through this

3   with you.  Do you have the indictment with you?

4          MS. BURTON:  I do, Your Honor.

5          THE COURT:  All right.  Let's go through this

6   together.  Count 1 of the indictment, I'm going to read this,

7   and the only reason I'm reading this is so you and I are on

8   the same page and you don't have any questions.  Okay?

9          THE DEFENDANT:  Thank you.

10          THE COURT:  So this is for your benefit.  So ask me

11   any question you have about this.  Count 1, you're pleading

12   guilty to, it says, of the superseding indictment, that says

13   on or about September 30th, 2010, said date being approximate,

14   in the Western District of Missouri and elsewhere, Corey

15   Monroe McKinney, defendant herein, did employ and use a minor,

16   child victim, who we now know -- who had testified here.

17   They're referring to Ms. Courtney Hill; right?  To engage in

18   sexually explicit conduct for the purpose of producing a

19   visual depiction of such conduct, and the visual depiction was

20   produced using materials that have been mailed, shipped, or

21   transported in interstate commerce -- in foreign or --

22   interstate or foreign commerce by any means, including by

23   computer as contained in a video file, entitled "3 the hard

24   way.wmv", all in violation of Title 18, United States Code,

25   Sections 2251(a) and (2).

1          That's what you've decided to plead guilty to here

2    today.  Do you have any questions about the nature of that

3    charge?

4          THE DEFENDANT:  No, sir.

5          THE COURT:  Okay.  You understand that that is Count

6    1?  That is a way to describe that count is production of

7    child pornography.  You understand that the punishment is not

8    less than 15 years, not more than 30 years imprisonment?

9    That's the statutory range of punishment.  A fine of not more

10   than $250,000, and supervised release from five years up to

11   life, and this is a Class B felony.  Do you understand that?

12         THE DEFENDANT:  I understand.

13         THE COURT:  The range of punishment is also on the

14   front page of the indictment; right?  Any questions about

15   Count 1?

16         THE DEFENDANT:  No, Your Honor.

17         THE COURT:  All right.  Let's move to Count -- it's

18   Count 6 on this indictment, but we're calling it Count 5, like

19   I said, so we wouldn't confuse the jury; right?  So but look

20   to Count 6 of the indictment.  Count 6 of the indictment is

21   sex trafficking of a child is what it's called.  Between on or

22   about March 23rd, 2011, and on or about April 7th, 2011, said

23   dates being approximate, in the Western District of Missouri

24   and elsewhere, Corey Monroe McKinney, defendant herein,

25   knowing and in reckless disregard of the fact that child

1  victim, and once again, we're talking about Courtney Hill, had

2  not attained the age of 18 years and would be caused to engage

3  in a commercial sex act, did knowingly, in and affecting

4  interstate commerce, recruit, entice, harbor, transport,

5  provide, obtain, and maintain by any means, a person, namely

6  CV, child victim, same -- same young lady we talked about, and

7  benefitted financially and by receiving something of value

8  from participation in a venture which engaged in recruiting,

9  enticing, harboring, transporting, providing, obtaining, and

10  maintaining the child victim; all in violation of Title 18,

11  United States Code, Sections 1591(a) and (b)(2).

12          That is Count 6.  Do you have any questions about

13  the nature of Count 6?

14          THE DEFENDANT:  No, Your Honor.

15          THE COURT:  That's the count that you intend to

16  plead guilty to with Count 1; true?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Do you understand that Count 6 has a

19  range of punishment which is on the front of this superseding

20  indictment, which sets out that it is not less than 10 years,

21  not more than life imprisonment, not more than $250,000 fine,

22  and supervised release from 5 years to life, and this is a

23  Class A felony?  Do you understand the range of punishment

24  associated with that?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Okay.  Now, so what I -- have you had a

2     chance to talk to your attorneys about the sentencing

3     guidelines in this case or --

4          THE DEFENDANT:  No, sir.  I never expected to get

5     that far.

6          THE COURT:  Okay.  Let's touch base -- I want to

7     talk to you a little bit about those.  One of the first -- in

8     the federal court system we have what's called the sentencing

9     guidelines.  And these are guidelines set out by the United

10    States Sentencing Commission, which looks at a number of

11    things, which looks -- we calculate what's called a total

12    offense level.  So these crimes would be looked at by the

13    United States probation office.  They usually calculate these

14    for us.

15         They will look at this -- these crimes, and

16    determine the total offense level.  Other things we'll look at

17    is what's called relevant conduct.  Relevant conduct is

18    conduct that's related to this, these crimes, that even though

19    you're not pleading guilty to other counts, they'll be

20    considered as what we call relevant conduct in calculating the

21    guidelines.

22         So we'll calculate these guidelines.  It will give

23    us a total offense level.  In fact, Ms. Burton, why don't

24    you -- why don't you -- so to illustrate this I'm going to

25    hand to you my guidelines manual, which is the 2012, the

1    current edition.  And why don't you show him the sentencing

2    table, just so he gets a picture of this.  Okay?

3              MS. BURTON:  Yes, Your Honor.

4              THE DEFENDANT:  I've seen this before.

5              THE COURT:  So basically what happens is, we get a

6    total offense level, Mr. McKinney.  And that is represented on

7    the left side of that page; right?  And then we get a criminal

8    history category.  We look at your criminal history, and I --

9    I don't know your criminal history.  I think some of the

10   filings suggested you had a couple misdemeanors maybe?

11             THE DEFENDANT:  No.  None.  I have a zero criminal

12   history, sir.

13             THE COURT:  Okay.  So what will happen is we'll

14   conduct an investigation; right?  And we'll determine what

15   criminal history you have.  You have zero.  You'll be a

16   criminal history category I; right?  And so that will work on

17   the table, and it will go with the total offense level.

18             Now, I got to tell you, as you might imagine, you're

19   pleading guilty to a Class A felony and a Class B felony, the

20   total offense level is generally pretty high; right?  So

21   that's -- that's how we -- and you can see where the months

22   are.

23             If you go down criminal history category I, say you

24   go to -- to one of these in the lower end, those are months,

25   is what that represents, a range of months.

1          Now, these are sentencing guidelines.  These are

2   advisory.  These are things that the Court considers; right?

3   We also have the statutory range of punishment, which I've

4   read to you and you said you understand it or related to each

5   of the counts; right?

6        (Mr. Daly present.)

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  That's called the statutory range of

9   punishment.  Once we calculate the guidelines, that's a

10  exercise we undertake.  Ms. Burton will have thoughts about

11  that, I'm sure, Mr. Caskey, the prosecutor will have thoughts

12  about that.  While I'll have respect for their positions, it's

13  generally my job to do that; right?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  And sometimes I agree with everybody,

16  and sometimes I disagree with everybody.  I can't tell you how

17  this is going to work out until we conduct our presentence

18  investigation; right?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  I always tell people, please cooperate

21  with the report writer so we can get an accurate and clear

22  picture of -- of you in this case, so we can calculate the

23  guidelines correctly, because that's part of my job is to do

24  this correctly.  So I'll look at these guidelines, I'll

25  calculate them after I hear any objections, and then I'll

1    consider whether or not I follow the guidelines.

2          Now we know in your case, you know, Mr. McKinney,

3    I've got to be honest with you, you've got a 15 year not less

4    than; right?  On Count 1.  So I know at least you're going to

5    get 15 years on this, because that's a statutory minimum;

6    right?  And on Count 6 it's a statutory minimum of 10 years.

7    So the guidelines will take that in consideration; right?

8    They won't go lower than the 15 years generally.  They'll --

9    if it does, it will be adjusted up to 15 years.  Do you

10   understand that?

11         THE DEFENDANT:  I understand.

12         THE COURT:  Okay.  So these guidelines are things

13   that attorneys fuss about, and judges fuss about.  But once we

14   calculate them, that's something we consider, but we don't

15   necessarily have to follow.  It's part of the consideration.

16         Let me tell you something else judges think about.

17   We have a statute called 18 U.S.C. 3553(a).  In every case

18   I -- I have to consider the factors set out in that statute.

19   And let's talk about those factors.

20         I have a little cheat sheet I've used.  Factors such

21   as the nature and circumstances of this offense, factors such

22   as your history and characteristics, factors such as the need

23   that the sentence imposed should reflect the seriousness of

24   the offense, promote respect for the law, and provide just

25   punishment.  Those are some things we consider.

1          The need to afford adequate deterrence to criminal

2    conduct so the public knows that this conduct should be

3    deterred.  We shouldn't do this and people, you know, will see

4    what happens and won't commit these offenses.  To protect the

5    public from further crimes of the defendant.  To provide the

6    defendant with needed educational and vocational training,

7    medical care, other correctional treatment in the most

8    effective manner.  The Court has to consider other kinds of

9    sentences available, which your attorneys usually bring to my

10   attention.  I have to consider the sentencing guidelines.  I

11   have to consider any relevant policy statements made by the

12   Sentencing Commission.  The need to avoid unwarranted

13   disparity in other cases among defendants in similar -- with

14   similar records in similar cases.  Any need to provide

15   restitution.

16          Ultimately, the goal is to impose a sentence

17   sufficient but not greater than necessary to carry out and

18   comply with the purposes set forth in this statute.  Those are

19   the kind of things that the judges consider in every federal

20   case, not just yours, but every case we have.  Do you

21   understand that?

22          THE DEFENDANT:  I understand.

23          THE COURT:  And that's a matter of statute.  That's

24   the law.  That's what we have to consider.  That's what

25   Ms. Burton and Mr. Caskey will be talking about the next time

1    we meet.

2            So you -- you understand that once we calculate

3    these sentencing guidelines, that I can go below them, I can

4    go above them, as long as I stay within the statutory range of

5    punishment.  You understand that?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  Okay.  Do you have any questions about

8    these guidelines?

9            THE DEFENDANT:  I just want to know what would be my

10   family's role in the sentencing process?

11           THE COURT:  Well, that kind of depends upon you and

12   your attorneys, and, you know, if they -- I hear sometimes --

13   I hear testimony from mothers and fathers and people like that

14   sometimes in the sentencing process.

15           THE DEFENDANT:  Okay.  Thank you.

16           THE COURT:  And I will tell you, that I read every

17   letter I get.  I get a lot of letters.  I read them all and I

18   consider all of that in this, certainly.

19           THE DEFENDANT:  All right.  Thank you.

20           THE COURT:  That's part of your history and

21   characteristics is what people who care about you tell me;

22   right?

23           Any other questions about this -- how we do this?

24   As you can see, it's a thick book; right?

25           THE DEFENDANT:  It is.

1          THE COURT:  And you can see the thicker the book is

2     the more likely lawyers and judges argue about these things;

3     right?  There's more room to fuss at each other about these.

4     Sometimes we agree with them, sometimes we don't; right?

5          Okay.  Now, you have a plea agreement in this case,

6     I'm told.  And it's my understanding, and I'm going to let you

7     look at that here in just a minute.  This plea agreement, it's

8     basically -- the form is you have a choice if you want to

9     plead guilty.  You can plead guilty to all the counts if you

10    want to; right?  Or without any deals.  Or you can plead

11    guilty to two counts, the two we talked about, but you have to

12    give up something in that; right?

13         THE DEFENDANT:  I understand.

14         THE COURT:  You have to give up, one of the things

15    is an appeal waiver, where you can't waive -- you can't appeal

16    your case and also you're waiving your right to the rest of

17    the trial; correct?

18         THE DEFENDANT:  Correct.

19         THE COURT:  Do you understand that?

20         THE DEFENDANT:  I do.

21         THE COURT:  Is that what you want to do?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  I'm going to give you about 15 minutes

24    to look at this thing.  Otherwise, if you need more time,

25    that's fine.  But we're going to continue with the trial; you

1    understand that?

2              THE DEFENDANT:  I understand.

3              THE COURT:  And so what do you think, Mr. Caskey?

4              MR. CASKEY:  I think we've got the -- I don't want

5    to speak for the U.S. Attorney.

6              Are you going to run a clean copy?

7              MR. DALY:  We have a copy right here.  He can look

8    at it.  We're going to run copies of it here in a second.

9              THE COURT:  I have more things I can talk to him

10   about.

11             MR. DALY:  Okay.  Sure.

12             THE COURT:  Okay?  So let's talk about -- I'm trying

13   to cover all the things that aren't in the plea agreement,

14   just so you and I can get those covered, then you can look at

15   the plea agreement if you want to.  Okay?

16             THE DEFENDANT:  Thank you.

17             THE COURT:  Now, this is -- we're doing this because

18   Mr. McKinney wants to do this; right?  This isn't my idea,

19   your attorney's idea, or the government's idea.  This is what

20   you want to do; correct?

21             THE DEFENDANT:  Correct.

22             THE COURT:  And are you pleading guilty today

23   because you are guilty of those two counts?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Now, you understand you're pleading to a

1    felony offense?

2              THE DEFENDANT:  That's correct.

3              THE COURT:  Have you ever been convicted of a felony

4    before?

5              THE DEFENDANT:  No, Your Honor.

6              THE COURT:  You understand as a convicted felon you

7    lose valuable civil rights, among those rights are your rights

8    to vote, your right to hold public office, your right to serve

9    on a jury, and your right to possess a firearm.  Do you

10   understand that?

11             THE DEFENDANT:  I understand.

12             THE COURT:  Let's talk about your -- one of the

13   things you're going to look at is a paragraph in here about

14   your waiver of appellate and post-conviction rights.  Let's

15   talk about those.  By waiving your rights in this case, you're

16   waiving your appellate rights to appeal this case or file a

17   post-conviction motion.  You understand that?

18             THE DEFENDANT:  I understand.

19             THE COURT:  There are three things you can't waive,

20   even if you wanted to, you can't waive illegal sentence, you

21   can't waive ineffective assistance of counsel, or

22   prosecutorial misconduct.  But in all other regards it's

23   going -- it's your decision to waive your right to appeal the

24   case; true?

25             THE DEFENDANT:  True.

1          THE COURT:  Also your rights to trial, which you

2     know a little bit about, because we're in the middle of a

3     trial; right?  Let's talk about your trial rights.  You have a

4     right to enjoy the presumption of innocence before a jury,

5     which we've talked about with the jury already.  You have a

6     right to require the government to prove their case beyond a

7     reasonable doubt each element of the offense.  You have a

8     right to have your attorneys assist you in your defense and --

9     and present evidence, if you so choose, cross examine

10    witnesses and test the government's evidence.  You have a

11    right to use the Court's subpoena power to get your witnesses

12    here in the courthouse.  You have a right to testify in your

13    own defense if you chose -- if you choose to do so, or

14    alternatively, you have a right against self-incrimination,

15    which means you wouldn't have to testify and no negative

16    inference could be drawn from that.

17          You have a right -- let's see.  What else?  To have

18    a jury decide whether or not you're guilty or not guilty in

19    this case.  You understand that?  Any questions about those

20    important rights?

21          THE DEFENDANT:  No, Your Honor.

22          THE COURT:  Okay.  Do you have a clean copy yet?

23          MR. DALY:  It's coming up right now.  Let me go

24    track it down.

25          THE COURT:  Okay.  Then let's have the government

1    make their factual basis then.  Who wants to do that for us?

2              MR. CASEY:  I'll go get -- Mr. Daly will do that.

3              THE COURT:  Mr. Daly, let's talk about Count 1.

4              MR. DALY:  Okay.

5              THE COURT:  If this case would be complete -- if we

6    would complete this case -- I know we're partially through it

7    -- what would the government's evidence be?

8              MR. DALY:  The government's evidence -- and I'll

9    recap.  Some of the evidence has been presented already.

10              THE COURT:  Sure.

11              MR. DALY:  So thus far at trial we have actually

12    played the video 3 the hard way.wmv, and that is a video that

13    was recorded on a computer using a computer and a webcam owned

14    by this defendant.  Further facts offered at trial would show

15    that the computer was an HP computer owned by the defendant,

16    and was obtained at his residence at 112 Oak street, Apartment

17    203.  That materials within that computer had been previously

18    mailed, shipped or transported in interstate or foreign

19    commerce.  It was -- that video was produced using those

20    materials, i.e., the computer, which was an HP computer, the

21    hard drive itself where the file was saved on as it was being

22    produced with the webcam.

23              The hard drive was going to be shown to have been a

24    product of Thailand.  Imported from Thailand.

25              And essentially that on or about September 30th,

1    2010, the video in question, 3 the hard way.wmv, as indicated

2    from previous testimony from the child victim, did depict --

3    was a visual depiction of sexually explicit conduct between

4    the child victim and the adult defendant here in this case,

5    Corey Monroe McKinney.  The child victim has already testified

6    that she was under the age of 18 at the time, that the

7    defendant was in full knowledge of that.  Essentially, there

8    was subsequent videos as well created.

9            Count 2, which is being dismissed, speaks of a video

10   that was recorded with a Sony camcorder at that same time of

11   that same sexual activity.  Again, these were all produced at

12   his apartment using materials that had been previously

13   shipped, transported or mailed in interstate or foreign

14   commerce by any means.

15           Moving forward.

16           THE COURT:  If that's -- if you're done with Count

17   1.

18           MR. DALY:  That's Count 1.  That's the factual --

19           THE COURT:  Let's do these one at a time, just so

20   the judge doesn't get confused and Mr. McKinney is on track

21   with us.

22           MR. DALY:  Absolutely.

23           THE COURT:  So Count 1, Mr. McKinney, and we've read

24   it to you, basically you're admitting that, first, you knew

25   that the child victim in here -- in this case, and when we say

1     child victim, we're talking about Courtney Hill; correct?

2            THE DEFENDANT:  Correct.

3            THE COURT:  That you knew she was 16 years old?

4            THE DEFENDANT:  Yes.

5            THE COURT:  And that you in -- in -- as far as this

6     one video, 3 the hard way, that you had committed sex acts

7     with her?

8            THE DEFENDANT:  Correct.

9            THE COURT:  And that you recorded these in video

10    format?

11           THE DEFENDANT:  Correct.

12           THE COURT:  And you did this using materials, and

13    you probably don't know the origin -- countries of origin.

14    The government says that they can prove these were

15    manufactured in other states and in other countries.  You

16    understand that?

17           THE DEFENDANT:  Yes.

18           THE COURT:  And you -- you don't have any reason to

19    contest that and you would agree to that; is that fair?

20           THE DEFENDANT:  That's fair.

21           THE COURT:  And you created this video and that you

22    had it, and I guess you just possessed it basically; right?

23           THE DEFENDANT:  Correct.

24           THE COURT:  And that was for your own personal use?

25           THE DEFENDANT:  That's right.

1          THE COURT: Okay. Did we cover everything?

2          MR. DALY: There may be some -- some to supplement,

3   Your Honor. Just want to make sure I used the word -- the

4   term very vague, sex acts. And I want to spell that out

5   specifically. Portions of the video were shown to the jury

6   while Courtney Hill was testifying. The first part of the

7   video shows the setup of the video and the recording and the

8   knowing awareness of the people on the video that it's being

9   recorded. In the initial part, in about a minute, minute and

10  a half into the video shows this adult defendant performing

11  oral sex, specifically on the minor victim, child victim

12  Courtney Hill, and again at the time, she was underage. She

13  testified that that's what was happening. He was actually

14  performing on camera oral sex on her.

15         Various brief segments of that video was also shown

16  separately. There was also another adult in that video that

17  was also engaged in various sexual activity, genital to

18  genital, mouth to genital contact within that video. Again,

19  we showed a small segment of it, but the entire video shows

20  extensive contact and visual depictions of sex acts, all of

21  which are defined as sexually explicit conduct under Title 18,

22  United States Code, Section 2256. And again, he knowingly

23  produced those visual depictions using those materials.

24         THE COURT: Okay. Mr. McKinney, do you agree --

25  just the sex acts part, that these were the sex acts that you

1    committed and that you and that the other adult and the other

2    child -- and the child committed together?

3              THE DEFENDANT:  Correct.  I agree with that.

4              THE COURT:  We saw it; right?

5              THE DEFENDANT:  Right.  I was just wondering if

6    Mr. Daly was beating a dead horse.  I just admitted that

7    stuff.

8              THE COURT:  Well, in fairness to Mr. Daly, and

9    lawyers tend to beat dead horses.  That's usually my line, to

10   be honest with you, Mr. McKinney.  But I know that the lawyers

11   want to make sure they get everything correct since we do have

12   a jury here.  They want to make sure that we covered all our

13   bases.

14             THE DEFENDANT:  He also said 2256.  It should be

15   2251, for the record.

16             THE COURT:  Yeah.  Yes.

17             MR. DALY:  If I may, 2251 is the -- is the charging

18   portion of that.  2256 is the actual statutory definition

19   referenced.

20             THE COURT:  That defines the sex acts.

21             THE DEFENDANT:  Okay.  But I'm pleading to 2251.

22             THE COURT:  What happens is -- that's a good point,

23   Mr. McKinney.  Thank you.  2251 is the statute.  These

24   statutes refer to other things.  Like within this Title 18,

25   they have definitions; right?

1          THE DEFENDANT:  Correct.

2          THE COURT:  And they say this -- a sex act is, and

3     they lay it out.  And so that's 2256.

4          THE DEFENDANT:  Okay.

5          THE COURT:  It's a definitional statute, even though

6     all the statutes aren't referenced in the charging document.

7     You understand that?

8          THE DEFENDANT:  I understand.

9          THE COURT:  Okay.  So let's talk about Count 6,

10    though, first.  Let's get Count 6 since we're on a roll here.

11         MR. DALY:  Okay.

12         THE COURT:  Would you state for the record what you

13    believe the evidence would be in Count 6?

14         MR. DALY:  Yes, Your Honor.  And again, we --

15         THE COURT:  And I don't want you to look at that

16    yet.

17         THE DEFENDANT:  Okay.

18         THE COURT:  I want to do count 6.  Go ahead.

19         MR. CASKEY:  Okay.

20         MR. DALY:  Count 6 specifically charges that between

21    March 23rd, 2011, and April 7th, 2011, here in the Western

22    District of Missouri, specifically Kansas City, Missouri, the

23    defendant did at the time, knowingly in and affecting

24    interstate commerce, recruited, enticed, harbored,

25    transported, provided, obtained, and maintained, by any means,

1  specifically Courtney Hill, who is a resident here of

2  Missouri, whose identity was disclosed to the grand jury and

3  here at trial, from -- and that he did so in reckless

4  disregard of the fact, knowing that she had not engaged -- had

5  not attained the age of 18 years and that she was 16 years at

6  the time, would be caused to engaged in a commercial sex act,

7  all in violation of Title 18, United States Code, Sections

8  1591(a) and (b)(2).

9          Essentially the evidence offered at trial, Your

10  Honor, was, again, he -- she was living with him, so he was

11  harboring her.  He had recruited her into this scheme, by

12  which she, being a 16 year-old female, young minor, would be

13  caused to engage in a sex act with a man for which she would

14  receive compensation, he would receive compensation, things of

15  value.  And certainly we have offered evidence and we've heard

16  evidence that she earned a hundred dollars immediately for,

17  you know, earning it.  She had earned it for the sex act with

18  him.

19          That this overall -- again, he had provided her to

20  do this, that she did so -- although she was initially moving

21  forward with the idea of having sex with -- with this adult

22  victim, A.J. Russell, it was the defendant who introduced the

23  idea of make money off of this sex act that she had.

24          We also heard expert testimony that described

25  this -- this facilitation, this arrangement, this sort of

1    grooming process that's consistent with other human

2    trafficking endeavors in which a commercial sex act occurs, a

3    minor female would obtain money, and there's some distribution

4    with the person that provides that person.  So we feel that we

5    had offered enough evidence to demonstrate factually, up 'til

6    this point, and would going forward, that this -- this is a

7    classic trafficking situation in which a thing of value was

8    exchanged for the sex act.

9             THE COURT:  Okay.  Let's talk about Count 6.  And

10   you heard the statement made by the United States attorney.  I

11   just want to cover the elements with you here.  So it is the

12   Count 6 that you decided to plead guilty to is the other count

13   that -- and this is sex trafficking of a child.  And basically

14   the evidence we heard so far, at least, is that you had this

15   young lady living with you; right?

16            THE DEFENDANT:  That's correct.

17            THE COURT:  And that during the course of this

18   relationship, from the time she was 14 to 16 that you two

19   engaged in sexual acts together?

20            THE DEFENDANT:  That's correct.

21            THE COURT:  That at some point, during the course

22   when she was 16, that you -- she made contact with

23   Mr. Russell, and you -- and -- and the victim -- child victim

24   talked about getting money from Mr. Russell; true?

25            THE DEFENDANT:  That's correct.

1          THE COURT:  And so the first payment -- so she had

2  sex with Mr. Russell.  You were in the closet during that

3  time; true?

4          THE DEFENDANT:  That's correct.

5          THE COURT:  And you were also taping this on a

6  webcam at the time?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  And then we saw a video at the end of

9  this sex act, which took place over an hour, you came out and

10  pressed stop and stopped the recording of the webcam because

11  the sex act was over; is that true?

12          THE DEFENDANT:  That's correct.

13          THE COURT:  And then this was going to be used for

14  commercial purposes; right?  You were going to get money from

15  Mr. Russell in exchange for this video; is that true?

16          THE DEFENDANT:  Yes.

17          THE COURT:  And the first amount you got was $100,

18  and she testified that you gave it to her because she earned

19  it; is that true?

20          THE DEFENDANT:  Yes.

21          THE COURT:  And so but there's another amount, a

22  $500 amount, and her testimony was that you're going to get

23  your brakes fixed, and that the rest would go to her.  So

24  there was a commercial benefit, there was a money -- monetary

25  benefit to you and to her in this; is that true?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And all of this happened in the Kansas

3    City metropolitan area, the Missouri side; true?

4          THE DEFENDANT:  Correct.

5          THE COURT:  Did I cover it, Mr. Daly?

6          MR. DALY:  I believe so, Your Honor.  I think that

7    covers every element of the charge.

8          THE COURT:  Okay.  So here's what we're going to do.

9    Here's the deal.  I want you to take your time.  Look at this,

10   Mr. McKinney.  And we may have to do this tonight.  Because,

11   like I said, we're getting close to putting that jury back to

12   work.  But I'm going to give you 20 minutes to look at this.

13   If that's not enough time, that's fine.  We're going to

14   continue with the trial, and you can look at this tonight

15   before you sign it.

16         I'm not here to twist your arm or talk you into

17   anything, but I am not going to keep this jury waiting, and I

18   want to make sure that we get this all covered before I

19   release them.  You understand that?

20         THE DEFENDANT:  Yes.

21         THE COURT:  So I'm going to give you 20 -- yes,

22   Mr. Daly?

23         MR. DALY:  Really brief, Your Honor.  Preceding the

24   sex act the way it was facilitated and the way the

25   communications occurred, it was facilitated on the Internet,

1    over Facebook, via text message, and subsequently the payment

2    was also conveyed using those means.  Those are all means of

3    in and affecting interstate commerce.  I want to make sure we

4    get that.

5              THE COURT:  Sure.  That's a good point.  That's a

6    good point.  And the deal is you're using text messages and

7    you and Ms. Hill together are using text messages and the

8    Internet to help you facilitate this; right?

9              THE DEFENDANT:  Yes.

10             THE COURT:  And you agree with that?

11             THE DEFENDANT:  I agree.

12             THE COURT:  Do you agree with what the prosecutor

13   said in this?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Okay.  Anything else, Mr. Daly?

16             MR. DALY:  No, Your Honor.

17             THE COURT:  We're going to take a 20-minute recess.

18   I'm going to give you a little bit longer.  And if you can't

19   get it done, that's all right, we're going to continue with

20   the trial.  But if you can, then we'll be done with this.

21   Okay?

22             MS. BURTON:  Your Honor, may I approach to give you

23   that back?

24             THE COURT:  Sure.  You know what, Ms. Burton, if you

25   want to keep that for a little while and go over that with

1    him, you're welcome to borrow that from me.

2          MS. BURTON:  All right.  Thank you.

3          THE COURT:  Thank you.

4          And Ms. Francis, will you let the jury know we're

5    going to need a little delay here?  Thank you.

6          And once again, I'll remind everybody in the

7    courtroom, please don't speak of this outside the courtroom,

8    because I have a jury who may be wandering around.  In

9    fairness to the defendant, I don't want them to hear about any

10   of this plea of guilty until it's all done, because I've not

11   accepted it yet.  Okay?  Thank you.

12        (Recess at 12:32 until 12:55 p.m.)

13        THE COURT:  Let's -- I'm sorry.  Let's have the

14   defendant and Ms. Burton come up here.  Let's talk.  And

15   Mr. Caskey, I don't want to leave you out, sir.  If you want

16   to come up, you're welcome to too.

17        Okay.  We've had about a -- by my calculations about

18   a 23 and a half minute break.  And Mr. McKinney, I told you

19   before we left I don't want you to rush into anything.  This

20   is a big decision.  Have you had a chance to review this plea

21   agreement?

22        THE DEFENDANT:  Yes, Your Honor, I have.

23        THE COURT:  Is this consistent, the spirit of this

24   plea agreement consistent with what you expected it to be as

25   far as what you get and what they get --

1              THE DEFENDANT:  Yes.

2              THE COURT:  -- out of the deal; right?  And let's

3      talk about that.  In every plea agreement, generally there's

4      some level of compromise; right?  The government gives up

5      something, and they're giving -- dismissing counts.  How many

6      counts are you dismissing, Mr. Daly?

7              MR. DALY:  We're dismissing, in addition to the two

8      dismissed prior to trial, we're dismissing five counts today,

9      Your Honor.

10             THE COURT:  Okay.  So they're dismissing a number of

11     counts, and they're giving that up, and then you're giving up

12     some things; right?

13             THE DEFENDANT:  That's correct.

14             THE COURT:  I really want to focus on what you're

15     giving up.  Okay?  So paragraph 15, I'm sorry, 16, on page 13,

16     is the waiver of appellate and post-conviction rights.  We've

17     already talked about that.  But I want to go over it again

18     since now it's in writing.  And I'm required to go over this

19     with you, as a matter of fact, under Rule 11.  You're waiving

20     your right to appeal this case or file a post-conviction

21     motion.  You understand that?

22             THE DEFENDANT:  I understand, Your Honor.

23             THE COURT:  In all respects except for three,

24     prosecutorial misconduct, ineffective assistance of counsel,

25     or illegal sentence.  Do you have any questions about

1    paragraph 16?

2           THE DEFENDANT:  No.

3           THE COURT:  Okay.  Now, paragraph 3, page 2, have

4    you looked at that?

5           THE DEFENDANT:  Yes.

6           THE COURT:  So I just want you to understand what

7    paragraph 3 is.  And it says this, but I just want to go over

8    it with you.  Basically you and the government are telling me,

9    this is what the facts of the case are.  This is the truth.

10   This is what happened.  You understand that?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Do you have any fusses or -- or fights

13   about paragraph 3?

14          THE DEFENDANT:  Besides Mr. Daly being slightly long

15   winded, no.

16          THE COURT:  Okay.  Very good.  So paragraph 3 is

17   what I'll accept as what you tell me is your -- your

18   representation of what actually happened in this case.  Those

19   are kind of the ones I usually cover with people, to be honest

20   with you.  But do you have -- you have read this entire plea

21   agreement?

22          THE DEFENDANT:  Yes, I have.

23          THE COURT:  And you've signed it to indicate to me

24   that you've read and you've understood it?

25          THE DEFENDANT:  Yes.

1        THE COURT:  Other than this plea agreement, have any

2   other promises or agreements been made to you to cause you to

3   enter a plea of guilty?

4        THE DEFENDANT:  No.

5        THE COURT:  Has anyone threatened or abused you or

6   your family to cause you to enter a plea of guilty?

7        THE DEFENDANT:  No.

8        THE COURT:  Are you under the influence of any

9   drugs, alcohol or medicines we haven't discussed?

10       THE DEFENDANT:  No.

11       THE COURT:  Do you have any questions about anything

12  we've done so far, Mr. McKinney?

13       THE DEFENDANT:  No.

14       THE COURT:  Anything we've talked about, anything in

15  this plea agreement, anything at all, because now is the time

16  really?

17       THE DEFENDANT:  You know, normally I have hundreds

18  of questions if I need to, I don't have a problem asking, but

19  I don't have any questions at this time, Your Honor.

20       THE COURT:  Okay.  So let's talk about then your --

21  the counts you're pleading guilty to are Count 1.  Let me see

22  here.  And let's talk about -- first, let's back up a little

23  bit.  Superseding -- I mean, the sentencing guidelines, have

24  you had a chance to talk to Mr. Caskey and Ms. Burton about

25  the sentencing guidelines?

1          THE DEFENDANT:  Just a smidgen, briefly.

2          THE COURT:  Okay.

3          THE DEFENDANT:  I wanted to make sure I read all

4     those.

5          THE COURT:  Okay.  Let's cover that a little bit.

6     What questions do you have about those?

7          THE DEFENDANT:  There -- one of the charges carries

8     a offense level of 30 and the other I believe is 32.  Would I

9     fall automatically under the highest one?

10         THE COURT:  Well, what happens is, under the total

11    offense level part of this is what you're talking about, there

12    are a lot of different other things that add or subtract from

13    that; right?

14         THE DEFENDANT:  Correct.

15         THE COURT:  And I don't -- I would be doing you a

16    disservice if I told you -- if I tried to even estimate.  In

17    fact, you know what I tell people, Mr. Caskey I know I deal

18    with him from time to time in the federal court system, and

19    he's probably got a really good understanding of how this

20    works.  But even the most experienced lawyer in the federal

21    court system who says, "I think your guidelines will be this,"

22    I would tell you not to believe them.  Because all they can do

23    is give you an estimation.  And a lot of these people have

24    worked with the guidelines for years, but they're -- a lot of

25    these -- these change over time, and sometimes they're hard --

1   we don't always agree on them; right?  In the case the judge

2   is usually the wild card; right?  Because my job is to

3   calculate them, and I may not agree with the prosecution or

4   the defense on that.  I don't know.

5           So I don't want to make any representations to you

6   about how the guideline calculations are going to be, because

7   we let -- we first direct -- I will direct the probation

8   office to do that, and then we'll work from there.

9           THE DEFENDANT:  And I digress, Your Honor.  Thank

10  you.

11          THE COURT:  But that's a good question.  And I just

12  want you to know that they may -- your attorneys may have

13  said, hey, I think these are how the guidelines are going to

14  fall out, and hopefully they said this is an estimation;

15  right?  Because we don't know enough yet.  And we learn that

16  through the presentence investigation.  And that's a lengthy

17  undertaking, by the way.  And that's why I direct everyone to

18  cooperate so we can get a clear picture and you can help us

19  get a clear picture, and so we can make good decisions related

20  to guideline decisions; right?

21          THE DEFENDANT:  Thank you.

22          THE COURT:  Any other questions?

23          THE DEFENDANT:  No, Your Honor.

24          THE COURT:  Okay.  Let's do this officially.  To --

25  to Count 1 of this indictment, do you plead guilty or not

1    guilty?

2                THE DEFENDANT:  I plead guilty.

3                THE COURT:  To Count -- we've changed it to Count 5.

4    It was originally Count 6 in the superseding indictment;

5    right?  So there's a little confusion there.  It's the

6    original Count 6 is now Count 5.  Do you plead guilty or not

7    guilty?

8                THE DEFENDANT:  Guilty.

9                THE COURT:  Very well.  It is the finding of this

10   court in this case that this defendant, Corey Monroe McKinney,

11   is competent, clear headed and able to understand the nature

12   and consequences of this plea of guilty, and that this plea of

13   guilty is a knowing and voluntary plea of guilty based upon a

14   substantial factual basis.  And at this time, Mr. McKinney, I

15   will accept your plea of guilty and order a presentence

16   investigation in this case.

17               I'll accept your pleas of guilty to Counts 1 and

18   Count 6, and you'll be now adjudged guilty of those offenses.

19               Any questions about any of this, Mr. McKinney?

20               THE DEFENDANT:  No, Your Honor.

21               THE COURT:  Anything on behalf of the government at

22   this time?

23               MR. DALY:  No, Your Honor.

24               THE COURT:  Anything about -- on behalf of the

25   defendant at this time?

1              MS. BURTON:  No, Your Honor.

2              THE COURT:  Okay.  So at this time I'll remand you

3      back to the custody of the U.S. Marshal Service, and we'll

4      conduct a presentence investigation.  I would encourage you to

5      cooperate with the report writer.  Any questions,

6      Mr. McKinney?

7              THE DEFENDANT:  Is it at all possible that I can

8      give my mom a hug?

9              THE COURT:  That's up to the U.S. Marshal Service,

10     and they're saying no.  I'm sorry.  That's the rules.  I

11     apologize you can't do that.  But they're in charge of the

12     security.  I defer to them.

13             So at this time the attorneys can stick around, if

14     they choose to.  I'm going to go back and talk to the jury and

15     let them know you're out here if you want to talk to them and

16     give them that choice.  But I'm going to go talk to them first

17     in the jury room.  Okay?  Thank you.

18         (Proceedings concluded at 1:04 p.m.)

19                      C E R T I F I C A T E

20        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

21     THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22

23     /s/Regina A. McBride, RDR, CRR  March 1, 2013
       REGINA A. MCBRIDE, RDR, CRR        DATE
24     Official Court Reporter

25